**THE HONORABLE RONALD B. LEIGHTON**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GORDON HEMPTON,

               Plaintiff,

    v.

POND5, INC., A DELAWARE
CORPORATION; AND POND5 USER
CKENNEDY342, A CORPORATION OR
INDIVIDUAL OF TYPE UNKNOWN,

            Defendants.

No.:   3:15-cv-05696-RBL

**POND5, INC.'S MOTION FOR
SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:
May 13, 2016**

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - i
(3:15-cv-05696 RBL)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

## I.    INTRODUCTION

Defendant Pond5, Inc. ("Pond5") moves for summary judgment. Pond5 is an online, crowd-sourced marketplace for users to share media. Pond5 is entitled to summary judgment because it is protected under the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA"). The DMCA was enacted to promote the global digital online marketplace for copyrighted works. It achieved this stated goal by creating safe harbors for service providers hosting such marketplaces. Every day, Pond5 connects thousands of owners of copyrighted works with interested customers. Pond5 is precisely the type of entity that the DMCA protects.

## II.    STATEMENT OF FACTS

**A.    THE POND5 MARKETPLACE**

Pond5 operates www.pond5.com ("pond5.com" or "the Website"), an online platform and marketplace for producers of media to license and distribute content to third parties. (Declaration of Thomas Crary ("Crary Dec.") ¶ 1). Pond5 utilizes a crowd-sourced model, whereby artists and other media owners ("Contributors") from around the world upload a wide variety of digital media ("Content"). Once the media is uploaded, customers ("Customers") can obtain royalty-free rights to the media by purchasing a license. (*Id.*). Types of media uploaded to the Website include video, images, music, 3D models, and sound effects. (*Id.*).

Pond5 currently employs approximately 107 people, has approximately 58,000 registered Contributors, and offers around 20 million items of Content. (Crary Dec. ¶ 2). Contributors upload anywhere from one to tens of thousands of items of Content. (*Id.*). In an average week, 100,000 new items of Content are posted and 12,000 items are downloaded. (*Id.*).

Pond5 does not own any Content on its marketplace. (*Id.* ¶ 3). Contributors own the Content, which is licensed to Pond5 and, in turn, sub-licensed to Customers. In this role, Pond5 serves solely as an intermediary to facilitate Contributors' sale of licenses to Customers. (*Id.*).

In the overwhelming number of cases, Pond5 has no direct contact with either Customers or Contributors. (*Id.* ¶ 4). Pond5's business model is premised upon Contributors uploading and

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1   Customers downloading Content without any human interaction with Pond5 employees. (*Id.*).

2   Transactions occur in this usual manner around 98% of the time. (*Id.*). Pond5.com does, of course,

3   have a Contact Us feature where Customers, Contributors, and others can contact Pond5 to ask

4   questions or seek assistance. (*Id.*). Pond5 generates revenue from its marketplace by retaining one

5   half of the proceeds from the licensing of Content. (*Id.* ¶ 5). The other half is distributed to the

6   Contributor. (*Id.*). Contributors generally set their own price for Content, although they have the

7   option of allowing Pond5 to set the price. (*Id.*).

8   **B.    TERMS OF USE, CONTRIBUTOR AGREEMENT, & LICENSE AGREEMENT**

9          Anyone who would like to join the Pond5 marketplace must first create an account and

10  accept Pond5's Terms of Use. (Crary Dec. ¶ 6). A user who would like to become a Contributor is

11  further required to accept Pond5's Contributor Agreement and any Customer must accept Pond5's

12  License Agreement. (*Id.*). The Terms of Use, Contributor Agreement, and License Agreement

13  contain important terms and conditions that govern the use of the Website, uploading and

14  downloading Content to and from the Website, and the use of Content. (*Id.* ¶ 6, Exs. 1-3). Each of

15  these agreements includes specific provisions prohibiting the misappropriation of copyrights. (*Id.*

16  Ex. 1 ("You will not … send or upload any … Content that infringes, misappropriates or violates

17  any else's copyright, trademark … or any other legal right"); Ex. 2 (warranting that the

18  Contributor is "the sole and exclusive owner of the Content and the copyright thereof," the

19  "Content represents original creations and expressions of subject matter," and the "Content has

20  not been obtained, created or submitted to us under this Agreement in violation of any law"); Ex.

21  3 ("You may not use any Content in a manner that violates any law").

22         The Terms of Use specifically state that the Website is operated as an "on-line

23  marketplace, providing storage of materials on our system or networks at the direction of Pond5's

24  users." (*Id.* Ex. 1). It includes a provision that allows Pond5 to terminate access for any reason

25  without prior notice and requires the user to indemnify Pond5 for use of the website in breach of

26  the terms. (*Id.*). It also includes a detailed provision for notifying Pond5 of any alleged

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 2
(3:15-cv-05696 RBL)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

infringement, including the statutorily-required content of such notice. (*Id.*). The Contributor Agreement states that, upon licensing Content to Pond5, the Contributor retains ownership, title and copyright to the work. (*Id.* Ex. 2 ¶ 3(2)). It includes an indemnity provision protecting Pond5 and Customers against violation of intellectual property rights of a third party. (*Id.* Ex. 2 ¶ 10).

C.   **PLAINTIFF'S CLAIMS OF COPYRIGHT INFRINGEMENT BY USER CKENNEDY342**

On May 26, 2015, Pond5's Audio Development Manager, Mike Pace, was contacted by an existing customer, Douglas Price of Pro Sound Effects. (Declaration of Mike Pace ("Pace Dec.") ¶ 1). Price's email introduced Nick Power as Mr. Hempton's attorney, and stated: "They believe there are some piracy issues going on regarding their catalogs." (*Id.* Ex. 1). The email did not elaborate on what the "piracy issues" were. (*Id.*). Within minutes, Mr. Pace responded:

> Mike Pace here, I handle things on the audio curatorial side; hope you're well!
>
> We take issues of fraud very seriously and we're working to implement an automated content recognition platform to prevent against infringements that escape our curators.... In the meantime, we're trying our best to address these issues efficiently on an ad hoc basis.
>
> We can do an immediate takedown, blacklist the fraudulent contributors, and audit to see if there have been any sales.  If it turns out there have been any infringing sales, we're willing to do whatever we can to stay on good terms with any legitimate catalog.
>
> Can you provide any more info as to the tracks in questions?

(Pace Dec. Ex. 2). The parties' next communication was by email from Nick Power to Mike Pace on May 29. (*Id.* Ex. 3). Mr. Pace responded and pressed Mr. Power to provide more information. (*Id.* Ex. 4). Mr. Power responded but did not identify the infringing work that was allegedly posted on the Website, instead stating broadly that his clients "have discovered thousands of their files offered for sale on Pond5." (*Id.* Ex. 5). Mr. Pace responded the same day, stating, in part:

> As I wrote in my initial email, we can immediately remove any potentially fraudulent content and take swift action to make things right once we know the tracks/contributors in question, which is information your clients will have to provide us. *At the risk of stating the obvious, Pond5 cannot locate your clients' intellectual property without being informed as to what they claim is theirs*.

(*Id.* Ex. 6) (emphasis added).

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

Thereafter, Pond5 did not hear from plaintiff or his legal counsel until June 29, when it received a takedown letter dated June 24 from Nick Power. (*Id.* ¶ 7, Ex. 7). The letter stated that files owned by plaintiff had been posted for sale on Pond5's website, identified user ckennedy342 as "the prime culprit," and stated that ckennedy342 "has uploaded thousands of files" owned by plaintiff. (*Id.*). The takedown letter did not list any of the files that were allegedly infringing or provide Pond5 with any other means of identifying the allegedly offending material. (*Id.*). Although the takedown letter characterized ckennedy342 as "the prime culprit," it did not identify any other Contributor as an alleged infringer. (*Id.*). The takedown letter listed, by number, numerous copyright registrations allegedly held by plaintiff and identified his work as "a catalog of tens of thousands of nature recordings," but did not otherwise specify which of his works were infringed upon or provide Pond5 with the ability to identify the infringed work. (*Id.*).

The next day, on June 30, 2015, Pond5 suspended the account of user ckennedy342 and removed all of his Content from its website. (Pace Dec. ¶ 8). Pond5 took these actions out of an abundance of caution, despite having not received notice sufficient to identify the specific infringing clips. (*Id.*). Pond5 also sent a confirming email to Nick Power and commenced an investigation into ckennedy342. (*Id.* ¶ 8, Ex. 8). On July 2, Plaintiff's counsel acknowledged receipt of the email and thanked Pond5 for removing the material. (*Id.* Ex. 9).

## D.   CKENNEDY342'S UPLOADS

Ckennedy342 opened his account and began uploading content onto pond5.com in August 2014. (Crary Dec. ¶ 10). He listed his name as Chris Kennedy and his location as Quebec, Canada. (*Id.*). Over the course of the next year, ckennedy342 uploaded 10,243 sound effects files to pond5.com. (*Id.*). In Pond5's experience, such a high volume is not unusual or suspicious for sound effect files because many Pond5 Contributors who upload sound effects have created and uploaded large volumes of sound effect files. (*Id.*). Until June 29, 2015, Pond5 had received no notice or information of any kind questioning anything in the ckennedy342 collection at pond5.com. (*Id.*). No other person or entity had provided any notice to Pond5 that Content posted

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

by ckennedy342 was infringing. (*Id.*).

E.   **POND5'S INVESTIGATION**

In addition to removing all of his uploads and banning him from the Website, Pond5 investigated ckennedy342. (Crary Dec. ¶ 11). During the course of its investigation, Pond5 discovered that there was a high likelihood that ckennedy342 had previously posted content under usernames WildAudioProductions and HassanKhan. (*Id.*). Both of these users, who were listed under different email addresses and identified their location as Karachi, Pakistan, had previously been banned from Pond5. (*Id.*). Pond5 concluded that ckennedy342 was and is likely to be Hassan Khan and likely lives in Pakistan. (*Id.*). Hassan Khan appears to hold himself out as a music composer. *See https://about.me/hkhan342* (last accessed April 19, 2016).

Pond5 was able to link ckennedy342 to Hassan Khan due to matches found between IP addresses, cookies, and information contained in PayPal accounts. (*Id.* ¶ 12).  The IP match and cookie match showed that, on at least one occasion, ckennedy342 logged in from the same computer that WildAudioProductions and Hassankhan had logged in from. (*Id.*). The PayPal account showed that funds deposited to "Chris Kennedy" were actually going to Khan. (*Id.*).

Pond5 readily admits that, if it had conducted the investigation into ckennedy342 at the time the account was created in August 2014, it likely would have linked ckennedy342 to Hassan Khan and the user would have been banned. (Crary Dec. ¶ 13). However, the processes involved in investigating ckennedy342 are manual processes and Pond5 did not, as a matter of policy, conduct such investigations of Contributors unless and until it became aware of suspicious activity. (*Id.*). Once Pond5 became aware of suspicious activity involving ckennedy342, it immediately conducted an investigation that resulted in the user being banned. (*Id.*).

F.   **POND5'S NOTICE OF INFRINGEMENT**

As of the filing of this Motion, plaintiff still has not identified the "thousands of files" that he contends were illegally uploaded by ckennedy342. (Crary Dec. ¶ 14). The only allegation that plaintiff has made that identifies files or clips is a paragraph in his complaint that lists, by name

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 5
(3:15-cv-05696 RBL)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

and upload date, *nine* clips that were allegedly posted by ckennedy342 and that were allegedly owned by the plaintiff. (Compl. ¶ 72). Through six months of litigation, and the months of communication that proceeded litigation, beyond this bare allegation, plaintiff has produced no evidence to support the allegation and has never identified the "thousands" of other files that were allegedly uploaded. (Crary Dec. ¶ 14). Plaintiff has never produced a DMCA-compliant notice identifying the clips in a manner that allows Pond5 to reasonably locate them and verify that they were, in fact, infringing. (*Id.*).

With respect to the nine clips alleged in the complaint, Pond5 compared their titles to those of the 10,243 clips that were uploaded by ckennedy342 and identified exact and similar matches. (*Id.* ¶ 15). That comparison revealed a total of 43 sales of the allegedly infringing clips (based on the similarity of name) resulting in revenue to Pond5 totaling $192.95. (*Id.*).

## G.   SOUND EFFECTS ON POND5.COM

This lawsuit involves claims of copyright infringement of nature sound recordings that are allegedly owned by the plaintiff. (Compl., Dkt. #1). Such nature sounds are classified as "sound effects" on the Website. (Crary Dec. ¶ 16). In May 2015, Pond5.com had approximately 650,000 sound effect clips with an average sales price of $3.42. (*Id.*). Pond5's revenue from the sale of *all* sound effect licenses was approximately $220,000.00 in 2014 and $270,000.00 in 2015. (*Id.*). The sale of sound effect licenses is not a significant source of income to Pond5 and has never been profitable. (*Id.*).

## H.   POND5'S EFFORTS TO COMBAT INFRINGEMENT

Pond5 makes significant efforts to combat copyright infringement. As discussed above, the Terms of Use, Contributor Agreement, and License Agreement each contains terms prohibiting and providing consequences for infringement. Additionally, Pond5's Website emphasizes the importance of posting high-quality Content, includes several references to copyright law, and includes a process whereby all submissions are subject to approval; the emphasis on quality, copyright statements, and the approval process are all intended, at least in part, to discourage

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 6
(3:15-cv-05696 RBL)

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

infringement. (Crary Dec. ¶ 17).

Pond5 utilizes watermarking and other methods to mark all Content that is posted on the Website. (Crary Dec. ¶ 18). For sound effects, every clip is embedded with a recording that audibly states "Pond5.com" at the beginning of the clip and repeats itself approximately every 7.5 seconds for the duration of the clip. (*Id*). All other Content is embedded with some type of mark to prevent Customers and other visitors to the Website from infringement. (*Id.*).

Pond5 also relies upon its network of Contributors, Customers, and others who access its website to inform it of Content that is or may be infringing. (*Id.* ¶ 19). Upon being notified of possible infringing activity, Pond5 *always* investigates the allegation and, if the notice is found to be credible, removes the Content. (*Id.*).

In addition to the foregoing, Pond5 utilizes software in an effort to combat infringement. (Crary Dec. ¶ 20). This includes content recognition software for music Content and software that Pond5 developed to detect duplicate tracks that are uploaded to the Pond5 website by different user accounts. (*Id.*). If a duplicate track is identified with a different user account, Pond5 investigates the circumstances and takes appropriate measures, which always involves the removal of any Content that Pond5 believes is infringing. (*Id.*).

I. **POND5'S CURATORIAL PROCESS**

Items uploaded to Pond5.com are subject to review and approval by Pond5 through its curatorial process. (Crary Dec. ¶ 21). Pond5 employs a total of 14 full-time and 10 part-time curators who are primarily responsible for the review and approval of Content. (*Id.*). Of the 24 curators, three are assigned to audio content, which includes music and sound effects. (*Id.*).

The review and approval process is conducted quickly. (*Id.* ¶ 22). Its primary purpose is to verify technical qualitative upload standards – i.e., to reject Content because its quality is very poor. (*Id.*). In addition, the process confirms that the Content has appropriate Meta-tags, is not obviously infringing, and has been categorized properly by the Contributor. (*Id.*). The time spent on the curatorial process varies depending on the media type, but it must necessarily be

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 7
(3:15-cv-05696 RBL)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

performed very quickly. (*Id.*). For example, a curator reviews between 2,000 and 3,000 sound effects on a given day, meaning that the curator can spend only a few seconds on each clip. (*Id.*).

Given the sheer volume of Content uploaded to the Website, Pond5's curators do not and simply cannot exert significant control over the Content. (*Id.*). Although Pond5 has the right to reject any Content, it has no control over or knowledge of the creation of the Content. (Crary Dec. ¶ 23). Nor does it have any input as to what Content is uploaded by a Contributor. (*Id.*). The Contributor has sole control over what he or she uploads to Pond5. (*Id.*). Pond5 does not edit Content that is uploaded by Contributors to its Website. (*Id.*). Rather, Pond5 conducts a cursory review of material and accepts or rejects it based almost entirely upon a brief qualitative assessment. (*Id.*).

## J.   LIMITATIONS ON POND5'S ABILITY TO PREVENT COPYRIGHT INFRINGEMENT

Pond5 is a marketplace that is crowd-sourced. (Crary Dec. ¶ 24). Annually, tens of thousands of Contributors upload millions of items of Content and thousands of Customers download hundreds of thousands of items. (*Id.*). In its role as the marketplace host, while Pond5 utilizes numerous mechanisms to prevent, identify, and investigate infringement, Pond5's practical ability to prevent infringement is limited. (*Id.*). Pond5 cannot prevent a Contributor from uploading stolen items, no more than YouTube, iStock, or Google Images can. (*Id.*).

Sound effects are particularly difficult to monitor. (*Id.* ¶ 25). They are usually of a short duration, there is often a huge volume of similar sounds, and the sound effects are not distinctive. (*Id.*). Moreover, unlike some music and video, there is no digital library or similar database from which to compare a particular sound effect to well-known copyrighted works. (*Id.*).

## K.   POND5'S PRACTICES REGARDING INFRINGEMENT CLAIMS & TAKEDOWN NOTICES

Pond5 has examined its practices with respect to takedown notices received. (Crary Dec. ¶ 26). Between 2012 and 2016, Pond5 received twenty notices from claimed content owners or their representative alleging that infringing Content was posted on pond5.com. (*Id.*). In each of those twenty cases, Pond5 removed the content that was allegedly infringing. (*Id.*). In most cases, the

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 8
(3:15-cv-05696 RBL)

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1    contributor was also banned from using the Website. (*Id.*). In a minority of cases, Pond5 decided

2    not to ban a contributor, either because the possible infringement appeared to be accidental, Pond5

3    believed there to be a significant likelihood that there was no infringement, or the contributor had

4    a track record of posting substantial material over a significant amount of time without any

5    accusations of infringement. (*Id.*). The decision to ban a contributor is made on a case-by-case

6    basis with input from management based upon the particular circumstances. (*Id.*).

7            With respect to repeat infringement, in the rare instance of a repeat copyright infringer,

8    Pond5's policy and practice is to ban repeat infringers. (*Id.* ¶ 27). This policy is implemented in

9    several ways. First, Pond5 bans any contributor that it concludes engaged in previous acts of

10   infringement. (*Id.*). Second, as discussed above, Pond5 often bans contributors based upon a

11   single act of infringement, reducing the possibility that the contributor can ever become a repeat

12   infringer. (*Id.*).  Third, in cases where Pond5 suspects infringement, it conducts an investigation,

13   which includes an examination of whether the user might have been previously banned and re-

14   entered the website under an alias. (*Id.*).

15           With the possible exception of the individual known in this lawsuit as ckennedy342, Pond5

16   has never become aware of a contributor that conducted repeat infringement. (*Id.* ¶ 28).  With

17   respect to ckennedy342, consistent with Pond5's policies, he was banned from the Website

18   immediately upon receipt of the takedown letter from the plaintiff's attorney. (*Id.*).

## III.    AUTHORITY

### A.    SUMMARY JUDGMENT STANDARD

21           A party may move for summary judgment, identifying each claim or defense on which

22   summary judgment is sought. Fed. R. Civ. P. 56(a). Summary judgment should be granted if

23   "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

24   matter of law." *Id.* Once the moving party has met its initial burden, the burden shifts to the

25   nonmoving party to establish the existence of an issue of fact regarding an element essential to that

26   party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). To discharge this burden,

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 9
(3:15-cv-05696 RBL)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

the nonmoving party cannot simply rely on its pleadings, but instead must produce *evidence* showing that there is a genuine issue for trial. *Id.* at 324. The nonmoving party cannot rely on speculation or conjecture in meeting its burden. *Wyler v. Holland Am. Line-USA, Inc.*, 348 F. Supp. 2d 1206, 1210 (W.D. Wash. 2003).

**B.    THE DIGITAL MILLENNIUM COPYRIGHT ACT & ITS SAFE HARBORS**

The DMCA was enacted in 1998. Congress explained the intent of the statute as follows:

> Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy. [The DMCA] provides this protection and creates the legal platform for launching the global digital on-line marketplace for copyrighted works. . . .

> At the same time, without clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet. In the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability. . . . [B]y limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand.

Sen. Rep. No. 105-190, 8 (1998). With these concerns in mind, Congress enacted the DMCA with a series of "safe harbors" for certain common activities of service providers. 17 U.S.C. § 512; *Ellison v. Robertson*, 357 F.3d 1072, 1076-77 (9th Cir. 2004). Central to the DMCA safe harbors is the DMCA-compliant takedown notice, whereby a service provider is afforded protection despite the presence of infringing material, but only so long as the service provider takes specific actions upon receipt of such notice. *See generally Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1112 (9th Cir. 2007) (discussing the importance of a compliant takedown notice).

A service provider has the burden of establishing that it meets the statutory requirements. *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1039 (9th Cir. 2013). If the service provider satisfies these elements, the safe harbor defense applies to all copyright claims, including direct, secondary, contributory, or vicarious claims of infringement. *See Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 749 (S.D.N.Y. 2012) *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 Fed. Appx. 51 (2d Cir. 2014). In this case, Pond5 meets every

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

statutory requirement of a DMCA safe harbor. Accordingly, this matter should be dismissed.

## C.  THE SAFE HARBOR ELEMENTS

A party seeking to invoke the DMCA safe harbors must initially meet a set of threshold criteria. First, the party must qualify as a "service provider." 17 U.S.C. § 512(k)(1)(B). Second, the service provider must satisfy certain conditions of eligibility, which require that the service provider adopt and reasonably implement a policy that "provides for the termination in appropriate circumstances" of repeat infringers and accommodates "standard technical measures" used by copyright owners to identify or protect copyrighted works. *Id.* §§ 512(i)(1), 512(i)(2).

Once the threshold criteria are met, in order to avail itself of the safe harbor protections, a party must qualify for one of the four safe harbors. For purposes of this Motion, Pond5 seeks protection under the third safe harbor – information residing on systems or networks at the direction of users. That safe harbor provides:

> A service provider shall not be liable . . . for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider
>
> (A) (i) does not have actual knowledge that the material . . . on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
>
> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
>
> (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1). Additionally, the service provider must meet statutory requirements associated with designation of an agent to receive notifications of claimed infringement. 17 U.S.C. § 512(c)(2). One critical qualification to the foregoing elements is that, by statute, eligibility for a DMCA safe harbor cannot require that a service provider monitor its service or affirmatively seek

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1    facts indicating infringing activity. 17 U.S.C. § 512(m)(1).

2          To summarize, Pond5 must prove the following elements: (1) it is a service provider; (2) it

3    has an adequate repeat infringer policy; (3) it accommodates standard copyright technical

4    measures; (4) plaintiff's claims involve storage at the direction of a user of material residing on

5    Pond5's system; (5) Pond5 acted expeditiously to remove or disable access to infringing material

6    upon obtaining actual or constructive knowledge of it; (6) to the extent that Pond5 had the right

7    and ability to control the activity, it did not receive a financial benefit directly attributable to the

8    infringing activity; (7) Pond5 acted expeditiously upon being provided with notice of infringement;

9    and (8) Pond5 has a proper agent. Each element is analyzed below.

10   **D.   POND5 SATISFIES EVERY ELEMENT FOR SAFE HARBOR PROTECTION**

11   **1.   Pond5 is a "Service Provider"**

12         As defined in the DMCA, a service provider is "a provider of online services or network

13   access, or the operator of facilities therefor." 17 U.S.C. § 512 (k)(1)(B). The definition is intended

14   to encompass a broad set of Internet entities. *Wolk*, 840 F. Supp. 2d at 744. One court commented

15   that it "is defined so broadly that we have trouble imagining the existence of an online service that

16   *would not* fall under the definitions." *In re Aimster Copyright Litig.*, 252 F.Supp.2d 634, 658

17   (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir.2003). Courts have found services such as

18   Youtube.com, Photobucket.com and Veoh.com—services whereby files are uploaded by users

19   and viewable on the providers' websites—to be "service providers" under the DMCA. *Wolk*, 840

20   F. Supp. 2d at 744. In a widely-cited decision from this Court, Judge Lasnik wrote: "Amazon

21   operates web sites, provides retail and third party selling services to Internet users, and maintains

22   computers to govern access to its web sites. These activities fall squarely within the broad scope

23   of the § 512(k)(1)(B) definition of 'service provider.'" *Corbis Corp. v. Amazon.com, Inc.*, 351 F.

24   Supp. 2d 1090, 1100 (W.D. Wash. 2004), *overruled on other grounds*, *Cosmetic Ideas, Inc. v.*

25   *IAC/Interactivecorp.*, 606 F.3d 612 (9th Cir. 2010).

26         In this case, Pond5 allows Contributors to upload various types of media which is made

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 12
(3:15-cv-05696 RBL)

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

available for licensing to Customers on Pond5's Website. Pond5 unquestionably falls squarely within the broad scope of "service provider" under the statute.

**2.  Pond5 Has Adopted & Implemented an Adequate Repeat Infringer Policy**

In order to satisfy the second element, a service provider must "(1) adopt a policy that provides for the termination of service access for repeat copyright infringers in appropriate circumstances; (2) implement that policy in a reasonable manner; and (3) inform its subscribers of the policy." *Ellison v. Robertson*, 357 F.3d 1072, 1080 (9th Cir. 2004). Courts have held that this requirement is not an overly burdensome one to meet. *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 513 (S.D.N.Y. 2013) (citing *Corbis,* 351 F. Supp. 2d at 1101).

With regard to the first prong of this element, a service provider meets this criterion so long as its policies "convey to users that those who repeatedly or flagrantly abuse their access to the internet through disrespect for the intellectual property rights of others know that there is a realistic threat of losing that access."  *Corbis*, 351 F. Supp. 2d at 1101 (citations and quotations omitted). Here, Pond5's Terms of Use and Contributor Agreement contain specific provisions prohibiting contributors from uploading material in violation of copyright law and the License Agreement prohibits Customers from using Content in violation of intellectual property laws. (See supra Part II.B.). The Terms of Use allow Pond5 to terminate access to the Website for any reason, including for breach of the Terms of Use or Contributor Agreement, and includes a provision requiring the user to indemnify Pond5 for liability arising out of a breach of the Terms of Use. (*Id.*). The Terms of Use includes a detailed non-legalese provision for notifying Pond5 of any intellectual property violations. (*Id.*). The Contributor Agreement allows Pond5 to terminate the agreement and remove Content at any time for any reason, requires the Contributor to indemnify both Pond5 and any Customer that innocently downloaded Content that was infringing, and preserves any intellectual property rights that the Contributor may have against a Customer. (*Id.*). In addition to the foregoing, Pond5 has a policy whereby those found to infringe are usually terminated for a first offense and always terminated for multiple offenses. (See supra Part II.K).

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

Pond5 has, without question, adopted a proper policy.

To meet the second prong of this requirement, the Ninth Circuit has held that

a service provider "implements" a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications.

*Perfect 10,* 488 F.3d at 1109. Notably, service providers are not obligated to affirmatively police their users for evidence of infringement. *Id.* at 1111. Here, as evidenced by language in Pond5's Terms of Use, Pond5 has an effective infringement notification procedure in place. As demonstrated by Pond5's conduct in this very matter, Pond5 implements a policy of investigating and, where appropriate, suspending accounts of infringing users upon receipt of a DMCA take-down notice. Finally, Pond5 does not actively prevent copyright owners from collecting information needed to issue such notifications. Thus, Pond5 reasonably implements its copyright infringer policy.

Finally, to meet the third prong of this requirement, service providers "need only inform users that, in appropriate circumstances, it may terminate the user's accounts for repeated copyright infringement." *Corbis,* 351 F. Supp. 2d at 1102. Here, Pond5's Terms of Use provide contact information for its DMCA agent, requires users to agree to not infringe others' copyrights, and puts users on notice that their accounts may be terminated for misuse. All of its agreements contain specific provisions prohibiting infringement and go further by including indemnification provisions. There can be no question that Pond5 informs its users of its infringement policy.

### 3.  Pond5 Accommodates Standard Technical Measures

Pond5 does not interfere with and, in fact, accommodates a copyright holder's "standard technical measures." The "standard technical measures" are defined within the statute as technical measures which copyright owners use to identify or protect their copyrighted works, and which

(A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

(B) are available to any person on reasonable and nondiscriminatory terms; and

(C) do not impose substantial costs on service providers or substantial burdens on their

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 14
(3:15-cv-05696 RBL)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

systems or networks.

17 U.S.C. § 512(i)(2). Although few cases have discussed or applied this threshold requirement in depth, the *Wolk* court found that this element was satisfied solely by the inclusion of watermarking on photographs, even though users could easily remove the watermark. 840 F. Supp. 2d at 745. On the other hand, courts have found that *advising* or *encouraging* users to conceal a work's copyrighted status is an example of a party's *failure* to comply with standard technical measures. *Obodai v. Demand Media, Inc.*, 11 CIV. 2503 PKC, 2012 WL 2189740, at *5 (S.D.N.Y. June 13, 2012) *aff'd* 522 Fed. Appx. 41 (2d Cir. 2013).

In this case, Pond5 advises and encourages its users to *promote* the copyrighted status of such work. Pursuant to Pond5's Content License Agreement, Pond5 users who distribute Content purchased on Pond5.com agree to use their "reasonable best efforts" to attribute credit to the Contributor. Additionally, Pond5 utilizes watermarking and other methods to mark all available Content that is posted on the Website. Pond5's Contributor Agreement also requires each Contributor that uploads Content to represent and warrant that he/she is the owner of the material or otherwise has legal right to it. It also preserves Contributors' intellectual property rights against Customers and third parties. The License Agreement requires Customers to notify Pond5 if the Customer becomes aware of an infringement claim. All of these facts support the conclusion that Pond5 goes far beyond the minimum standard necessary to satisfy the standard technical measures element.

**4.   This Case Involves Storage at the Direction of a User on Pond5's System**

Plaintiff's infringement claims arise out of the storage of plaintiff's copyrighted work on Pond5's network at the direction of user ckenney342. Courts have interpreted "storage at the direction of a user" to cover "more than mere electronic storage lockers." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 39 (2d Cir. 2012) (internal quotations omitted). By its terms, the safe harbor presupposes that service providers provide access to users' stored material. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1017 (9th Cir. 2013). This

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 15
(3:15-cv-05696 RBL)

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

element "encompasses the access-facilitating processes that automatically occur when a user uploads a video" to the provider's website. *Id.* at 1016.  Accordingly, the § 512(c) safe harbor extends to software functions performed "for the purpose of facilitating access to user-stored material." *Viacom*, 676 F.3d at 39.

This case involves allegations of infringement resulting from ckennedy342's uploads of audio Content to Pond5's website and subsequent possible downloads of such content by Customers. Accordingly, this matter concerns "storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."

## 5. Pond5 Acted Expeditiously Upon Obtaining Actual or Constructive Knowledge

"[T]he DMCA recognizes that service providers who do not locate and remove infringing materials they do not specifically know of should not suffer the loss of safe harbor protection." *UMG Recordings,* 718 F.3d at 1023. Specifically, under section 512(c) of the DMCA, a service provider must expeditiously remove infringing material when it has actual knowledge of the infringing material, it has awareness of facts or circumstances that make infringing activity apparent (so-called "red flag" knowledge), or it receives a takedown notice. *Viacom*, 676 F.3d at 27-28, 31. Such actual or "red flag" knowledge must be specific to the infringing content at issue in the litigation. *Capitol Records*, 972 F. Supp. 2d at 524-25. Likewise, in order to trigger a concomitant obligation from the service provider to remove material, a takedown notice must provide a level of detail sufficient for the service provider to identify and locate the infringing material. *See* 17 U.S.C. § 512(c)(3)(A).

This element is easily satisfied because it is undisputed that, prior to June 29, 2015, Pond5 had no notice of the alleged infringement by ckennedy342 and, on June 30, 2015, Pond5 removed all content uploaded by ckennedy342. Thus, even if the plaintiff could somehow demonstrate actual or constructive knowledge, *which he cannot*, Pond5 still satisfies this element because it expeditiously removed the infringing material *within one day of receiving notice.*

While Pond5 expeditiously removed content on June 30, 2015, Pond5 has never obtained

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 16
(3:15-cv-05696 RBL)

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

actual or constructive notice before or after that date. Initially, plaintiff's notification letter of June 29, 2015 was deficient. In order to provide notice to a service provider, a notification letter must, *inter alia*, include the following:

> (ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.
>
> (iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

17 U.S.C. § 512(c)(3)(A). A notification that fails to comply substantially with these provisions is not considered in determining whether a service provider is aware of facts or circumstances from which infringing activity is apparent. 17 U.S.C. § 512(c)(3)(B). In this case, the June 29th letter did not identify the copyrighted work claimed to have been infringed or the specific files which the plaintiff claimed to be infringing, only that ckennedy342 was the "prime culprit" and "has uploaded thousands of files" owned by plaintiff. Courts have routinely held that a service provide cannot be held liable for its failure to remove content for which the plaintiff has failed to provide proper notice. *See, e.g., Wolk*, 840 F. Supp. 2d at 747. Plaintiff cannot argue that the Court should consider various writings together, such as the complaint, documents disclosed in discovery, and his defective notice letter, in evaluating this issue. *Perfect 10, Inc.*, 488 F.3d at 1113 ("Permitting a copyright holder to cobble together adequate notice from separately defective notices also unduly burdens service providers.").

Through some six months of litigation, Plaintiff has still not provided Pond5 with adequate notice containing an identifying description of either the files claimed to be infringing or the material that he claims was infringed. With respect to the former, despite his allegations that ckennedy342 uploaded "thousands" of infringing audio files, plaintiff has failed to identify those files either in his notification letter, the complaint or in discovery. The only allegation that plaintiff has even made that identifies files or clips is a single paragraph in the complaint that makes a bare allegation listing, by name and upload date, nine clips that were allegedly posted by ckennedy342

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

and that were allegedly owned by the plaintiff. Through six months of litigation, and the months of communication that proceeded litigation, beyond this bare allegation, plaintiff has produced no evidence to support the allegation and has never identified the "thousands" of other files that were allegedly uploaded. Plaintiff has never produced a DMCA-compliant notice identifying the clips in a manner that allows Pond5 to reasonably locate them and verify that they were, in fact, infringing.

Plaintiff has also failed, in the many months that preceded litigation and the six months of litigation, to adequately identify the material that he contends was infringed upon. In discovery, plaintiff produced over sixty audio files, most of which exceed thirty minutes, totaling over forty hours of nature sounds. (Crary Dec. ¶ 29). Plaintiff made no allegation that any of these sixty files were illegally uploaded. Although speculative, it appears as though plaintiff simply produced all or much of his copyrighted audio library and that, perhaps, he contends that portions of some or all of these files were uploaded by ckennedy342. (*Id.*). Plaintiff has failed to make any effort to identify those portions of the 40-plus hours of audio that were allegedly infringed upon and Pond5 has no means of making that identification. (*Id.*). Plaintiff's attempt to satisfy the knowledge element by producing a massive volume of audio, without making any effort to identify those portions that were allegedly infringed upon, does not comply with the statute and cannot succeed.

It is anticipated that the plaintiff will make various arguments regarding constructive knowledge. He may argue that Pond5 should have identified ckennedy342 as a likely infringer earlier because he posted under an alias, was from Pakistan, uploaded a large number of files, or some other reason. These arguments cannot succeed for two reasons. First, the knowledge requirement requires knowledge or awareness of *specific infringing material*. *UMG Recordings*, 667 F.3d at 1037; *Viacom*, 676 F.3d at 30. Awareness of the specific material is necessary "because expeditious removal is possible only if the service provider knows with particularity which items to remove." 676 F.3d at 30. While the DMCA does not require actual knowledge, the requisite "knowledge" (whether actual or constructive) must pertain to the specific infringing material. *Id.* at 30-32. Second, the DMCA expressly states that eligibility for protection under a

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 18
(3:15-cv-05696 RBL)

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

safe harbor cannot be predicated on requiring that a service provider monitor its service or affirmatively seek facts indicating infringing activity. 17 U.S.C. § 512(m)(1); *Perfect 10,* 488 F.3d at 1113 ("The DMCA notification procedures place the burden of policing copyright infringement . . . squarely on the owners of the copyright."); *UMG Recordings,* 667 F.3d at 1038 ("We do not place the burden of determining whether [materials] are actually illegal on a service provider."); *UMG Recording, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1108 (C.D. Cal. 2009) ("[I]f investigation of 'facts and circumstances' is required to identify material as infringing, then those facts and circumstances are not 'red flags.'"). Plaintiff's attempt to foist constructive knowledge on Pond5 would impose a duty to investigate far beyond what the DMCA requires.

In this case, within minutes of being contacted about possible infringement, Pond5 asked plaintiff to provide "more info as to the tracks" in question. Plaintiff and his attorney ignored that request. Three days later, when plaintiff's counsel contacted Pond5, he again failed to identify the infringing tracks. Pond5 responded: "At the risk of stating the obvious, Pond5 cannot locate your clients' intellectual property without being informed as to what they claim is theirs." Despite Pond5's pleas, the plaintiff still failed to inform Pond5 of the infringing tracks. A month later, plaintiff sent a notice letter, which once again failed to identify either the infringing clips or the infringed-upon files. Months later, plaintiff filed this lawsuit, which, *once again*, failed to identify the files. Now, some six months after litigation was commenced, plaintiff has *still* not identified the "thousands of files" that ckennedy342 allegedly uploaded, nor has he sufficiently identified the audio files that he claims were infringed upon. Despite these facts, plaintiff somehow contends that Pond5 had actual or constructive knowledge of the *specific infringing material* that he contends was infringing.

Pond5 lacked actual or constructive knowledge in May 2015 when first contacted by plaintiff, in June 2015 when the deficient DMCA notice letter was sent, in September 2015 when this lawsuit was filed, and today when this Motion is filed. Despite having no knowledge, Pond5 removed all allegedly infringing Content *within one day* of being informed that ckennedy342 had

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

uploaded material that allegedly included plaintiff's material. Accordingly, Pond5 satisfies the expeditious removal requirement of 17 U.S.C. § 512(c)(1).

**6.  Pond5 Did Not Receive a Financial Benefit Directly Attributable to the Infringing Activity and Did Not Have the Right and Ability to Control the Activity**

Under this element, Pond5 must demonstrate *either* that it did not receive a financial benefit directly attributable to the infringing activity *or* that it did not have the right and ability to control the infringing activity. 17 U.S.C. § 512(c)(1)(B); *Corbis,* 351 F. Supp. at 1109 ("Both elements must be met for the safe harbor to be denied."). In this case, Pond5 neither received a financial benefit nor had the right and ability to control the activity.

Under Ninth Circuit law, the relevant financial benefit inquiry is "whether the infringing activity constitutes a draw for subscribers, not just an added benefit." *Ellison,* 357 F.3d at 1079. In this case, there is no evidence that the allegedly infringing activity served as a draw to Pond5's website. First, plaintiff has failed to demonstrate which, if any, clips were infringing. Because plaintiff has failed to demonstrate infringement, there cannot be a draw to such activity. Second, even if it is assumed that ckennedy342 uploaded thousands of clips that infringed upon plaintiff's works, the evidence shows a lack of financial benefit. At most, Pond5 generated $192.95 in revenue from those clips, which amounts to less than one tenth of one percent of Pond5's revenue from the sale of sound effects (which is not a profitable part of Pond5's business). Moreover, the costs incurred by Pond5 associated with curation, hosting ckennedy342's uploads on its Website, and administering the sales of the licenses, exceed the amount of revenue generated from the sale of infringing Content. (Crary Dec. ¶ 15). The costs incurred by Pond5 in investigating the allegations of infringement raised by the plaintiff greatly exceed the amount of revenue generated from the sale of these allegedly infringing clips. (*Id.*). In light of the *de minimis* revenue associated with the sale of the infringing clips, the unprofitability of those sales, and the amount of resources

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 20
(3:15-cv-05696 RBL)

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

committed to investigating the allegations, no reasonable person could conclude that Pond5 received a financial benefit from the infringing activity.[1]

Additionally, there is no evidence that the sales of the allegedly infringing Content were attributable to the *infringement*. There must be a causal relationship between the infringing activity and the financial benefit. *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1044-45 (9th Cir. 2013). In *Fung*, the court found that a causal connection existed because:

> Fung promoted advertising by pointing to infringing activity; obtained advertising revenue that depended on the number of visitors to his sites; attracted primarily visitors who were seeking to engage in infringing activity, as that is mostly what occurred on his sites; and encouraged that infringing activity. Given this confluence of circumstances, Fung's revenue stream was tied directly to the infringing activity involving his websites, both as to his ability to attract advertisers and as to the amount of revenue he received.

*Id*. In this case, none of the factors relied upon in *Fung* exist. Pond5 does not engage in advertising, directly or indirectly, that encourages infringement. (Crary Dec. ¶ 30). Pond5 does not otherwise encourage infringing activity. (*Id.*). In fact, the opposite is true; the success of Pond5 rests significantly upon its reputational strength among Contributors and in the general marketplace.  (*Id.*). Its reputation would be severely damaged if it welcomed, encouraged, or even tolerated infringement. (*Id.*). Pond5 is unaware of any information suggesting that its Website hosts a perceivable volume of infringing Content. (*Id.*). Pond5 rarely receives complaints involving alleging infringement and, over the course of five years, only received twenty DMCA takedown notices. (*Id.* ¶¶ 26, 30). Further, with respect to the sales of Content uploaded by ckennedy342, there were no irregular patterns or unusual numbers of sales that would suggest that Customers'

---

[1]  Pursuant to the Terms of Use, ckennedy342 forfeited the balance in his account once Pond5 concluded its investigation in July 2015. Plaintiff may argue that these facts support a finding that Pond5 incurred a financial benefit. The argument fails on many levels. First, as discussed above, any such forfeiture is offset many times over by the costs associated with investigating ckennedy342 and, hence, is not a financial benefit. Second, the forfeiture resulted from a contract provision that is clearly intended to discourage infringement. While there may not be case law directly on point, there is overwhelming case law supporting the proposition that a service provider's efforts to prevent infringement cannot be utilized to support a conclusion that the service provider is not entitled to safe harbor protection; any other conclusion would defy the very purpose of the DMCA. Third, the argument defies the *Ellison* requirement that the infringing activity must constitute a draw for subscribers. The funds in question are, by any reasonable measure, the exact opposite – they deter infringement.

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

purchases were based upon the allegedly infringing nature of the Content. (*Id.* ¶ 31). Rather, the sales occurred in the normal course of business without any appearance that they had any connection to the alleged infringement. (*Id.*). Accordingly, there is no evidence of a causal connection between the alleged infringement and any financial benefit.

Pond5 also lacked the right and ability to control the infringing activity. The House Report accompanying the DMCA provides further explanation of this provision:

> [The DMCA] is not intended to discourage the service provider from monitoring its service for infringing material. Courts should not conclude that the service provider loses eligibility for limitations on liability under [the safe harbors] solely because it engaged in a monitoring program.

H.R. Conf. Rep. 105-796, 73, 1998 U.S.C.C.A.N. 639, 649. Likewise, a conclusion that merely removing or blocking content constitutes the requisite control would render the DMCA internally inconsistent: a service provider who has or obtains knowledge of infringing material is *required* to remove or disable access to the material in order to gain safe harbor protection, but in taking such action, the provider would be admitting the "right and ability to control" the infringing material. *Viacom*, 676 F.3d at 37. Accordingly, the "right and ability to control" provision "requires something more than the ability to remove or block access to materials posted on a service provider's website." *Id.* at 38. It must be shown that the service provider in fact exerts "substantial influence on the activities of users." *UMG Recordings, Inc.*, 718 F.3d at 1030 (*quoting Viacom*, 676 F.3d at 38). Such substantial influence requires a showing of "purposeful, culpable expression and conduct" or "high levels of control over activities of users." *Id.* (internal quotations omitted). In *Wolk*, the court concluded that such substantial activity "must take the form of prescreening content, rendering extensive advice to users regarding content and editing user content." 840 F. Supp. 2d at 748 (citing *Corbis*, 351 F. Supp. 2d at 1110).

In *Capitol Records*, the service provider, Vimeo, implemented a program that included significant content restrictions, such as a prohibition of commercials and "fan vids." 972 F. Supp. 2d at 528. Vimeo's employees were provided with substantial monitoring tools to enforce the content restrictions and those tools were regularly utilized. *Id.* Additionally, employees had

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 22
(3:15-cv-05696 RBL)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

"significant discretion to manipulate the visibility" of website content, resulting in employees commenting internally that "we are just straight controlling our website" and characterizing the control as "editorial fascism . . . important to keeping our website from becoming a trashpile." *Id.* Vimeo staff members could also promote a particular item or demote it through a "burying" tool, the "effect of which is that the video does not appear on the 'Discover' tab." *Id.* The court even found that "the record contains evidence that Vimeo staff communicated with some of its users regarding content, at times suggesting to them that it would tolerate the uploading of copyrighted material." *Id.* at 529. Despite all of that evidence, the court concluded that, as a matter of law, Vimeo did not exert substantial control. *Id.* at 529-530.

In this case, while Pond5 has enacted significant measures aimed at preventing and reducing copyright infringement, it does not exercise substantial influence over the content of material that is uploaded. With respect to 98% of the transactions that occur on its website, Pond5 has no human interaction with either the Contributor or the Customer. Pond5 plays no role whatsoever in selecting content to upload, does not edit user Content uploaded to its site by Contributors, and does not render extensive advice to its Contributors. Pond5 does not provide Contributors with detailed instructions regarding the layout, appearance, or content of material that is uploaded to Pond5. The curatorial process consists of an extremely brief review of content followed by a decision to accept or reject content based upon qualitative standards.

Several courts have concluded that it is difficult or impossible for a service provider to exert substantial control based upon the amount of content uploaded to the website. *See id.* at 530; *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1153 (N.D. Cal. 2008) (finding that "no reasonable juror could conclude that a comprehensive review of every file would be feasible" when hundreds of thousands of video files had been uploaded); *Wolk*, 840 F. Supp. 2d at 748 (stating that, "considering that millions of images are uploaded daily, it is unlikely that this kind of prescreening is even feasible"). Pond5 employs 24 curators, only 14 of which are full-time, to review 100,000 items of content per week. Three of those curators are assigned to audio content

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

and, on a typical day, a single curator reviews 2,000 to 3,000 sound effect clips, which equates to an average review time of around five seconds per sound effect clip. It would be impossible for Pond5 to exert substantial influence over its content while reviewing thousands of items per day. Accordingly, Pond5 does not have the right or ability to control infringing Content uploaded by its Contributors within the purview of § 512(c) of the DMCA.

**7.  Pond5 Acted Expeditiously Upon Notice**

Pond5 was notified of allegedly infringing material on June 29, 2015 and removed the content on June 30, 2015. Pond5 acted expeditiously in removing content.

**8.  Pond5 Has a Proper Agent**

Pond5's Terms of Use designate and provide contact information for a DMCA agent in compliance with 17 U.S.C. § 512(c)(2). Additionally, Pond5 has provided the Copyright Office with the agent information, which is also accessible by the general public. *See* http://copyright.gov/onlinesp/agents/p/pond5_inc.pdf.

## IV.   <u>CONCLUSION</u>

Pond5 is entitled to summary judgment. Pond5 meets every element for protection under the DMCA and is precisely the type of service provider that the DMCA was enacted to protect. This motion demonstrates that Pond5 takes significant measures to prevent copyright, investigates such claims immediately, removes infringing material expeditiously, and regularly bans users for infringing activity. Pond5 did not financially benefit from the allegedly infringing material and did not have the right and ability to control it. The facts also demonstrate that the plaintiff, despite months of pre-litigation activity and six months of litigation, still has not produced evidence satisfactory to trigger DMCA requirements to remove content and, despite the plaintiff's failure, Pond5 removed the allegedly infringing content some nine months ago. Pond5 respectfully requests that this matter be dismissed with prejudice.

**DATED** this 21st day of April, 2016.

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 24
(3:15-cv-05696 RBL)

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

NICOLL BLACK & FEIG PLLC


/s/ Curt H. Feig
/s/ Larry E. Altenbrun
Curt H. Feig, WSBA # 19890
Larry E. Altenbrun, WSBA #31475
Attorneys for Defendant Pond5, Inc.

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 25
(3:15-cv-05696 RBL)

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, I electronically filed the foregoing with the Clerk of the Court using the CM/CF system which will send notification of such filing to the following:

Cynthia J. Heidelberg
BRESKIN JOHNSON & TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, WA 98104
206-652-8660
Email: cheidelberg@bjtlegal.com

Nicholas E. D. Power
LAW OFFICEOF NICHOLAS POWER
540 Guard St., Ste 140
Friday Harbor, WA 98250
360-298-0464
Email: nickedpower@gmail.com

Roger M. Townsend
BRESKIN JOHNSON & TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, WA 98104
206-652-8660
Fax: 206-652-8290
Email: rtownsend@bjtlegal.com

DATED this 21st day of April, 2016.


/s/ Larry E. Altenbrun
Larry E. Altenbrun, WSBA #31475

DEFENDANT POND5 INC.'S MOTION
FOR SUMMARY JUDGMENT - 26
(3:15-cv-05696 RBL)

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555