# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

GORDON HEMPTON,                )
                               )
          Plaintiff,           )
                               )
      -v-                      ) CAUSE NO.
                               ) 3:15-CV-05696-DWC
POND5, INC., A Delaware        )
Corporation; and POND5 USER    )
CKENNEDY342, A corporation of)
Individual of Type Unknown,    )
                               )
          Defendants.          )
_____

DEPOSITION UPON ORAL EXAMINATION

OF

30(b)(6) THOMAS CRARY
_____

Taken at 1000 Second Avenue, Suite 3670

Seattle, Washington

DATE TAKEN:   March 22, 2016

REPORTED BY:  Nancy M. Kottenstette, RPR, CCR 3377

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

Hempton v. Pond5, Inc., et al.                30(b)(6) Thomas Crary

Page 15

1    into the document.  Tell me what is Pond5's general

2    business model?  You can describe it in your elevator

3    speech.

4       A   We're a digital media e-commerce platform.  We

5    refer to it as a two-sided marketplace business where

6    contributors of digital media artwork can contribute

7    their content onto our platform for storage, sale, and

8    marketing of their digital media content.

9            And on the buyer's side, buyers can come to

10   our site, search a comprehensive library of digital

11   media works, find what they need to complete their

12   creative projects.

13      Q   When you use -- just so I'm comfortable with

14   your terminology, when you refer to the two-sided

15   marketplace, you refer to the one party on the one

16   side as contributors?

17      A   Yes.

18      Q   And then the other side you refer to them as

19   buyers?

20      A   Yes.

21      Q   And has the business model been, essentially,

22   the same since Pond5's inception?

23      A   Yes.

24      Q   And how does the pricing work for digital

25   media on your e-commerce platform?

Electronically signed by Nancy Kottenstette (001-168-063-2113)                 20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 16

1        A     Generally, our artists or contributors will

2    set their own price for the works that they post onto

3    the site.

4        Q     And are there any minimums or maximums that

5    are imposed on contributors?

6        A     There are no maximums.  There are some basic

7    minimums to make sure things aren't too low.

8        Q     Is that a specific number, or is that

9    something determined in the curatorial review?

10       A     They're specific numbers set by policy.  I

11   don't know them off the top of my head because it

12   varies by each form of media.

13       Q     And for audio media, do you know the minimum

14   price?

15       A     Within audio, there's music and there's sound

16   effects.  Are you referring to one or the other?

17       Q     I'm interested in both actually.  Do you have

18   a minimum price for music?

19       A     I remember the music one, I believe, is $20.

20   On sound effects, I believe it's 2, maybe 1, though.

21   I'm not sure.

22       Q     And who determines the policy for the minimum

23   price?

24       A     The executive team, I guess, I would say based

25   on recommendation from the contenting.  It's not

BUELL REALTIME REPORTING, LLC

SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                30(b)(6) Thomas Crary

Page 32

1      Q    And how do you record assent to the terms of
2  use?
3      A    Basically, when you sign up with a username
4  and password, there's a check box that says accepts
5  Pond5's terms of use.
6      Q    It says at the top that Pond5 may change the
7  terms of service without notice.  To your knowledge,
8  have the terms of use changed during the course of
9  your employment at Pond5?
10     A    I don't believe so.
11     Q    And is that also true of the content license
12 agreement?
13            MR. ALTENBRUN:  If you know.
14     A    Yeah.  It's been at least a year since any of
15 the three agreements were revised.  I don't remember
16 exact dates of when each of them were revised.  But,
17 generally, probably on average two years old or so.
18     Q    And then if I could draw your attention to
19 page 2 document Bates marked Pond5 00137, do you see
20 that?
21     A    Yes.
22     Q    I'd like to ask you about the evaluation
23 license.  How does the evaluation license work to your
24 understanding?
25     A    So, basically, as a registered user, you can

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 33

1    go on the site and preview any of the content with

2    certain restrictions that both legally limit your

3    ability to use it as well as functionally limit your

4    ability to use it.

5        Q    Okay.  And, in particular, I'd like to ask

6    about the functional limitations on use.

7        A    Okay.

8        Q    So what are the functional limitations on use

9    of an evaluation?

10       A    Lower resolution, so, you know, if it's a

11   video file, for instance, or a photo, it doesn't have

12   the full resolution.  You can't see the highest level

13   of detail, and then everything is watermarked, whether

14   it be a photo that has the Pond5 logo embossed in

15   there or a video, same thing.  Or in the case of

16   audio, I believe, every seven seconds-ish, there's a

17   Pond5.com kind of harassing voice that's in the

18   background.

19       Q    Okay.  And so is it -- is there also -- you

20   mentioned lower resolution.  Does that apply to only

21   the video file or the photo; is that right?

22       A    I believe so.  I couldn't say for sure on the

23   audio whether that's actually down converted or not.

24   I'm not sure.

25       Q    It's been our experience it remains high

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                30(b)(6) Thomas Crary

Page 34

```
 1    quality, and then there's the video watermark --
 2    excuse me.  The audio watermark.
 3            Is the user able to download a copy of the
 4    file onto their digital media and it's in their
 5    control?
 6        A   Do you mean to download the previewed copy?
 7        Q   Yes.  It's a bad question.  So say someone
 8    goes to download a sound effects file, for example.
 9        A   Right.
10        Q   Say it's the sound of waves.
11        A   Right.
12        Q   And they'll download a copy of -- for the
13    evaluation license from the Pond5 website.
14        A   Right.
15        Q   Right?
16        A   Yeah.
17        Q   Do they pay any money for that?
18        A   No.
19        Q   Do you make a record of who's done that?
20        A   We do track.  That is a data attribute.
21        Q   What does that mean?
22        A   Meaning if someone plays the preview or
23    downloads a preview, we do track the data usage.
24        Q   When you say track the data usage, what data
25    do you --
```

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

Electronically signed by Nancy Kottenstette (001-168-063-2113)                      20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 35

1       A    That someone has downloaded it.

2       Q    Do you know who has downloaded it?

3       A    As a preview?

4       Q    Yes.

5       A    I'm saying we track it.  I haven't looked up

6    any particular attribute for any particular user.

7       Q    I'm trying to determine what information you

8    know and don't know.

9       A    Off the top of my head -- and I don't even

10   know which particular content we're talking about.

11   Are we talking about Mr. Hempton's content?  Are we

12   talking about other stuff in general?

13      Q    I'm particularly interested in the content

14   that gets downloaded and the control that you exercise

15   over that content and, in particular, an evaluation

16   license at this line of inquiry.  So go back to the

17   example of let's say it's a .wav file, meaning a sound

18   recording of waves.

19      A    Got you.

20      Q    And say it was originated from Mr. Hempton

21   originally and then uploaded by a third party, for

22   example.  When that content is uploaded onto the Pond5

23   marketplace and then a buyer comes and obtains an

24   evaluation license, that's the example that I'm asking

25   about right now.

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 36

1         So when a buyer comes and obtains an

2   evaluation license, they then get a digital copy of

3   the file; correct?

4               MR. ALTENBRUN:  Object to the form.

5       A   Yes.  They have a digital copy of a .wav wave

6   file with a harassing audio watermark.

7       Q   When you say ".wav wave," you mean .wav --

8       A   Yes.

9       Q   -- and the word "wave"?

10      A   Yes.  Just making sure it's clear there are

11  waves in both cases.

12      Q   I should have used a bird call.  I'm going to

13  switch my example to a bird call now for clarity of

14  language.

15        So that user now has an evaluation copy of, in

16  this hypothetical, Mr. Hempton's copyrighted recording

17  of a bird call, and it also has that watermark every

18  seven seconds, which says Pond5; right?

19      A   I believe so, yeah.

20      Q   That's kind of an English accent that comes

21  over the license; right?

22      A   Yeah.

23              MR. ALTENBRUN:  Object to form.

24      A   I don't know if it's English, but it's

25  American, I think.

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 37

1     Q    And do you track of the buyers of an
2     evaluation license their name, username?
3                MR. ALTENBRUN:   Object to the form.
4     A    Yes.
5     Q    And do you track their IP addresses?
6     A    We track, yes, what IP addresses they log in
7     from, yes.
8     Q    And do you track -- do you do any cookie
9     tracking for that?
10    A    If they allow us to put cookies on to their
11    computer, then we do track a cookie.
12    Q    And are there any other efforts to track or
13    control evaluation licensed content?
14                MR. ALTENBRUN:   Objection to form,
15    calls for a legal conclusion.
16    A    I don't know what you mean by control.  We're
17    just tracking data attributes passively.
18    Q    Any other data attributes other than the ones
19    you've described here?  Are there any other data
20    attributes you track?
21                MR. ALTENBRUN:   Object to form.
22    A    We track thousands of data attributes for
23    every behavior that a customer would do on our website
24    for the purposes of improving sales primarily.
25    Q    Okay.  So you're tracking things like --

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 41

1      A    Sure.  Basically, you know, our website has

2    some 20 million items of digital media.  And when one

3    is sold, for whatever price has been set by the

4    artist, the artist gets their 50 percent share, and we

5    take a 50 percent commission on the sale.

6      Q    Okay.  And the 50 percent, is that net of your

7    costs?

8      A    No.  That is gross of costs.

9      Q    And if you could, describe to me a little bit

10   about how the money flows through.  So a user

11   purchases content on the Pond5 system.  Who collects

12   the money from the buyer?

13     A    A third party intermediary.  Typically, most

14   purchases are done via credit card.  So we have a

15   payment processer that processes those payments, and

16   we receive the gross amount three, four days later

17   once it is cleared through the payment processer.

18     Q    Okay.  What are the average credit card fees

19   associated with those sales?

20           MR. ALTENBRUN:  Object to the form.

21     A    About 3 percent.

22     Q    So let's say a piece of content was sold for

23   $10.  How much would you expect the contributor to

24   receive of that?

25     A    They would receive 5.

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 60

1    Mr. Hassan Khan?

2        A    We have not.

3        Q    And have you been in contact with Mr. Khan

4    regarding this lawsuit?

5        A    No.

6        Q    And why not?  I caution you not to respond to

7    me with your legal strategy what the lawyers have

8    said.

9        A    Why not?

10             MR. ALTENBRUN:  Let me object because

11   this is beyond the scope.  You may answer if you don't

12   disclose attorney-client privileged conversations.

13       A    Sure.  I mean, I think the only reason we have

14   not is we don't believe it would be that effective in

15   this case given where he's located and, you know, the

16   fact that he has used aliases in the past.  Certainly,

17   something we could still do.

18       Q    I'm going to ask you next about your

19   curatorial review.  Is that a term of art that's used

20   within Pond5?

21       A    Yeah.

22       Q    What is curatorial review?

23       A    It's a brief review of content that is

24   submitted through the upload process to be put live on

25   the site.  It's a human review.

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 64

1              MR. ALTENBRUN:  Objection.  I think
2    you've misstated his testimony.
3        Q   Let me ask you this way:  What efforts do the
4    audio -- do the curatorial review team for audio
5    undertake to recognize fraud?
6        A   As of today?
7        Q   Sure.
8        A   So, I mean, the review process is two-fold.
9    We do an artist identification process at the
10   beginning of the relationship with an artist where we
11   ask them to submit IDs, physical photo identification.
12   And that process, while not part of the curatorial
13   process per se, is part of the initial artist
14   on-boarding experience.  So to join that process where
15   they have to submit valid photo identification with
16   a -- meaning it has to be nonexpired.  The name has to
17   match the name on the account.
18       Q   And when did you institute the artist
19   identification review and particularly reviewing photo
20   IDs?
21       A   Last fall.
22       Q   Can you be more specific?
23       A   Probably late October, November.
24       Q   Why did you institute that program?
25       A   Partly in response to this particular incident

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 65

 1    where, you know, we found an instance of someone using

 2    an alias that did not represent themselves.  It was

 3    the first time we had ever come across this problem.

 4        Q   Well, you've come across claims of copyright

 5    infringement on your website before; correct?

 6        A   Yes.

 7        Q   So when you say it's the first time we've

 8    encountered this problem, what do you mean by that?

 9        A   Where someone has returned to the website

10    using a false identity if, indeed, that's what they

11    were doing.

12        Q   Okay.  And what other artist identification

13    review do you do today other than the photo IDs?

14        A   As part of the process, we do manually check

15    for matches against our database on IP address and

16    cookie ID.

17        Q   Anything else?

18            MR. ALTENBRUN:  Object to the form.

19        A   I think that's pretty much it.

20        Q   And then the manual check for IP addresses and

21    cookie ID, when did that start?

22        A   At the same time.

23        Q   And for the same reason?

24        A   Yes.

25        Q   You say you check for matches against a

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 81

1   Exhibit 7.

2       A    I believe he had two usernames at the time, at

3   least around the same time.  I'd have to look to go

4   see exactly when.  Because he had a total of three

5   usernames, we were able to match -- Hassan Khan, Wild

6   Audio Productions, and later Chris Kennedy, Ckennedy.

7   The first two happened at or around the same time,

8   Wild Audio Productions and Hassan Khan.  I don't

9   remember if when this communication was happening in

10  May whether he already had the Hassan Khan account up

11  or not.

12      Q    Okay.  And at this point what I'm interested

13  in here is the steps in the context of May and June

14  and I think even in July 2014 as the indicators that

15  you had that Wild Audio Productions was Mr. Khan?

16      A    I mean, if we had his ID, I assume it would

17  have confirmed his identity, and I believe -- I don't

18  remember.

19      Q    Feel free to take your time.

20      A    There's nothing I can look at here.  I believe

21  he listed his name as Hassan Khan even under Wild

22  Audio Productions.

23      Q    And you reviewed his ID and you also -- at

24  some point -- strike that.  Let's get to the --

25                  (Exhibit 9 was marked.)

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 82

1      Q    The court reporter has handed you Exhibit 9.

2   Do you recognize what this is?

3      A    Yes.

4      Q    What is this?

5      A    This is an e-mail exchange between Mr. Hempton

6   and I.

7      Q    And in that -- I'll draw your attention to

8   page 1.  You note that you've done an internal

9   investigation using IP addresses, cookie matches, and

10  other means.  And is that right that you conducted an

11  investigation?

12     A    Yes.

13     Q    Okay.  And we'll look at the results of that

14  investigation in a minute.  Can you tell me the

15  investigation that Pond5 undertook once it learned of

16  Mr. Hempton's complaint?

17     A    Yeah.  It's a lot of the same stuff we've

18  talked about with searching the users' accounts and

19  looking for the data attributes that we do track and

20  trying to match them against other potentially

21  red-flagged hits we have in the database.

22     Q    So you did an investigation of the Ckennedy

23  account, and at that time you determined that Ckennedy

24  was also Mr. -- associated with the previously blocked

25  contributor from Wild Audio Productions; is that

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 83

1    right?

2        A    We believe it's likely, yes.

3        Q    And upon what basis did you make that

4    conclusion?

5        A    By the fact that we did find positive matches

6    for both IP address, cookie ID, and third case we also

7    had a PayPal name that had the name Hassan Khan in it,

8    which is unusual for someone to actually use their

9    real name in PayPal actually.  But in this case,

10   Mr. Hassan Khan was not very smart in his attempts to

11   avoid tracking.

12       Q    Okay.  And so -- we've printed out a copy of

13   the spreadsheet you provided.

14              (Exhibit 10 was marked.)

15       Q    Do you recognize Exhibit 10?

16       A    Yes.

17       Q    What is Exhibit 10?

18       A    Exhibit 10 is a file that I sent to

19   Mr. Hempton in support of the investigation, steps

20   that we took, and to assist him in helping us

21   determine which, if any, of his clips were infringed

22   upon by Mr. Hassan Khan or the perpetrator and to

23   determine what, if any, sales occurred related to the

24   associated infringing clips.

25       Q    And now we're talking about -- and the

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 84

```
 1   account -- the Pond5 user ID is 554434; is that right?

 2       A    That's the same as Ckennedy342, that's right.

 3       Q    And is that the same user ID as used by Wild

 4   Audio Productions?

 5       A    No.

 6       Q    And so Mr. Khan -- is it your conclusion that

 7   Mr. Khan went back on the Pond5 site using the same IP

 8   address and started a new contributor account?

 9       A    Yeah.  He logged in even just -- you can see

10   it on this page.  He logged in from several IP

11   addresses even in the course of his ten years with

12   Pond5, only one of which was a match to his previous

13   IP address.

14       Q    And how can I determine that from this report?

15       A    You can't.  You'd have to search the more than

16   several million IP addresses we have tracked in

17   history.

18       Q    So if you had, as of summer or fall of 2014,

19   instituted that the IP address and cookie address and

20   name accounting systems, that you would have caught

21   the Ckennedy account as being associated with the

22   previously determined fraudulent account; is that

23   true?

24                MR. ALTENBRUN:  Object to form, calls

25   for speculation.
```

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 85

1       Q   Is that true?

2       A   I believe if we had had the same policies in

3   place, then we would have flagged it for further

4   review.

5       Q   If I could draw your attention --

6       A   Just to clarify one thing if I could --

7       Q   Of course.

8       A   -- it's assuming, of course, on his first

9   log-in when he signed up as a contributor that was the

10   IP address that matched.  He could have logged in at

11   any of these subsequent IP addresses later on, and

12   that's why we found the match because we did this,

13   obviously, in retrospect.  Only if he had signed in

14   with that same IP address on the first log-in when he

15   signed up for the account would we have that to match

16   against the database.

17       Q   But if you were maintaining a database of IP

18   addresses that were associated with previously

19   identified fraudulent activity, you would have then

20   caught it as Mr. Kennedy or the Ckennedy username

21   signed onto the system?

22       A   We do the manual review one time when they

23   sign up as a new contributor and they upload their

24   first content.  It's a one-time manual process.  If he

25   later, on a subsequent upload or in the ordinary

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 94

1    someone is a fraudster, is there additional review

2    that Pond5 does based on the amount of content that's

3    been contributed to the Pond5 system?

4         A    Because of what factor?

5         Q    The sheer volume of the content upload.

6         A    No.  I don't think there's any additional

7    steps we would take other than reviewing the content.

8         Q    And is that different in 2014 than today, your

9    answer to that question?

10        A    No.  I mean, like I said, as we explained

11   before, there's a certain amount of work that we do at

12   the artist level, and then there's a certain amount of

13   work that we do at the clip level.  And the larger the

14   selection of content it gets, the quicker it is to

15   review a selection of media.

16        Q    At the clip level?

17        A    At the clip level.

18        Q    And at the artist level, the review is the

19   same?

20        A    That's right.  Well, the same regardless of

21   how much media they contribute.

22        Q    And that's changed over the course of the time

23   relevant to this case?

24        A    Not with regard to whether that they've

25   uploaded a larger volume of clips.  We are now

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 95

 1    reviewing everyone regardless of whether they have

 2    uploaded 200 or 10,000.  We wouldn't change that

 3    because there has been no risk factor associated with

 4    larger libraries.  If anything, it's a counter risk

 5    factor.  It appears to go -- the correlation goes the

 6    other way.

 7        Q    All right.  So Mr. Khan is an exception to

 8    that correlation?

 9        A    Absolutely.  Potentially, assuming he's a

10    fraudster, assuming facts.  I'm not allowed to object.

11    I guess you are.

12        Q    Your answer is fair.  The question I asked

13    about the change of time is that you changed your

14    policy in the October/November 2015 time frame; right?

15        A    Yes.

16        Q    And that's when you start doing your

17    additional curatorial review.  And if I can understand

18    your testimony correctly, your additional curatorial

19    review does not change the level of investigation of

20    the contributor based on the volume of content

21    provided?

22        A    That's right.

23        Q    Let me draw your attention back to -- that's a

24    fair question.  So prior to October/November 2015,

25    what curatorial and artist review did Pond5 conduct,

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 96

1   not at the clip level, but at the artist or

2   contributor level?

3       A   Right.  I'm not aware of the full extent of

4   the process, but I believe that the review was mostly

5   just at the clip level previously.  And only upon an

6   incident of concern or where we've been made aware of

7   a potential instance of infringement would we

8   investigate at the artist level.

9       Q   So drawing your attention back to Exhibit 10,

10  which is the report you produced regarding Mr. Khan --

11  and this is not Bates'd, but if you go to the first

12  page regarding the user data page, so if you could

13  describe what you see on the user data page and we're

14  talking specifically about user ID 554434.

15      A   This is the user data for Ckennedy342, also

16  user ID 554434, and this lists several attributes that

17  we track, including his name, the company he has

18  purported to be representing, his e-mail address,

19  where he resides, when the account was created, that

20  we've confirmed the e-mail, so that's one identity

21  check measure we do take is confirming e-mail

22  addresses upon sign-up.  And then it lists his last

23  ten log-ins by date and the IP address that we have on

24  file for those log-ins.

25      Q   Okay.  And you said you confirm e-mail

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 111

1    represent that this was taken recently from the

2    website?

3                    MR. TOWNSEND:  Yes, yesterday.

4        Q    Okay.  And so is it an accurate statement to

5    say that your curators are quite selective?

6        A    Relative to what?  I mean, honestly, this

7    is -- there's two reasons why you say something like

8    this.  One is for marketing purposes so you get the

9    highest quality stuff, which is important, obviously,

10   to have the highest quality and to represent that we

11   do have the highest quality.  And the second one is

12   when you reject someone's content, you can point to

13   the reason why and say, sorry, we're very selective.

14       Q    So but is it an accurate statement that your

15   curators are quite selective?

16       A    Honestly, I don't believe so, to be honest.  I

17   think we probably are much more liberal than our

18   competition in letting stuff in.  I can tell you that

19   virtually everything that gets uploaded gets accepted

20   onto our site.  I wouldn't call ourselves very

21   selective, no.

22                    (Exhibit 13 was marked.)

23       Q    So I'll represent for the record that this

24   Exhibit 13 has been marked as confidential in case it

25   doesn't come up in the copy.  What is Exhibit 13?

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 117

1    in the user agreements is that you pay on the 15th?

2         A    Yes.

3         Q    Of every month?

4         A    Exactly.

5         Q    And so if you looked into the object ID and

6    looked at the other transactions, then when you do

7    that on the PayPal site, you can associate the

8    Ckennedy342 with the other --

9         A    That's right.

10        Q    -- sites that --

11        A    Well -- sorry.

12        Q    The user IDs that are reflected in your

13   analysis and spreadsheet --

14        A    That's right.

15        Q    -- in Exhibit 10?

16        A    That's right.  There will be no reason for him

17   to actually enter in his real identification there.

18   Most people -- I wouldn't say most people.  There are

19   lots of people who don't enter in their real

20   identification there because, you know, it's meant to

21   be an anonymous form of payment.  So he was, in his

22   sloppy ways, not really good at covering up his own

23   fingerprints.

24        Q    That makes sense.  And would you -- so does

25   that lead you to the conclusion that Mr. Khan is a

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 120

 1   say it's a notable increase.  It's been a pretty

 2   detailed search.  We've gone through more than 10,000

 3   IDs since then, and we've only -- we flagged probably

 4   a couple dozen.

 5       Q   And so looking at Exhibit -- the payments

 6   exhibit, can you determine how much money you paid to

 7   Ckennedy342?

 8       A   Well, if I had a calculator, I would say --

 9   and maybe the question is better -- I actually know,

10   so I can just tell you how much he's been paid.  It's

11   $4,063.

12       Q   And if you could grab Exhibit 8 --

13       A   Or I should say $4,063 is how much revenue is

14   associated with his account.  Half of that would be

15   how much he was paid.

16       Q   And there's some evidence that I've seen in

17   the record, and Exhibit 8 is one of those, if you

18   could grab that exchange.  This is the CRM software

19   with the exchange between the Ckennedy account and

20   Ellie, customer service and curatorial liaison.

21           And what I'm interested in here is the

22   Ckennedy user is complaining about when does he get

23   his money, and then Ellie states on July 3 saying that

24   there's evidence of fraud.  And the one sentence here

25   is "Because you are not in compliance with our

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 121

1    Contributor Agreement, you have essentially forfeited

2    your balance."

3             And so is it your understanding that the

4    balance was forfeited?

5        A    We did not pay the remaining balance that he

6    had accrued.

7        Q    And do you know about how much that was?

8        A    I don't.

9        Q    And is it your policy that in the event of

10   knowledge of fraud from a contributor that you forfeit

11   the balance that the contributor had in the account?

12             MR. ALTENBRUN:   Object to the form.

13       Q    Does that make sense to you?

14       A    Yeah.   I mean, it's something we can do.   I

15   think we don't necessarily go back in time and try and

16   recapture the money that was already paid to him.   But

17   if there's an outstanding balance -- basically,

18   everything stops as soon as you're flagged.   Not only

19   can they not be downloaded anymore, but they also

20   can't be paid through the normal course.

21       Q    Do you know if you could go to PayPal and say

22   give us the money back?   Have you pursued that?

23       A    I don't think we've ever tried.   I don't think

24   we would be very successful with that, but I don't

25   know.

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 122

1                    (Exhibit 15 was marked.)

2       Q    I have a couple questions about Exhibit 15.

3    Do you recognize the exchanges that are reflected in

4    Exhibit 15?

5       A    I recognize the type of exchanges, although I

6    don't know if I've read these specific ones.

7       Q    Describe to me what this type of exchange is.

8       A    Right.  So in addition to the ID verification,

9    we did -- across all media types, we did a specific

10   extensive investigation into all existing sound

11   effects artists because we became aware, partly

12   through this case, that it is the most difficult of

13   all of our media types to be able to determine whether

14   something online is potentially infringing work.

15         So as part of that, we put in place this

16   additional manual process going back to all sound

17   effects artists asking them to provide additional

18   documentation and support of the legitimacy of their

19   collection.

20      Q    That's the same kind of exchange that you

21   would now do on the front end; is that right?

22      A    Well, yes.  We do it on the front end.  So all

23   new people go through this process as well in sound

24   effects, but this is more extensive than our overall

25   ID verification process that I was explaining earlier.

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 123

1    This is ID verification plus that we're now doing with

2    regard to sound effects.

3        Q    And in addition to the now standardized

4    approach that you take as of late 2015, what are the

5    additional fraud screening you do for the sound

6    effects?

7        A    So in addition to the same ID verification, we

8    also do, as indicated here on this front page, a link

9    to your official website and/or web presence, for

10   example, LinkedIn page, a full screen display of your

11   digital audio work station and displaying your

12   original sound file from your most recent Pond5

13   submission.

14          So, basically, what this is -- I'll take them

15   one at a time.  The first one is saying if you're

16   holding yourself out as a musician and actually

17   marketing yourself as such -- because most musicians

18   that do sound effects would do so because they also

19   want to sell through their own independent channels

20   and get themselves some recognition -- you will be

21   holding yourself out as such.

22          This prevents people that are simply in the

23   business of ripping other people off to sell to other

24   people.  It scopes out that group of people through

25   that first test, and the second one requires an

BUELL REALTIME REPORTING, LLC

SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 128

1    about the -- so you also say that Pond5 utilizes

2    automatic content recognition from Audible Magic to

3    detect possible illegal improper posting of music

4    content.

5         A   Right.

6                   (Exhibit 17 was marked.)

7         Q   Do you recognize Exhibit 17?

8         A   I've seen it before, yes.

9         Q   What is it?

10        A   You know, I'm not exactly sure, but I think it

11   was part of our planning for the implementation of

12   Audible Magic.  It was probably put together by our

13   products and content teams.

14        Q   And was Audible Magic one of the safeguards

15   that you implemented after becoming aware of

16   Mr. Hempton's complaints?

17        A   It was under -- it was planning to be

18   implemented before the complaint.  It was actually

19   implemented after the complaint.

20        Q   And do you know when this document was

21   created?

22        A   Let's see.  One day of April 2015.  I would

23   guess it was probably compiled over some period of

24   time.

25        Q   And what is Exhibit 17, if you can describe

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 129

1   it?

2        A    I would call this a product implementation

3   specification.  So in order to get our developers and

4   our product team to implement this as an automated

5   process through the site, this is the plan, basically,

6   of that.

7        Q    And how do you pay Audible Magic?

8        A    If I remember right, we pay them a flat fee.

9   It's, basically, a licensing fee for the software, and

10  it's linked to some volume of number of tracks that

11  we're scanning as well.  So there's a fixed component

12  and a variable component.

13       Q    And there are tranches that you --

14       A    As volumes get higher, the prices get a little

15  bit lower on a variable basis.

16       Q    And do they have a fraud detection software

17  that they host on their own website?

18       A    Yeah.  It's kind of a duplicate detection

19  system of their own, and it matches against a very

20  large library, not just our library, but it matches

21  against their library.  If you're an artist,

22  particularly a musician, it's one of two major

23  databases that you would register with to make sure

24  that companies like us are able to be able to search

25  against it to figure out whether there are matching

BUELL REALTIME REPORTING, LLC
SEATTLE 206.287.9066  OLYMPIA 360.534.9066  SPOKANE 509.624.3261  NATIONAL 800.846.6989

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                30(b)(6) Thomas Crary

Page 130

1    things.

2        Q    Do you know who Audible Magic's competitor is

3    or the other database that you referenced?

4        A    I think it's the YouTube version.  What's it

5    called?  I don't remember the name of it.  YouTube has

6    their own content recognition platform.

7        Q    When you're dealing with Audible Magic, do

8    they have a kind of bronze, silver, gold-type

9    standard, or is there a just one off-the-shelf product

10   that they provide?

11                MR. ALTENBRUN:  Objection, beyond the

12   scope.

13       A    No.  There's one offering.

14       Q    It's just Audible Magic, yea or nay?

15       A    Yeah.

16       Q    And there's a reference here that Audible

17   Magic is not used for sound effects content like

18   Mr. Hempton's; right?

19       A    That's right.

20       Q    And why is that?

21       A    Because sound effects are not typically

22   registered under Audible Magic or the competing

23   content verification system.

24       Q    I see.  So their library to check against is

25   not as great?

Electronically signed by Nancy Kottenstette (001-168-063-2113)                20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

Page 131

```
 1      A    It doesn't include sound effects.

 2      Q    And there's quite a few references

 3   specifically in this document.  Let's kind of go

 4   through it, and I notice, in particular, there are

 5   references to Ckennedy, for example, on the document

 6   Bates Pond 302.  Do you see that reference?

 7      A    Yes.

 8      Q    So is it their representation that their fraud

 9   detection would have caught fraud that came from

10   Ckennedy342?

11      A    No.

12                MR. ALTENBRUN:   Object to the form and

13   lack of foundation.

14      Q    You say no?

15      A    No.

16      Q    Why is that?  Why do you say that?

17      A    Well, so let me go back.  So what they're

18   talking about here is additional ID verification

19   steps.  This is not in reference to the Audible Magic

20   anymore.  This is a separate document.

21      Q    Okay.  So Audible Magic is --

22      A    The first few pages here, and then when you

23   get to this page --

24      Q    When you say "this page," what do you mean?

25      A    This page, Pond 300.
```

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Hempton v. Pond5, Inc., et al.                    30(b)(6) Thomas Crary

```
                                                    Page 132
 1      Q    Let's stop at 292.  Is that -- excuse me.
 2   298.
 3      A    298, that's the Audible Magic specification.
 4      Q    Okay.
 5      A    But then you are referencing Pond 300, which
 6   is part of the content audit specification, which is a
 7   different specification.
 8      Q    So who created this document?
 9      A    This particular one actually was created by
10   Mike Pace, our audio manager, but it actually goes
11   above and beyond audio.  This is across all media
12   types.
13      Q    So this is a description of the photo ID and
14   some of the other things that you've talked about?
15      A    Basically, all measures we're taking -- I
16   don't mean all measures, but a summary, a broad
17   overview of the measures we're taking during the first
18   half of this year to reduce risk in the content
19   collection.
20      Q    I see.  And in this document, Mr. Pace --
21   correct me if I'm wrong -- sets up a sort of
22   cost-benefit analysis versus the cost of a deterring
23   risk versus the benefit of deterring risk and fraud;
24   is that a fair statement?
25                  MR. ALTENBRUN:  Objection, document
```

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4