# EXHIBIT 1

# Deposition of 30(b)(6) Thomas Crary

# Hempton v. Pond5, Inc., et al.

# March 22, 2016



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**

www.buellrealtime.com

Olympia | 360.534.9066     Spokane | 509.624.3261     National | 800.846.6989

email: info@buellrealtime.com



Page 1

```
            UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

GORDON HEMPTON,         )
                        )
     Plaintiff,         )
                        )
     -v-                ) CAUSE NO.
                        ) 3:15-CV-05696-DWC
POND5, INC., A Delaware )
Corporation; and POND5 USER )
CKENNEDY342, A corporation of)
Individual of Type Unknown, )
                        )
     Defendants.        )
_____

           DEPOSITION UPON ORAL EXAMINATION

                        OF

              30(b)(6) THOMAS CRARY
_____


         Taken at 1000 Second Avenue, Suite 3670

                  Seattle, Washington




DATE TAKEN: March 22, 2016
REPORTED BY: Nancy M. Kottenstette, RPR, CCR 3377
```

Page 2

```
              APPEARANCES
FOR THE PLAINTIFF:
     Roger M. Townsend, Esq.
     Cindy Heidelberg, Esq.
     BRESKIN JOHNSON TOWNSEND
     1000 Second Avenue
     Suite 3670
     Seattle, WA 98104
     206.652.8660
     rtownsend@bjtlegal.com

     Nicholas Power, Esq.
     LAW OFFICES OF NICHOLAS POWER
     540 Guard Street
     Suite 150
     Friday Harbor, WA 98250
     360.298.0464
     nickedpower@gmail.com

FOR THE DEFENDANT:
POND5, INC., A DELAWARE CORPORATION
     Larry E. Altenbrun, Esq.
     NICOLL BLACK & FEIG
     1325 Fourth Avenue
     Suite 1650
     Seattle, WA 98101
     206.838.7555
     laltenbrun@nicollblack.com
ALSO PRESENT: Gordon Hempton
```

Page 3

```
                INDEX OF EXAMINATION
                                          PAGE
EXAMINATION
     Questions By Mr. Townsend:             5
CROSS-EXAMINATION
     Questions By Mr. Altenbrun:          142
REDIRECT EXAMINATION
     Questions By Mr. Townsend:          147


                INDEX OF EXHIBITS
NUM.         DESCRIPTION                   PAGE
Exhibit 1    Notice of Deposition           12
Exhibit 2    Pond5 Org Chart                12
Exhibit 3    Pond5 Content License Agreement  14
Exhibit 4    Pond5 Contributor Agreement    19
Exhibit 5    Pond5 Terms of Use             20
Exhibit 6    Pond5 Content License Agreement  49
Exhibit 7    Correspondence between Wild    73
             Audio Productions and Pond5
             customer service most recently
             dated 5/5/14

Exhibit 8    Correspondence between Chris   74
             Kennedy and Pond5 most recently
             dated July 3

Exhibit 9    E-mail chain between Mr. Hempton  81
             and Mr. Crary most recently
             dated 10/16/15
```

Page 4

```
Exhibit 10   File sent to Mr. Hempton on    83
             Information on Hassan Khan

Exhibit 11   E-mail chain between Hassan Khan  89
             and Pond5 most recently dated
             1/10/14

Exhibit 12   Frequently asked questions    110

Exhibit 13   Graph (Confidential)          111

Exhibit 14   Payment information to Mr. Khan  115

Exhibit 15   ID verification letters       122

Exhibit 16   Plaintiff's First             124
             Interrogatories and Requests for
             Production of Documents

Exhibit 17   Audible Magic SDK Implementation  128
             Task
```

Page 61

1  Q  So when content is initially uploaded, a human
2  will review the content?
3  A  To some degree, depending on what the content
4  is and, you know, yes.
5  Q  And is it fair to say -- I think I've seen
6  this in some of the pleadings that you characterize
7  the primary review is for purposes of evaluating the
8  quality of the content; is that right?
9  A  Yeah.  Yes, I would say that's the primary
10 purpose is making sure that things on our site have a
11 salable value.
12 Q  And I think I saw that you have 20 million
13 files of content on your website; is that right?
14 A  In that sum, yeah.
15 Q  And then the curatorial review happens only at
16 upload; is that right?
17 A  Yes.
18 Q  So there's a period of time where the
19 contributor will go on to the system, upload the
20 content; is that right?
21 A  Yes, yes.
22 Q  And it goes through a human curatorial review?
23 A  Yes.
24 Q  And so maybe you could -- we could look
25 through the -- or let's look through Exhibit 2, which

Page 62

1  is the org chart, and you can kind of identify for me
2  who's performing curatorial review within your
3  organization.
4  A  So on Pond 000124 under the contenting,
5  basically, all the people that are listed as curators.
6  Q  All right.  So the content team on Pond 124,
7  does this represent the entirety of the content team
8  that does curatorial review?
9  A  It looks like it.
10 Q  And who is Rick Gell?
11 A  He is the head of our content department.
12 Q  Where is he located?
13 A  New York.
14 Q  And it looks like people are kind of all over
15 the world.  There's a group in Prague; is that right?
16 A  Yeah.
17 Q  And the majority of the content curatorial
18 review is done there; is that right?
19 A  Well, I mean, I think it's primarily our photo
20 curatorial group is in Prague.  Our video and audio is
21 primarily led out of New York.
22 Q  And so is there a reason why there are
23 18 people in Prague doing image and illustration
24 review, and in terms of audio, it looks like there's
25 only two people?

Page 63

1  A  Three.  Mike Pace is the manager, and then
2  Dani is in New York.  And Miklos is in Hungary.
3  Q  Is there a reason why there's so many more
4  people doing image and illustration curatorial review
5  as compared to the audio curatorial review?
6  A  Primarily, the volumes are higher with images.
7  Q  And as part of the curatorial review, does
8  Pond5 conduct a review as to whether or not the
9  contributor has the authority to upload the content?
10 A  I mean, obviously, that process is primarily a
11 legal one that takes place by the user accepting the
12 terms of use and the contributor agreement.  The
13 curator's job -- and they're not lawyers, obviously.
14 They're primarily artists themselves, and they've been
15 trained to recognize certain things that might be
16 indicators of potential copyright infringement, but
17 it's certainly not their specialty.
18    And the fact is they have only a short time.
19 Like the process is primarily -- the amount of volumes
20 that we have being contributed don't allow for an
21 in-depth study of any particular work.  They're
22 looking at each of these things for a matter of a few
23 brief seconds and often in batches.
24 Q  And you say they're trained to recognize
25 fraud.  What does that mean to you?

Page 64

1    MR. ALTENBRUN:  Objection.  I think
2  you've misstated his testimony.
3  Q  Let me ask you this way:  What efforts do the
4  audio -- do the curatorial review team for audio
5  undertake to recognize fraud?
6  A  As of today?
7  Q  Sure.
8  A  So, I mean, the review process is two-fold.
9  We do an artist identification process at the
10 beginning of the relationship with an artist where we
11 ask them to submit IDs, physical photo identification.
12 And that process, while not part of the curatorial
13 process per se, is part of the initial artist
14 on-boarding experience.  So to join that process where
15 they have to submit valid photo identification with
16 a -- meaning it has to be nonexpired.  The name has to
17 match the name on the account.
18 Q  And when did you institute the artist
19 identification review and particularly reviewing photo
20 IDs?
21 A  Last fall.
22 Q  Can you be more specific?
23 A  Probably late October, November.
24 Q  Why did you institute that program?
25 A  Partly in response to this particular incident

Page 65

1  where, you know, we found an instance of someone using
2  an alias that did not represent themselves. It was
3  the first time we had ever come across this problem.
4      Q  Well, you've come across claims of copyright
5  infringement on your website before; correct?
6      A  Yes.
7      Q  So when you say it's the first time we've
8  encountered this problem, what do you mean by that?
9      A  Where someone has returned to the website
10 using a false identity if, indeed, that's what they
11 were doing.
12     Q  Okay.  And what other artist identification
13 review do you do today other than the photo IDs?
14     A  As part of the process, we do manually check
15 for matches against our database on IP address and
16 cookie ID.
17     Q  Anything else?
18         MR. ALTENBRUN:  Object to the form.
19     A  I think that's pretty much it.
20     Q  And then the manual check for IP addresses and
21 cookie ID, when did that start?
22     A  At the same time.
23     Q  And for the same reason?
24     A  Yes.
25     Q  You say you check for matches against a

Page 66

1  database.  What database are you referring to?
2      A  You mean on the IP address?
3      Q  Yes.
4      A  Against all tracks of IP addresses we have in
5  our database.  So if someone has logged in from the
6  same IP address before, we check it.
7      Q  And is tracking -- so tracking IP addresses is
8  a significant part of your fraud screening?  Is that a
9  safe thing to say?
10         MR. ALTENBRUN:  Object to the form.
11     A  You know, it's a step we're taking probably
12 out of an abundance of caution.  There's some real
13 problems with that as an approach to fraud detection.
14 One, it's very easy to spoof.  It wouldn't be hard for
15 someone to avoid that as a detection mechanism.
16         On the other hand, it also gives you a large
17 number of false positives as well.  So it's certainly
18 not an ideal form of detection, but, again, out of an
19 abundance of caution, we are doing it as a manual
20 process that has taken an enormous amount of man hours
21 to do.  But, frankly, it's not a scalable part of our
22 business.
23     Q  Why is it not scalable?  Because it's too
24 manual?
25     A  Yeah.  We have 58,000 and counting artists.

Page 67

1  Reviewing IDs from people around the world is -- one,
2  it takes a lot of time.  It's not an easy thing to do
3  when you're dealing with IDs that are from countries
4  that are, you know, not America, let's just say.
5  Oftentimes, they're in different languages or
6  different fonts.  Just reading them from a clarity
7  point of view and matching them up to something else
8  is not always easy to do.
9          It's not a great measure mainly because it's
10 not scalable.  It's not something we can do at scale.
11 We've invested a tremendous amount of resources to try
12 to get a handle on the issue, but it's not something
13 we can do at scale, let's say.
14     Q  And do you rely on any third party databases
15 of IP addresses that are associated with fraudulent
16 behavior?
17     A  No.
18     Q  And you said that you get a lot of false
19 positives.  Can you explain what you mean by that?
20     A  Well, you know, IP addresses often get grouped
21 together, and if someone who is a legitimate artist
22 gets grouped together from a hit and was flagged as
23 potentially illegitimate, you realize, of course, when
24 we're flagging people that's potentially illegitimate
25 we're doing so sometimes with limited investigation,

Page 68

1  so it's not even concluded necessarily they're
2  fraudulent.  We'll mark them fraudulent as a
3  precautionary measure sometimes.
4          So a lot of time if IP addresses go through
5  the same subnet gateway, etc., they can get grouped
6  together.  You get a number of hits that you're not
7  sure whether or not it is potentially from the same
8  originating computer or not.
9      Q  And when you get a positive hit on an IP
10 address, what steps do you undertake to review whether
11 or not it was a false positive or a positive,
12 positive?
13     A  We look at -- it's a case-by-case basis.  You
14 look at the other attributes that have been submitted,
15 like the ID itself, any other track record they have
16 operating with us, for instance.  So just to be clear,
17 we went back and actually reviewed our existing
18 artists as well as part of this process.
19         If they have a five-year track record of being
20 what appears to be upstanding and have a collection
21 that has performed in the market without having been
22 questioned, then that gives us indication that they
23 would potentially be okay.  But if there's any doubt
24 whatsoever, we would take their stuff offline and seek
25 additional verification.

17 (Pages 65 to 68)

Page 69

1  Q  And is one of the steps you do is get on
2  Google and see whether or not the contributor or the
3  e-mail address or any of the other personally
4  identifiable information has some kind of social media
5  footprint?
6  A  That's a good example of a follow-up
7  investigation that we could do is check for artistic
8  web presence that would match their identity to the
9  person.
10  Q  And are IP addresses associated with specific
11  geographic regions?
12  A  Yes.  At least at the origin, they are.  If
13  they go through a certain tunneling, they can be
14  spoofed.
15  Q  And so if they're not spoofed and they're
16  associated with an IP address, is it possible for
17  Pond5 and the curatorial review to determine where the
18  contributor is located?
19      MR. ALTENBRUN:  Objection, lack of
20  foundation, beyond the scope.  You can answer.
21  A  Yeah.  I mean, often, we have an indication of
22  where the IP address appears to have originated, but
23  you don't know whether it actually was there or not.
24  Q  But the only reason it wouldn't be in the
25  location -- strike that.

Page 70

1      The only time when a contributor's IP address
2  would not be accurately represented in their system
3  would be if the contributor had somehow spoofed the
4  system to intentionally deceive or otherwise cover
5  their footprint; is that right?
6      MR. ALTENBRUN:  Objection, lack of
7  foundation.
8  A  Yeah.  I'm not an expert on spoofing of IP
9  addresses, but I would assume what you're saying is
10  true.
11  Q  So unless you're spoofing, the IP address will
12  identify the location of the contributor; correct?
13      MR. ALTENBRUN:  Same objection.  You've
14  also misstated his testimony.
15  Q  Feel free to correct me if I'm wrong.
16  A  I would just say I'm not an expert.
17  Q  Okay.  But is it your basic understanding that
18  an IP address, unless spoofed, is associated with a
19  geographic region?
20  A  Yeah, I think so.
21  Q  And is it also true that specific geographic
22  regions are more associated with fraud than others?
23      MR. ALTENBRUN:  Object to the form,
24  lack of foundation.
25  A  Yeah.  Certainly, there are certain regions

Page 71

1  that tend to have higher instances of fraud than
2  others.  We found that in the data.  That's true.
3  Q  And do you check whether or not the IP address
4  is associated with a location that the Department of
5  Commerce or the U.S. government has said that we're
6  prevented from -- or U.S. companies --
7  A  Yeah.  The blacklisted companies, yeah.
8  That's actually done by our payment providers.
9  Q  So the payment provider will do that at the
10  credit card level?
11  A  Yes.  For purchasing, that's right.
12  Q  Is that also done at the IP address level?
13  A  We do block certain countries holistically
14  from the site.
15  Q  Which?
16  A  Those would include the blacklisted countries
17  as well as a few others that we believe are too risky
18  to engage in.
19  Q  Where does Pakistan fit?
20  A  Pakistan is not in that list.
21  Q  And in your review of the data, do you find
22  there's a correlation between fraud and IP addresses
23  in Pakistan?
24  A  No.  It's not one of the ones we come up with
25  as a particularly high risk territory.

Page 72

1  Q  You also said that you manually check for
2  matches against the database for IP addresses and
3  cookie ID?
4  A  Yes.
5  Q  Can you explain to me what you mean by cookie
6  ID?
7  A  Well, as I understand it, if a user accepts
8  cookies onto their site, we will place a cookie onto
9  their computer to be able to track certain buyer
10  attributes of -- basically, track some of their
11  preferences and things like that.
12      So some users accept cookies, and if they do,
13  we'll place a cookie there.  And then we can track the
14  fingerprint that the cookie in terms of if that
15  computer is logged in again under a different
16  username.
17  Q  And if I heard you correctly, you talked about
18  buyers and the cookie ID; is that right?  How does the
19  cookie ID review help, if at all, screen against fraud
20  by contributors?
21  A  So it's similar to the IP address in that it
22  allows you to compare one computer against another and
23  say is this the same computer that's being used.  But
24  it's only available in very limited circumstances, so
25  it doesn't give you a whole lot of matches.

Page 81

1  **Exhibit 7.**
2  A   I believe he had two usernames at the time, at
3  least around the same time.  I'd have to look to go
4  see exactly when.  Because he had a total of three
5  usernames, we were able to match -- Hassan Khan, Wild
6  Audio Productions, and later Chris Kennedy, Ckennedy.
7  The first two happened at or around the same time,
8  Wild Audio Productions and Hassan Khan.  I don't
9  remember if when this communication was happening in
10 May whether he already had the Hassan Khan account up
11 or not.
12     Q   Okay.  And at this point what I'm interested
13 in here is the steps in the context of May and June
14 and I think even in July 2014 as the indicators that
15 you had that Wild Audio Productions was Mr. Khan?
16     A   I mean, if we had his ID, I assume it would
17 have confirmed his identity, and I believe -- I don't
18 remember.
19     Q   Feel free to take your time.
20     A   There's nothing I can look at here.  I believe
21 he listed his name as Hassan Khan even under Wild
22 Audio Productions.
23     Q   And you reviewed his ID and you also -- at
24 some point -- strike that.  Let's get to the --
25         (Exhibit 9 was marked.)

Page 82

1     Q   The court reporter has handed you Exhibit 9.
2  Do you recognize what this is?
3     A   Yes.
4     Q   What is this?
5     A   This is an e-mail exchange between Mr. Hempton
6  and I.
7     Q   And in that -- I'll draw your attention to
8  page 1.  You note that you've done an internal
9  investigation using IP addresses, cookie matches, and
10 other means.  And is that right that you conducted an
11 investigation?
12    A   Yes.
13    Q   Okay.  And we'll look at the results of that
14 investigation in a minute.  Can you tell me the
15 investigation that Pond5 undertook once it learned of
16 Mr. Hempton's complaint?
17    A   Yeah.  It's a lot of the same stuff we've
18 talked about with searching the users' accounts and
19 looking for the data attributes that we do track and
20 trying to match them against other potentially
21 red-flagged hits we have in the database.
22    Q   So you did an investigation of the Ckennedy
23 account, and at that time you determined that Ckennedy
24 was also Mr. -- associated with the previously blocked
25 contributor from Wild Audio Productions; is that

Page 83

1  right?
2     A   We believe it's likely, yes.
3     Q   And upon what basis did you make that
4  conclusion?
5     A   By the fact that we did find positive matches
6  for both IP address, cookie ID, and third case we also
7  had a PayPal name that had the name Hassan Khan in it,
8  which is unusual for someone to actually use their
9  real name in PayPal actually.  But in this case,
10 Mr. Hassan Khan was not very smart in his attempts to
11 avoid tracking.
12    Q   Okay.  And so -- we've printed out a copy of
13 the spreadsheet you provided.
14        (Exhibit 10 was marked.)
15    Q   Do you recognize Exhibit 10?
16    A   Yes.
17    Q   What is Exhibit 10?
18    A   Exhibit 10 is a file that I sent to
19 Mr. Hempton in support of the investigation, steps
20 that we took, and to assist him in helping us
21 determine which, if any, of his clips were infringed
22 upon by Mr. Hassan Khan or the perpetrator and to
23 determine what, if any, sales occurred related to the
24 associated infringing clips.
25    Q   And now we're talking about -- and the

Page 84

1  account -- the Pond5 user ID is 554434; is that right?
2     A   That's the same as Ckennedy342, that's right.
3     Q   And is that the same user ID as used by Wild
4  Audio Productions?
5     A   No.
6     Q   And so Mr. Khan -- is it your conclusion that
7  Mr. Khan went back on the Pond5 site using the same IP
8  address and started a new contributor account?
9     A   Yeah.  He logged in even just -- you can see
10 it on this page.  He logged in from several IP
11 addresses even in the course of his ten years with
12 Pond5, only one of which was a match to his previous
13 IP address.
14    Q   And how can I determine that from this report?
15    A   You can't.  You'd have to search the more than
16 several million IP addresses we have tracked in
17 history.
18    Q   So if you had, as of summer or fall of 2014,
19 instituted that the IP address and cookie address and
20 name accounting systems, that you would have caught
21 the Ckennedy account as being associated with the
22 previously determined fraudulent account; is that
23 true?
24        MR. ALTENBRUN:  Object to form, calls
25 for speculation.

Page 89

1  external hard drive for uploading onto Pond5; is that
2  right?
3     A   Is there a page you're referring to?
4     Q   Let me ask you:  Do you recall whether or not
5  Mr. Khan uploaded content using an external hard
6  drive?
7     A   To be honest, I don't.
8        (Exhibit 11 was marked.)
9     Q   Can you take a minute to review this exchange?
10 I'll draw your attention to the third page where
11 Jonathan Rennie says "The best and fastest way to get
12 a large media collection on your portfolio on our
13 website would indeed be to mail it to us on a DVD or
14 even an external hard drive."  Do you see that?
15    A   I do, yes.
16    Q   And so do you know whether Mr. Khan -- let me
17 ask you that.  Does this refresh your recollection as
18 to whether Mr. Khan provided Pond5 with an external
19 hard drive or a DVD --
20    A   To be honest, I don't think I read this one in
21 the past.  This is a new one for me.
22        MR. ALTENBRUN:  Let me object based on
23 the fact that is beyond the scope.
24    Q   There are -- there's a link here, though,
25 that -- well, strike that.

Page 90

1        Do you know whether or not Mr. Khan, whether
2  as Ckennedy or Wild Audio or other user, uploaded and
3  contributed content onto the Pond5 system by upload or
4  mail?
5     A   I do not know.  It's not an attribute I've
6  looked into.
7     Q   He could have done it either way, though; is
8  that right?
9     A   Yes.
10    Q   And is the uploading of content or the
11 providing of a DVD a risk factor in your curatorial
12 review for fraudulent content?
13    A   No.
14    Q   Okay.  And is the volume of content provided
15 by the contributor a risk factor for fraud detection?
16    A   No.  I would say, in fact, it's usually the
17 opposite.
18    Q   And would it be an appropriate use of
19 resources to take more time to do fraud protection
20 against someone who is providing thousands of files
21 and a potential fraudster than it would someone who is
22 maybe only putting one or two files and, therefore,
23 the risk is less?
24        MR. ALTENBRUN:  Object to the form.
25    A   Yeah.  As I said before, I don't think it's a

Page 91

1  risk factor.  If anything, the correlation goes the
2  other way.
3     Q   But the likelihood of infringement might be
4  lower, but the damage associated with the infringement
5  might be greater if there's more content; is that a
6  fair statement?
7        MR. ALTENBRUN:  Object to the form.
8     A   I don't know.
9     Q   Okay.  So just say, hypothetically, I am a
10 copyright infringer from Pakistan, and I upload one
11 content.  The risk of infringement is only that one
12 item of content; right?
13    A   Yes.
14    Q   And if I'm a fraudster from Pakistan who
15 uploads 10,000 files, then the risk is much greater;
16 right?
17        MR. ALTENBRUN:  Object to the form,
18 assumes facts, and it's an incomplete hypothetical.
19    A   I mean, I don't know.  Honestly, it depends
20 on -- I guess you're assuming that all 10,000 are
21 infringing and all one is infringing.  And then the
22 question is which ones get sold more.  That one could
23 get sold many more times than the 10,000 potentially.
24    Q   That's not my question.  My question is:
25 Isn't it an appropriate place to put resources if you

Page 92

1  see somebody who's uploading a massive library of
2  10,000 items of content to look at that individual and
3  maybe at that point do a Google search or maybe at
4  that point do some fraud protection?  And isn't the
5  risk then of a massive library of fraudulent content
6  on your website greater than a single user who may
7  have only a single piece of content?
8        MR. ALTENBRUN:  Objection, asked and
9  answered.
10    A   Like I said, I don't think it's a big risk
11 factor.  The correlation usually goes the other way,
12 and we have lots and lots of people that have 10,000
13 files on our site.  It's not that unusual to be
14 honest.
15    Q   How many people would you say upload more than
16 10,000 files on your site?
17    A   I don't know.  Hundreds, if not thousands.
18    Q   And so you have thousands of users who have
19 more than 10,000 files?
20        MR. TOWNSEND:  Objection, misstates his
21 testimony.
22    A   Hundreds, if not thousands.  It's definitely
23 hundreds.
24    Q   So if you have hundreds of users with 10,000
25 content, wouldn't it be appropriate to spend more than

Page 93

1   a couple seconds reviewing their content as part of
2   your curatorial review?
3       A   We would spend more than a couple seconds on
4   the curatorial review.  A couple of seconds we would
5   say is the average length of time we would spend on
6   each clip.
7       Q   I see.  So if someone is putting 10,000 files
8   on, the amount of time during review of each clip is
9   the same per clip as if someone has put only one or
10  two?
11      A   It's an average, but it's more, quite a bit
12  more obviously.
13      Q   I'm asking the question on a per clip basis.
14  Are they more or less based on the number, or are they
15  the same based on the number of files uploaded?
16      A   On a per clip basis, it does become more
17  efficient.  So the average review time per clip goes
18  down with a larger number of files because some of the
19  tests we do or the review we do would be at the user
20  level, you know.  And for instance, 10,000 clips we
21  would probably sample the 10,000.  We wouldn't look at
22  every single clip.
23      Q   And in terms of reviewing whether or not the
24  contributor has the authorization to and is a, to use
25  Mr. Pace's language, fraudster, to determine whether

Page 94

1   someone is a fraudster, is there additional review
2   that Pond5 does based on the amount of content that's
3   been contributed to the Pond5 system?
4       A   Because of what factor?
5       Q   The sheer volume of the content upload.
6       A   No.  I don't think there's any additional
7   steps we would take other than reviewing the content.
8       Q   And is that different in 2014 than today, your
9   answer to that question?
10      A   No.  I mean, like I said, as we explained
11  before, there's a certain amount of work that we do at
12  the artist level, and then there's a certain amount of
13  work that we do at the clip level.  And the larger the
14  selection of content it gets, the quicker it is to
15  review a selection of media.
16      Q   At the clip level?
17      A   At the clip level.
18      Q   And at the artist level, the review is the
19  same?
20      A   That's right.  Well, the same regardless of
21  how much media they contribute.
22      Q   And that's changed over the course of the time
23  relevant to this case?
24      A   Not with regard to whether that they've
25  uploaded a larger volume of clips.  We are now

Page 95

1   reviewing everyone regardless of whether they have
2   uploaded 200 or 10,000.  We wouldn't change that
3   because there has been no risk factor associated with
4   larger libraries.  If anything, it's a counter risk
5   factor.  It appears to go -- the correlation goes the
6   other way.
7       Q   All right.  So Mr. Khan is an exception to
8   that correlation?
9       A   Absolutely.  Potentially, assuming he's a
10  fraudster, assuming facts.  I'm not allowed to object.
11  I guess you are.
12      Q   Your answer is fair.  The question I asked
13  about the change of time is that you changed your
14  policy in the October/November 2015 time frame; right?
15      A   Yes.
16      Q   And that's when you start doing your
17  additional curatorial review.  And if I can understand
18  your testimony correctly, your additional curatorial
19  review does not change the level of investigation of
20  the contributor based on the volume of content
21  provided?
22      A   That's right.
23      Q   Let me draw your attention back to -- that's a
24  fair question.  So prior to October/November 2015,
25  what curatorial and artist review did Pond5 conduct,

Page 96

1   not at the clip level, but at the artist or
2   contributor level?
3       A   Right.  I'm not aware of the full extent of
4   the process, but I believe that the review was mostly
5   just at the clip level previously.  And only upon an
6   incident of concern or where we've been made aware of
7   a potential instance of infringement would we
8   investigate at the artist level.
9       Q   So drawing your attention back to Exhibit 10,
10  which is the report you produced regarding Mr. Khan --
11  and this is not Bates'd, but if you go to the first
12  page regarding the user data page, so if you could
13  describe what you see on the user data page and we're
14  talking specifically about user ID 554434.
15      A   This is the user data for Ckennedy342, also
16  user ID 554434, and this lists several attributes that
17  we track, including his name, the company he has
18  purported to be representing, his e-mail address,
19  where he resides, when the account was created, that
20  we've confirmed the e-mail, so that's one identity
21  check measure we do take is confirming e-mail
22  addresses upon sign-up.  And then it lists his last
23  ten log-ins by date and the IP address that we have on
24  file for those log-ins.
25      Q   Okay.  And you said you confirm e-mail

Page 117

1  in the user agreements is that you pay on the 15th?
2   A   Yes.
3   Q   Of every month?
4   A   Exactly.
5   Q   And so if you looked into the object ID and
6  looked at the other transactions, then when you do
7  that on the PayPal site, you can associate the
8  Ckennedy342 with the other --
9   A   That's right.
10  Q   -- sites that --
11  A   Well -- sorry.
12  Q   The user IDs that are reflected in your
13 analysis and spreadsheet --
14  A   That's right.
15  Q   -- in Exhibit 10?
16  A   That's right.  There will be no reason for him
17 to actually enter in his real identification there.
18 Most people -- I wouldn't say most people.  There are
19 lots of people who don't enter in their real
20 identification there because, you know, it's meant to
21 be an anonymous form of payment.  So he was, in his
22 sloppy ways, not really good at covering up his own
23 fingerprints.
24  Q   That makes sense.  And would you -- so does
25 that lead you to the conclusion that Mr. Khan is a

Page 118

1  repeat offender?
2   A   I don't know if I see the link between those
3  two statements.
4   Q   Just that he's -- you know, he, through
5  different usernames, has uploaded content that has
6  been subject to a fraud 98 score.
7   A   Well, I mean, we certainly did link those
8  things, and that was one of the factors we considered
9  when we looked at the case as a whole and said, you
10 know, there's his name, the same name that we've
11 already blocked.  This looks like one we should block
12 again.
13  Q   And how many fraud -- are there other scores
14 that are -- other than the 98 that are fraud scores
15 within your internal tracking system?
16  A   We have a couple others.  98 is the main one.
17  Q   Okay.  And how many fraud 98 scores would you
18 say you have in your system if you know?
19  A   I happen to know.
20  Q   Good.
21  A   We have 1,800.
22  Q   And what would you say is your expectation as
23 to how you determined that there were -- of the 1,800
24 people that have reached the fraud score, how you came
25 to that conclusion?

Page 119

1   A   How those --
2   Q   Generally, how you learned that people
3  warranted the fraud score?
4   A   Yeah.  From a variety of measures.  I mean,
5  we've had these 20 cases where someone has sent a
6  complaint, and that probably was associated with some
7  20 of those.  The other 1,780, I would say, had come
8  from various measures, whether they be identified by
9  someone internally such as the curators as part of the
10 review process, through an external complaint,
11 through -- you know, a lot of them are on the credit
12 card side where there have been known credit card
13 offenders where they've, basically, either used a
14 fraudulent credit card or have disputed a charge that
15 was valid.
16     So when someone disputes multiple charges that
17 are valid, we would look into that and look at other
18 factors and determine whether or not they're
19 fraudulent as well.  So there's lots of ways
20 internally and externally.
21  Q   Makes sense.  And would you say that there has
22 been a notable spike or increase in the number of
23 users you've determined to be fraudulent since you
24 instituted the new procedures in November 2015?
25  A   You know, we found some more, but I wouldn't

Page 120

1  say it's a notable increase.  It's been a pretty
2  detailed search.  We've gone through more than 10,000
3  IDs since then, and we've only -- we flagged probably
4  a couple dozen.
5   Q   And so looking at Exhibit -- the payments
6  exhibit, can you determine how much money you paid to
7  Ckennedy342?
8   A   Well, if I had a calculator, I would say --
9  and maybe the question is better -- I actually know,
10 so I can just tell you how much he's been paid.  It's
11 $4,063.
12  Q   And if you could grab Exhibit 8 --
13  A   Or I should say $4,063 is how much revenue is
14 associated with his account.  Half of that would be
15 how much he was paid.
16  Q   And there's some evidence that I've seen in
17 the record, and Exhibit 8 is one of those, if you
18 could grab that exchange.  This is the CRM software
19 with the exchange between the Ckennedy account and
20 Ellie, customer service and curatorial liaison.
21     And what I'm interested in here is the
22 Ckennedy user is complaining about when does he get
23 his money, and then Ellie states on July 3 saying that
24 there's evidence of fraud.  And the one sentence here
25 is "Because you are not in compliance with our

Page 133

1  speaks for itself.
2     A  He's an aspiring business person that has
3  learned well from his CFO that everything should be
4  evaluated under one of many frameworks including
5  cost-benefit.
6     Q  Is it fair to say that Pond5 made a
7  determination, as reflected in this document and
8  otherwise, as to how much fraud detection to do based
9  on the costs of that detection?
10    A  No.  I don't actually even to this day we
11 haven't made a final determination on what we are
12 going to do, but I would venture to guess we'll do
13 quite a bit based on our discussions.  We're going to
14 do pretty much everything possible going above and
15 beyond.
16        And the interesting thing is it's really about
17 our reputation.  You know, as you now know, we don't
18 make any money from sound effects.  We lose money more
19 than any other media type, but our reputation is
20 valuable well beyond the compare of the actual revenue
21 and/or profits that we do receive or some day will
22 receive.  So the reason we are going to these extent
23 for a $3 sound effect is because we need to protect
24 our reputation.
25    Q  And there's an option -- if you look at

Page 134

1  page 304 and the next two pages, there's a reference
2  to an Option 1, fast track; Option 2, content tiering;
3  Option 3, contributor provides more documentation;
4  Option 4, upload page and process involves asking
5  contributor for more info.  Are those options in the
6  alternative?
7        MR. ALTENBRUN:  Objection, beyond the
8  scope, if you know.
9     A  I really don't know, to be honest.  I haven't
10 been through this document with Mike in enough detail
11 to answer.
12    Q  Well, I mean, I think it is relevant to the
13 DMCA for no other reason it says in bold based on the
14 DMCA, but is it -- so I do think it's clearly within
15 the scope of what we've talked about.  I just want to
16 understand what options you're doing for fraud
17 detection and what you've determined to pick and what
18 you've employed and not.
19        So do you know, as you sit here today, which
20 of these options that Pond5 will employ or has
21 employed?
22    A  I think we've talked in great depth about what
23 we're currently employing.  I think this document is
24 more talking about what we could additionally move to,
25 and it's a recommendation from one person, Mike Pace,

Page 135

1  who has less legal background than any person in this
2  room by far.  He's a guitarist.  So I wouldn't take
3  his DMCA arguments too seriously.
4     Q  And do you know the date?  I see there's a
5  date on page 311 of November 2015.  I'm wondering if
6  you know when this document was created?
7     A  Where's the date, you say?
8        MR. ALTENBRUN:  It's under 311 is the
9  only date I saw.
10    A  So March 11?
11    Q  Of Pond 311.  It's the Bates reference, and
12 the date is November 18, 2015.
13    A  Yeah.
14    Q  And it looks like a specific reference to a
15 specific communication.  There's also a December 2015
16 reference.
17    A  Yeah.  You've got a few things getting stapled
18 together.
19    Q  That's how they get produced.  That's what
20 you're for.
21    A  310 and 311 are different communications than
22 300 to 309.
23    Q  And those are Exhibit 15?  So I understand
24 that now.  So the document that is 300 through --
25    A  309.

Page 136

1     Q  -- 309 is a stand-alone document?
2     A  That's right.
3     Q  Do you know the date of that document?
4     A  I don't.  I could estimate.
5     Q  What would be your estimate?
6     A  Sometime this year.  So I would guess maybe
7  January or February.
8     Q  You mentioned certain other competitors that
9  you have in the industry.  Do you recall that
10 testimony?  You referenced the Shutterstock and the
11 like.  Do you recall that?
12    A  Sure, yes.
13    Q  All right.  So as you evaluate Pond5's fraud
14 detection and fraud prevention protocol, have you made
15 a comparison of that of your protocol as compared to
16 Shutterstock?
17    A  I don't know if we know every step of the
18 Shutterstock's process, but we know generally the
19 types of steps they do.  And I think it's very
20 comparable.
21    Q  What does Shutterstock do, do you know?
22    A  They do artist identification, and they have a
23 very brief similarly linked curatorial review process.
24    Q  And do you know when or how long they've
25 instituted that process?