# EXHIBIT 1

```
               UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON AT SEATTLE


_____

GORDON HEMPTON,                    )
                                   )
        Plaintiff,                 )
                                   )
        -v-                        ) CAUSE NO.
                                   ) 3:15-CV-05696-DWC
POND5, INC., A Delaware            )
Corporation; and POND5 USER        )
CKENNEDY342, A corporation of)
Individual of Type Unknown,        )
                                   )
        Defendants.                )
_____


           DEPOSITION UPON ORAL EXAMINATION

                          OF

              30(b)(6) THOMAS CRARY
_____



        Taken at 1000 Second Avenue, Suite 3670

                  Seattle, Washington




   DATE TAKEN:    March 22, 2016
   REPORTED BY:   Nancy M. Kottenstette, RPR, CCR 3377
```

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

```
 1   understanding from a business model perspective of the
 2   rights afforded to the buyer?
 3       A   Well, I'll refer to it as a royalty-free
 4   license, which is meant to be a fairly broad set of
 5   rights that the buyer has.  It's meant to be a low
 6   friction way of buying digital media content.
 7              MR. ALTENBRUN:  Counsel, let me just go
 8   back to your last question because I don't want this
 9   to become a problem.  I recognize it appears as though
10   my office probably left out a page from that
11   disclosure.  I will say that in our discovery
12   responses we explained that these three agreements are
13   all contained online.  We provided links to them, I
14   believe.
15              MR. TOWNSEND:  I'm not upset from the
16   discovery perspective.
17              MR. ALTENBRUN:  What I'm saying is I
18   have in my hand a copy of the content license
19   agreement if you would like to take it and make a
20   photo copy.  I just want to make sure I don't have any
21   notes on it.  We can take a quick break.
22              MR. TOWNSEND:  And I think we can print
23   it out, but it sounds like in your objections, you
24   know, regarding asking him a legal conclusion, I think
25   it sounds like he's well versed in the business model
```

 1   and probably the language which you speak on a daily
 2   basis.
 3   BY MR. TOWNSEND:
 4       Q   You were saying before your counsel spoke it's
 5   a low-friction, royalty-free license?
 6       A   That's right.
 7       Q   And can you describe what you mean by that?
 8       A   Well, I mean, it's almost best described in
 9   comparison to the historical way of transferring
10   rights which they referred to rights managed which
11   were, you know, a more restrictive set of rules that
12   apply to sort of geographies or usage limits or
13   particular end usage of the digital media.
14       Q   And so are you referring to the broad category
15   of digital rights management?
16       A   Yes.
17       Q   Or DRM?  Are you familiar with that acronym?
18       A   I haven't heard the acronym, no.  I can
19   stipulate that it's okay.
20       Q   I'll refer to digital rights management.  So
21   under digital rights management model, is the --
22   what's your understanding of a digital rights
23   management business model?
24               MR. ALTENBRUN:  Can you state the
25   question?  What's your understanding of --

```
 1              MR. TOWNSEND:   -- digital rights
 2   management business model.
 3       A   As I said, it tends to be -- it tends to grant
 4   more narrow rights to usage of particular media
 5   assets.
 6       Q   So you mentioned restrictions on rights based
 7   on --
 8       A   Geography, for instance, is a key one.
 9       Q   Or time?
10       A   Time based, exactly.  Occasionally, a usage
11   limit.
12       Q   Like ten free uses and then you have to start
13   paying?
14       A   You know, I don't know.  The thing of it is
15   there are these bespoke agreements, and the problem
16   with the model was they required lawyers to intervene
17   to negotiate every single agreement.  And business
18   people don't want to spend lots of money on lawyers
19   for the purposes of, you know, obtaining the rights
20   they need for the agreements.
21           So the nice thing about the royalty-free model
22   is you agree to a broad but specific set of rights
23   that makes sense for most all situations, and you just
24   have an agreement that covers all those rights.  If
25   you still want something that isn't included by that,
```

1   it tends to default to the rights management approach.
2   That's where then you need to get the lawyers involved
3   to negotiate a bespoke agreement again.
4          It's a simpler way that allows businesses to
5   conduct business with less friction so they don't have
6   to track their usages or the markets that they could
7   end up putting a particular video online, for
8   instance.
9       Q   And you use the expression "bespoke
10  agreement."  What do you mean by that?
11      A   Like a custom drafted content license
12  agreement effectively.
13      Q   And isn't it also true that under the digital
14  rights management model there could be standardized
15  restrictions, say, for time or location or number of
16  seats or something like that?
17             MR. ALTENBRUN:  Objection, lack of
18  foundation.
19      A   I don't know that they're necessarily any
20  different.  For instance, there is a limit for our
21  number of seats, so I don't know that that's a
22  differentiating factor.
23      Q   So I guess I'm exploring to this idea that you
24  express which is, as I understand it, you have a
25  royalty-free license or a digital rights management

1  license, and one of the complexities of a digital
2  rights management license is that you have to do,
3  essentially, a negotiated agreement on each
4  transaction?
5      A    Exactly.  And what we do is we do the
6  royalty-free version as many of our competitors have
7  done.  So the industry has really been evolving over
8  the last 20 years from a rights management approach
9  towards royalty-free.  And rights management has been
10 shrinking quite quickly, and royalty-free has been
11 expanding.
12     Q    And I want to ask you about that.  But I also
13 want to finish the line of question, which is:  Isn't
14 it also possible under a digital rights management
15 licensing model that you could have a clear or
16 standardized restriction on use based on geography or
17 time or other factor?
18              MR. ALTENBRUN:  Let me just object.
19 This is beyond the scope of this FRCP 30(b)(6)
20 deposition.  You can answer if you're able to.
21     A    I'm not quite sure I understand the question.
22     Q    Okay.  So to me you set up a dichotomy between
23 a bespoke agreement and a digital rights management
24 agreement.
25     A    Right.

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

Page 27

1    Q    And the complexity of a bespoke agreement is
2    it needs to be negotiated with lawyers?
3    A    Right.
4    Q    And a royalty-free is that it's -- you take
5    away a lot of the legal complexity because it's an
6    unrestricted license?
7    A    It's comprehensive to most circumstances.
8    That's the way I would say it.
9    Q    It grants broad rights to the buyer?
10   A    Yes.  Broad, standard rights, exactly.
11   Q    But you could have limited standard rights
12   also, couldn't you?
13   A    What do you mean I could?  Pond5 could.
14   Q    Pond5, yeah.
15   A    We could.  We only have one content license
16   agreement, though, yeah.
17   Q    But it would be a feasible business model
18   to -- strike that.
19        You could still have a clear limited, say,
20   one-year license in which that would be a standardized
21   quick grab agreement; is that fair?
22             MR. ALTENBRUN:  Objection, lack of
23   foundation, beyond the scope, and object to the form
24   of the question.
25   A    Yeah.  We compete in a competitive

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

1  marketplace, and we have companies that are much
2  bigger than us that, you know, we're not a term-maker.
3  We're a term-taker, if you will.  Do you know what I
4  mean?  The royalty-free license model we, generally,
5  conform to the same basic terms as other competitors
6  do.
7      Q   And you described the sort of migration from a
8  digital rights management business model to a
9  royalty-free business model.
10     A   Industry-wide that is, yeah.
11     Q   Industry-wide.  Are there also competitors who
12 are operating on a SaaS business model?
13             MR. ALTENBRUN:  Objection, beyond the
14 scope.
15     A   I don't know what you mean by that, but
16 nothing that I've ever heard referred to as SaaS
17 business model.  What are you thinking?
18     Q   Software as a service --
19     A   I know the term.  I can't understand the
20 application to this industry.
21     Q   Basically, a streaming-type approach where you
22 could access it during a certain period on servers
23 located somewhere else that could be accessed?
24     A   I don't know of any in our industry that do
25 that, no.

Page 35

```
 1    A    That someone has downloaded it.
 2    Q    Do you know who has downloaded it?
 3    A    As a preview?
 4    Q    Yes.
 5    A    I'm saying we track it.  I haven't looked up
 6  any particular attribute for any particular user.
 7    Q    I'm trying to determine what information you
 8  know and don't know.
 9    A    Off the top of my head -- and I don't even
10  know which particular content we're talking about.
11  Are we talking about Mr. Hempton's content?  Are we
12  talking about other stuff in general?
13    Q    I'm particularly interested in the content
14  that gets downloaded and the control that you exercise
15  over that content and, in particular, an evaluation
16  license at this line of inquiry.  So go back to the
17  example of let's say it's a .wav file, meaning a sound
18  recording of waves.
19    A    Got you.
20    Q    And say it was originated from Mr. Hempton
21  originally and then uploaded by a third party, for
22  example.  When that content is uploaded onto the Pond5
23  marketplace and then a buyer comes and obtains an
24  evaluation license, that's the example that I'm asking
25  about right now.
```

```
 1            So when a buyer comes and obtains an
 2   evaluation license, they then get a digital copy of
 3   the file; correct?
 4                 MR. ALTENBRUN:  Object to the form.
 5       A    Yes.  They have a digital copy of a .wav wave
 6   file with a harassing audio watermark.
 7       Q    When you say ".wav wave," you mean .wav --
 8       A    Yes.
 9       Q    -- and the word "wave"?
10       A    Yes.  Just making sure it's clear there are
11   waves in both cases.
12       Q    I should have used a bird call.  I'm going to
13   switch my example to a bird call now for clarity of
14   language.
15            So that user now has an evaluation copy of, in
16   this hypothetical, Mr. Hempton's copyrighted recording
17   of a bird call, and it also has that watermark every
18   seven seconds, which says Pond5; right?
19       A    I believe so, yeah.
20       Q    That's kind of an English accent that comes
21   over the license; right?
22       A    Yeah.
23                 MR. ALTENBRUN:  Object to form.
24       A    I don't know if it's English, but it's
25   American, I think.
```

Electronically signed by Nancy Kottenstette (001-168-063-2113)                    20600188-c4b7-4a4a-8491-93626f8eaed4

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE
---------------------------------------------X
GORDON HEMPTON,

               Plaintiff,

    -against-

POND5, INC., A Delaware Corporation;
and POND5 USER CKENNEDY342, A
Corporation or Individual of Type
Unknown,

              Defendants.

CASE NO.: 3:15-CV-05696-DWC
---------------------------------------------X

                  126 East 56th Street
                  New York, New York

                  August 16, 2016
                  9:10 a.m.


    DEPOSITION of 30(b)(6) THOMAS CRARY - VOL. II before Melissa Gilmore, a Shorthand Reporter and Notary Public of the State of New York.

1   a Google search on that?

2        Q.    Yes.

3        A.    No.

4        Q.    I have one more line of questioning,
5   and I want to follow up on some comments from
6   my client, but let me go through the evaluation
7   license issue and then take a break, and we
8   will wrap up.

9              So I wanted to go back over the
10  issue of the -- or the treatment of evaluation
11  licenses by Pond5.

12             Just for the record, can you
13  describe how evaluation files are download and
14  made available to end users?

15             MR. ALTENBRUN:  Objection, beyond
16     the scope and object to form.

17       A.    So I think what you're referring to
18  is the previews that are available through the
19  site?

20       Q.    Right.

21       A.    So customers that are previewing
22  content of any media type, you know, in this
23  case we're talking about a sound effect, can go
24  onto the site, search for the search term
25  they're interested in finding, and then preview

```
 1   a compressed version of the file with audio
 2   watermarking attached to it.
 3        Q.    So two questions.  One is what is
 4   the audio watermark that's put on there, and
 5   has that changed in the last year?
 6             MR. ALTENBRUN:  Objection, beyond
 7        the scope.
 8        A.    I think we did change it a few
 9   months ago.  It used to say, "Pond5.com."  Now,
10   it just says, "Pond5."
11        Q.    Let the record reflect that was done
12   in an English accent.
13        A.    Actually it was Dani DiCiaccio.
14        Q.    And you mentioned that they're
15   compressed files.
16             Has that always been the case?
17        A.    Yes.
18        Q.    And describe what you mean by
19   compressed files.
20             MR. ALTENBRUN:  Objection, beyond
21        the scope.
22        A.    So the bit rate of a full
23   uncompressed wave file is 1.4-megabytes per
24   second, megabits per second, and these files
25   are compressed to 120 kilobits to 192,
```

1   somewhere in that range, depending on the -- I
2   don't even know what actually, but how they're
3   compressed for both, you know, speed of loading
4   as well as to prevent piracy.
5       Q.   Do you track the user identity of
6   anyone who's downloaded a -- well, strike that.
7            When you download a sample, it's an
8   evaluation license or sample version, right?
9       A.   Yeah.
10      Q.   Is that downloaded onto a hard drive
11  so the user can use it and modify it?
12           MR. ALTENBRUN:  Objection, beyond
13      the scope and object to form.
14      A.   No.  No.  To my knowledge, I don't
15  think it -- at least it wouldn't be easily done
16  where you could actually download it to your
17  computer.  It's a preview that plays through
18  the browser.
19           It wouldn't surprise me if there's
20  some particularly engineering people out there
21  that have a way of getting such evaluation
22  licenses to their computer.  I, you know,
23  personally wouldn't know how to do it.
24      Q.   And do you track the user identity
25  that are subject to the evaluation license?

1              MR. ALTENBRUN:  Objection, beyond
2       the scope.
3       A.     We endeavor to track it for, you
4   know, business intelligence purposes.  We have
5   had some spotty data on it.  You know, the
6   tracking mechanisms have to be very
7   consistently applied to all the different
8   items.
9              So we endeavor to track it, and it's
10  one of the areas we're trying to, you know, be
11  able to track consistently.
12      Q.     Do you know whether anyone has -- or
13  anyone at any time has entered into an
14  evaluation license for any of the CKennedy342
15  content?
16             MR. ALTENBRUN:  Objection, beyond
17      the scope.
18      A.     I have not looked at the data
19  associated with these files.
20      Q.     Okay. And so you don't know if
21  that's -- that data exists; is that right?
22             MR. ALTENBRUN:  Objection, beyond
23      the scope.
24      A.     I don't know if it exists.
25      Q.     And just looking at the Pond5

Page 272

1   website right here, it says -- I'll represent
2   to you that it says you can either save it to
3   your collection or download a preview.
4           Does that sound -- does that change
5   your testimony in any way as to whether or not
6   you can download an evaluation copy of a sound
7   file?
8           MR. ALTENBRUN:  Objection, beyond
9       the scope, and apparently we have a lack
10      of foundation.
11          Go ahead and answer.
12      A.   Honestly, I don't know.  I'm not
13  sure, to be honest.  You know, I'm an
14  administrator of the site.  So I'm not sure
15  what I'm capable of doing that regular
16  customers are capable of doing.
17          If you want to stipulate that that's
18  a feature that you've shown works, I'm willing
19  to believe you.
20      Q.   If you look on the Pond5 website,
21  and what we have got up here is a search for
22  frog brass for stock production music and, you
23  know, it has a button here for download a
24  preview.
25          MR. ALTENBRUN:  Frog what?

1           MR. POWER:  I searched frog.
2           MR. TOWNSEND:  Just download any
3      file.
4           MR. ROSEN:  In sound effects you're
5      looking at?
6           MR. ALTENBRUN:  Off the record.
7           (Discussion off the record.)
8           (Audio playing.)
9           MR. TOWNSEND:  Let the record
10     reflect that counsel just, while we were
11     off the record, went to the Pond5 system
12     and we searched for frog and found a frog
13     sound effect which played the sound of a
14     frog, correct?
15          MR. ALTENBRUN:  Yes, I stipulate to
16     that.
17          MR. TOWNSEND:  And it also allows
18     for the download of a preview of that
19     content; is that right?
20          MR. ROSEN:  Is that right?
21     A.   Well, we got to login.
22          MR. ROSEN:  I didn't hear that.  I
23     heard you could hear it.  I didn't hear
24     you could download it.
25          MR. TOWNSEND:  Let the record

```
 1        reflect the website says it allows you to
 2        download.
 3        A.    I think you're probably right.  As I
 4   think about it now, I think you're probably
 5   right that you can download it.
 6              I think, you know, for instance, if
 7   you were -- if you were trying to show it to a
 8   customer before you buy and say, this is what
 9   we're going to put in, the preview copy allows
10   you to insert it into the production that
11   you're doing with the watermark, and you can
12   replace it with the full, the uncompressed file
13   later without the watermark.
14              So it does.  We have been able to
15   reperform what you have said.
16        Q.    And as far as you know, the
17   evaluation copies or preview copies that can be
18   downloaded can be distributed; is that right?
19              MR. ALTENBRUN:  Objection, beyond
20        the scope.
21        A.    Not legally.
22        Q.    Not legally, but technically?
23              MR. ALTENBRUN:  Objection, beyond
24        the scope, calls for speculation.
25        Q.    As far as you know?
```