UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GORDON HEMPTON )
)
        Plaintiff, )    CASE NO. 3:15-cv-05696-BJR
)
    v. )
)    ORDER GRANTING SUMMARY
POND5, INC. et. al, )    JUDGMENT TO DEFENDANT
)    POND5, INC.
)
        Defendants. )
)
)
_____ )

## I.     INTRODUCTION

Before the Court is Defendant's Motion for Summary Judgment. Having reviewed the parties' submissions, the record of the case, and the relevant legal authority, the Court will grant the motion. The reasoning for the Court's decision is set forth below.

## II.     BACKGROUND

### A.     The Parties

Plaintiff, Gordon Hempton, holds himself out as "the world's preeminent nature sound recordist and a pioneer in the field of acoustic ecology" who has "amassed a library of thousands of the Earth's rarest sounds[.]" Opp. to Motion for Summary Judgment, Dkt. No. 22, at 2-3. Hempton claims that "his library of copyrighted work is immensely valuable, and as such is closely controlled and licensed for specific purposes." *Id*. According to Hempton, his

"recordings are his livelihood and he has licensed them for use in the film, television, and software industries." *Id.*

Defendant Pond5, Inc. ("Pond5") operates www.pond5.com, a website through which media producers can license and distribute content to third parties. Pond5 asserts that it "utilizes a crowd-sourced model, whereby artists and other media owners from around the world upload a wide variety of digital media," including video, images, music, 3D models, and sound effects, and customers can obtain royalty-free rights to the media by purchasing a license. Motion, Dkt. No. 18 at 2 (internal definitions omitted). Pond5 generates revenue from its website by retaining one half of the proceeds from the licensing fee, the other half is distributed to the contributor.

Defendant ckennedy342 is a former Pond5 contributor. He opened an account with pond5.com in August 2014, listing his name a Chris Kennedy and his location as Quebec, Canada. However, Pond5 has since discovered that ckennedy342 is most likely Hassan Khan, a former Pond5 contributor who had previously posted content under the usernames WildAudioProductions and HassanKhan. Both of these users, who were listed under different email addresses and identified their location as Karachi, Pakistan, had been banned from Pond5's website for posting infringing material.

**B.    The Pond5.com Website**

Currently, pond5.com has approximately 58,000 registered contributors with approximately 20 million items of digital media uploaded on its website. In an average week, 100,000 new items of digital media are posted by contributors and 12,000 items are downloaded by customers. Pond5 claims that it does not own the content on its marketplace; rather, the contributors own the content, which is licensed to Pond5 and, in turn, sub-licensed to customers.

Therefore, Pond5 asserts, it "serves solely as an intermediary to facilitate [c]ontributors' sale of licenses to [c]ustomers." Dkt. No. 18 at 2.

Anyone who would like to use pond5.com must first create an account and accept Pond5's Terms of Use. A user who would like to become a contributor (*i.e*, upload media to the website) is further required to accept Pond5's Contributor Agreement. Likewise, a user who would like to purchase content from the website must first accept Pond5's License Agreement. Pond5 asserts that these three agreements—Pond5's Terms of Use, Contributor Agreement, and License Agreement—contain the terms and conditions that govern the use of pond5.com. Relevant to this motion, each of these agreements specifically prohibits the misappropriation of copyrights. For instance, the Terms of Use states: "You will not … send or upload any … Content that infringes, misappropriates or violates any else's copyright, trademark … or any other legal right." Declaration of Thomas Crary, Dkt. No. 19, Ex. 1 at 3. The Contributor Agreement requires the contributor to warrant that he is "the sole and exclusive owner of the Content and the copyright thereof," that the "Content represents original creations and expressions of subject matter," and that the "Content has not been obtained, created or submitted to [Pond5] under this Agreement in violation of any law." *Id*. at Ex. 2 at 5-6. Lastly, the License Agreement requires the customer to warrant that he will not "use any Content in a manner that violates any law." *Id*. at Ex. 3 at 4.

In addition, the Terms of Use includes a provision that allows Pond5 to terminate access to its website for any reason without prior notice and requires a user to indemnify Pond5 for use of the website in a manner that breaches the Terms of Use. *Id*. at Ex. 1 at 3. It also includes a provision for notifying Pond5 of any alleged infringement, including the statutorily-required content of such notice. *Id*. at 5.

**C.      Plaintiff's Claims**

On May 26, 2015, Pond5's Audio Development Manager, Mike Pace, was contacted by an existing Pond5 customer who forwarded to Pace an email from Hempton. In the forwarded email, Hempton requests that the existing customer contact "the right person at Pond5" so that his attorney, Nick Power, "can work with [Pond5]" because he has discovered "a widespread piracy issue at www.pond5.com." Declaration of Mike Pace, Dkt. No. 19 at Ex. 1. Within thirty minutes of the email being forward to Pace, Pace sent an email to Power, Hempton's attorney. *Id.* at Ex. 2. In it, Pace stated that Pond5 "take[s] issues of fraud seriously" and "can do an immediate takedown, blacklist the fraudulent contributors, and audit to see if there have been any sales." *Id.* at Ex. 2. Pace requests that Power provide more information on "the tracks in question." *Id.*

Power responded three days later on May 29, 2015. *Id.* at Ex. 3. He asked to arrange a telephone call with Pace after Power had a chance to "better review [his] clients' situation." *Id.* Pace responded that same day and again requested that Hempton provide further information regarding the allegedly infringing tracks. *Id.* at Ex. 4. Power responded shortly thereafter, stating that his clients "have discovered thousands of their files offered for sale on Pond5." *Id.* at Ex. 5. He further stated that his clients need Pond5 to "to locate their intellectual property that is illegally offered for sale on Pond5's site" and immediately take "measures to prevent any further infringement." *Id.* However, Power did not specifically identify the infringing work that was allegedly posted on the website. *Id.* Pace responded that same day, stating, in part:

> As I wrote in my initial email, we can immediately remove any potentially fraudulent content and take swift action to make things right once we know the tracks/contributors in question, which is information your clients will have to provide us. *At the risk of stating the obvious, Pond5 cannot locate your clients' intellectual property without being informed as to what they claim is theirs.*

4

*Id*. at Ex. 6 (emphasis added).

Pond5 did not hear from Hempton or his legal counsel again until June 29, 2016 when it received a takedown letter dated June 24 from Power. *Id*. at Ex.7. The letter sets forth Hempton's background as a nature sound recordist and lists, by number, twenty copyright registrations that are allegedly held by Plaintiff . The letter goes on to state that "[i]t has come to Mr. Hempton's attention that at least one (and very likely every) audio file from each of the above referenced registrations has been posted for sale on Pond5's website. The prime culprit appears to be your user who is identified by the username: Ckennedy342. This user has uploaded thousands of files that are covered under [the] above-referenced registrations." *Id*. at 1. The letter concludes by requesting that Pond5 immediate take down all files offered by ckennedy342. *Id*. at 1-2. The next day, on June 30, 2015, Pond5 suspended ckennedy342's account and removed all of his content from the website. Pace Dec. at ¶ 8.

Thereafter, on September 28, 2015, Hempton instituted this lawsuit against Pond5 and ckennedy342. Comp., Dkt. No. 1. He alleges that ckennedy342 uploaded hundreds of his copyrighted audio files to Pond5's website without his permission and offered the files for sale. The number of files that Hempton alleges was uploaded to Pond5 and the number of files that he alleges was subsequently purchased and downloaded by Pond5 customers has varied throughout the course of this litigation, but, at this point, Mr. Hampton appears to have settled on claiming that: (1) 655 of his audio files were uploaded to the website; (2) 86 of those files were purchased by Pond5 customers; and (3) the 86 files were downloaded a total of 146 times.[1]

Hempton asserts that Pond5 customers who purchased and downloaded his files were "falsely told that they purchas[ed] a broad, royalty-free, world-wide license that allows them to

---

[1] Mr. Hempton also alleges that "an unknown number of free 'evaluation copies'" of his work were a downloaded by Pond5 customers. Dkt. No. 33 at 1 (quoting Comp. at ¶ 16).

use, copy, perform, reproduce, and create derivative works from [the files] with almost no restrictions." Dkt. No. 33 at 1. Therefore, Hempton argues, "the number of additional and continuing copyright infringements" by the Pond5 customers who downloaded his files "is uncontained." *Id*. at 1-2. He seeks the following relief: (1) actual and/or statutory damages pursuant to 17 U.S.C. § 504; (2) Defendants' revenues and profits pursuant to 17 U.S.C. 504 (b); (3) injunctive relief pursuant to 17 U.S.C. § 502; (4) the impoundment and destruction of infringing articles pursuant to 17 U.S.C. § 503; and (5) attorney's fees and costs pursuant to 17 U.S.C. § 505. Dkt. No. 1 at ¶ 124.

Pond5 filed the instant motion for summary judgment, arguing that it is protected under the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA"). Hempton opposes the motion, claiming that Pond5 is not eligible for safe harbor protection under DMCA.

## III.   DISCUSSION

### A.   Legal Standard

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has met its burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot simply rely on its pleadings, but instead must produce evidence showing that there is a genuine issue for trial. *Id*. at 324. Nor can the nonmoving party rely on speculation or conjecture to meet its burden. *Wyler v. Holland Am. Line-USA, Inc*., 348 F. Supp. 2d 1206, 1210 (W.D. Wash. 2003).

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**B.     The DMCA**

"Difficult and controversial questions of copyright liability in the online world prompted Congress to enact [the DMCA]." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir.2004)). Tackling copyright infringement on the Internet required Congress to balance the competing interests of copyright holders with those of internet service providers whose services may be usurped to infringe copyrights. *Corbis Corp. v. Amazon.com, LLC*, 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004), *overruled on other grounds*, *Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612 (9th Cir. 2010).  In balancing these interests, Congress was particularly "loath to permit the specter of liability to chill innovation" on the web. *UMG recordings*, 718 F.3d at 1014. Congress decided that "by limiting [service providers'] liability," it would "ensure[ ] that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand." *Id*. (quoting S.Rep. No. 105–190, at 8 (1998)).  To that end, DMCA created several "safe harbors" that protect certain common activities of internet service providers. *Corbis*, 351 F. Supp. 2d at 1098 (citing S.Rep. No. 105-190, at 19). These safe harbors do not render service providers immune from copyright infringement; however, they do protect eligible service providers from all monetary and most equitable relief that may arise from such activity. *Id*. at 1098-99 (citing *Ellison*, 357 F.3d at 1077).

A party seeking to invoke the DMCA safe harbors must initially meet a set of threshold criteria. First, the party must qualify as a "service provider." *Corbis*, 351 F. Supp. 2d at 1099 (citing 17 U.S.C. § 512(k)(1)(B)). Second, the service provider must demonstrate that it has adopted, reasonably implemented, and informed its users of "a policy that provides for the

7

1   termination in appropriate circumstances" of repeat infringers. *Id*. § 17 U.S.C. § 512(i)(A).

2   Third, the service provider must accommodate "standard technical measures" used by copyright

3   owners to identify or protect copyrighted works. *Id*. § 512(i)(B). A service provider that does not

4   meet these threshold criteria may not invoke the DMCA's safe harbors. *Corbis*, 351 F. Supp. 2d

5   at 1099.

6        If the threshold criteria are satisfied, a service provider may avail itself of the safe harbor

7   protections if it qualifies for one of four safe harbors offered by DMCA. Here, Pond5 asserts that

8   it is entitled to the third safe harbor—protection for "infringement of copyright by reason of the

9   storage at the direction of a user of material that resides on a system or network controlled or

10  operated by or for the service provider." 17 U.S.C. § 512(c). To qualify for this particular safe

11  harbor, Pond5 must demonstrate that it:

12

13      (A)   (i) does not have actual knowledge that the material … on the system or
              network is infringing;

14

15            (ii) in the absence of such actual knowledge, is not aware of facts or
              circumstances from which infringing activity is apparent; or

16

17            (iii) upon obtaining such knowledge or awareness, acts expeditiously to
              remove, or disable access to, the material;

18

19      (B)   does not receive a financial benefit directly attributable to the infringing
              activity, in a case in which the service provider has the right and ability to
              control such activity; and

20

21      (C)   upon notification of claimed infringement as described in paragraph (3),
              responds expeditiously to remove, or disable access to, the material that is
22            claimed to be infringing or to be the subject of infringing activity.

23  *Corbis*, 351 F. Supp. 2d at 1099 (citing 17 I.S.C. § 512(c)(1)).

24

25

8

**C.      Pond5 Qualifies for the DMCA's Third Safe Harbor**

**1.      Pond5 satisfies the threshold criteria under § 512(i)**

As discussed above, in order to qualify for safe harbor protection under DMCA, Pond5 must satisfy the following three threshold criteria: (1) Pond5 must be a service provider as the term is defined under DMCA, (2) it must have adopted and reasonably implemented a repeat infringer policy, and (3) it must not interfere with standard technical measures.[2] 17 U.S.C. § 512(i). Plaintiff concedes that Pond5 meets the first and third criteria, but argues that Pond5 cannot satisfy the second criteria because it has not adopted nor reasonably implemented a policy for termination of repeat infringers. For the sake of brevity, this Court will only discuss the criteria challenged by Plaintiff.

The Ninth Circuit has held that the DMCA's infringement policy requirement has three prongs. *Corbis*, 351 F. Supp. 2d at 1100 (citing *Ellison*, 357 F.3d at 1080). In order to satisfy the infringement policy requirement, a service provider must: (1) adopt a policy that provides for the termination of service access for repeat copyright infringers in appropriate circumstances; (2) inform users of the infringement policy; and (3) implement the policy in a reasonable manner. *Id.*

It is undisputed that Pond5 requires each of its users to accept Pond5's Terms of Use and Contributor Agreement before a user can upload media content on its website. With respect to Pond5's infringement policy, the relevant provisions in the Terms of Use are as follows:

- You will use the Website and participate on the Website for lawful purposes only;

- You will not on or through the Website do any of the following:

    1. conduct any fraudulent, criminal offence or other unlawful activity;

    2. upload any Content that is illegal…;

---

[2] The term "standard technical measures" refers to technical means by which copyright owners may identify or protect copyrighted works. *Corbis*, 351 F. Supp. 2d at 1099, n. 2 (citing *Ellison*, 357 F.3d at 1080).

3. send or upload any communication, Content that infringes, misappropriates or violates anyone else's copyright, trademark, privacy, publicity or any other legal right;

- We may at our sole discretion terminate or limit anyone's access to or use of the Website at any time and for any reason without prior notice. In addition, we may immediately terminate or limit your access to or use of the Website, any pre-paid credits or subscriptions and/or any Evaluation License without notice, if you fail to comply with any provision of these Terms of Use or any other agreement with us.

- These Terms of Use are in addition to the Pond5 Contribution Agreement, the Pond5 Content License Agreement and the Pond5 Privacy Policy and the policies, guidelines and restrictions contained on the Website (which are all incorporated by this reference into these Terms of Use).

Declaration of Thomas Crary, Dkt.No. 19, Ex. 1 at 2-3, 6-7. In addition, the Terms of Use includes a detailed non-legalese description of how to contact Pond5 in the event there is infringing content on the website. *Id.* at 5. The relevant provisions in the Contributor Agreement are as follows:

- We have the right in our sole discretion and for any reason, but not the obligation, to (i) accept or reject any Submitted Content, or (ii) at any time revoke any acceptance or Submitted Content and remove the same from the Website.

- You hereby represent and warrant …

    1. The Content represents original creations and expression of subject matter;

    2. You … are the sole and exclusive owner of the Content and the copyright thereof or otherwise have obtained from such owner and have the full legal right, power and authority to grant or transfer all of the rights to the Content granted and transferred to us under the Agreement …;

    3. The Content has not been obtained, created, or submitted to us under this Agreement in violation of any law;

    4. The Content is not subject to any terms or condition that might be breached by the Content being used or distributed by (i) us as

10

contemplated under this Agreement, or (ii) any Content User or other Person as contemplated by the Pond5 License Agreement;

• We may for any or no reason terminate this Agreement in connection with any specific Content or all Content.

*Id*. at Ex. 2 at 2, 5-6, 12. The Contributor Agreement also requires a contributor to indemnify both Pond5 and any customer who innocently downloads content that is infringing. *Id*. at 6-7.

Pond5 argues that the above provisions satisfy the three prongs of the infringement policy requirement as set forth by the Ninth Circuit. With regard to the first prong, Pond5 notes that "a service provider meets this criterion so long as its policies 'convey to users that those who repeatedly or flagrantly abuse their access to the internet through disrespect for intellectual property rights of others know that there is a realistic threat of losing that access.'" Dkt. No. 18 at 13 (quoting *Corbis*, 351 F. Supp. 2d at 1101). Pond5 argues that the provisions in its Terms of Use and Contributor Agreement are more than sufficient to "convey" to its users that it does not tolerate violations of intellectual property laws and that if a user does upload infringing content, the user's account will be terminated and his or her content removed from the website.

With regard to the second prong, Pond5 argues that a service provider satisfies that criterion if it has "a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications." Dkt. No. 18 at 14 (quoting *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007)). Pond5 points out that it has a detailed DMCA notification procedure in its Terms of Use and "[a]s demonstrated by [its] conduct in this very matter, [it] implements a policy of investigating and, where appropriate, suspending accounts of infringing users upon receipt of a DMCA takedown notice." *Id*.

11

Finally, with regard to the final prong, Pond5 argues that a service provider "need only inform users that, in appropriate circumstances, it may terminate the user's accounts for repeated copyright infringement." *Id*. (quoting *Corbis*, 351 F. Supp. 2d at 1102). Here, Pond5 argues, its Terms of Use and Contributor Agreement both contain specific provisions that prohibit infringement, require its users to agree to not infringe others' copyrights, and place users on notice that their accounts may be terminated for misuse. According to Pond5, "[t]here can be no question that Pond5 informs its users of its infringement policy." *Id*.

Plaintiff counters that while Pond5 cites to provisions in its agreements that "generically prohibit the misappropriation of copyrights and provide that Pond5 may terminate users for any reason," it does not "cite to a written repeat infringer policy, or any language in its agreements addressing repeat infringement." Dkt. No. 22 at 12. According to Plaintiff, this is because "[n]o such language exists." *Id*. Indeed, Plaintiff argues, Pond5 admits that it does not have a written repeat infringer policy. *Id*. at 11 (citing Crary 30(b)(6) deposition at 149-150). Plaintiff argues that an essential element of the infringement policy requirement is that "not only must the service provider have a repeat infringer policy, but that the infringer policy *must be communicated to users*." *Id*. at 12 (emphasis in original). Plaintiff claims that without a written repeat infringer policy, "it is impossible for Pond5 to communicate this policy to its users." *Id*.

This Court concludes that Pond5 has adopted an infringement policy and has reasonably communicated that policy to its users. The provisions of Pond5's Terms of Use and Contributor Agreement, which each contributor is required to accept before uploading content to the website, clearly and unambiguously prohibits contributors from uploading material to which they do not hold the copyright. The provisions just as clearly state that Pond5 retains the right to terminate a user's access to the website in the event of a breach Pond5's Terms of Use. The fact that Pond5

12

1

2

3

allows for such banishment for *any* violation of its terms, rather than specifically limiting banishment to repeat infringers, is immaterial. Pond5 goes beyond the threshold requirement of DMCA by communicating a policy to its users that allows for termination for any infringement.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Courts in the Ninth Circuit have rejected arguments similar to that raised by Plaintiff. For instance, in *Corbis*, the plaintiff argued that Amazon's alleged infringement policy was too vague because it did not include the term "repeat infringer" and did not describe the methodology employed to determine which users would be terminated for repeated copyright violations. *Corbis*, 351 F. Supp. 2d at 1100. Judge Lasnik rejected this argument, stating that "[t]he language of § 512(i) and the overall structure of the DMCA indicate that the user policy need not be as specific as [plaintiff] suggests." *Id*. at 1100. Judge Lasnik noted that the term "repeat infringer" is not defined in § 512(i), nor does the section elaborate on what circumstances merit terminating a repeat infringer. *Id*. at 1101. He further noted that this "open-ended language contrasts markedly with the specific requirements for infringement notices and take-down procedures" set forth elsewhere in DMCA. *Id*. This, Judge Lasnik concluded, demonstrated that Congress was willing to "infuse[] the statute with specific detail when it so chose. The fact that Congress chose not to adopt such specific provisions when defining a user policy indicates its intent to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined." *Id*. With that in mind, Judge Lasnik determined that Amazon had sufficiently conveyed to its users that repeat infringers faced termination because its Participation Agreement prohibited the listing, linking, or posting of any material that violated copyright laws, made clear that those who violated Amazon's policies faced termination, and informed that repeated violations could result in permanent suspension. *Id*.

13

Likewise, in *Perfect 10, Inc. v. CCBill LLC*, the service provider had a policy that stated that in the service provider's discretion it may "disable and/or terminate the accounts of any [] client who is accused of infringing the rights of others." 340 F. Supp. 2d 1077, 1089 (C.D. Cal. 2004) *reversed on other grounds Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 110 (9th Cir. 2007). Based on this language, the court concluded that there was no genuine issue of material fact that the service provider had adopted a policy that allows for the termination of repeat infringers in appropriate circumstances, even though the policy did not use the term "repeat infringer." Here, Pond5's agreements repeatedly exhort against uploading infringing material and warn that a user's access to the website may be terminated at Pond5's sole prerogative. The evidence demonstrates that Pond5 has adopted an infringement policy as required under § 512(i).

Next, Plaintiff argues that even if Pond5 does have a repeat infringer policy, Pond5 cannot demonstrate that it reasonably implemented the policy. Here, Plaintiff argues that Pond5 took no action to prevent infringing activity from occurring on its website prior to ckennedy342 uploading his copyrighted work. For instance, Plaintiff argues, Pond5 admits that "it conducted no review 'at the artist level' to determine whether [a] [c]ontributor of the content owned, or was likely to own, the content being uploaded." Dkt. No. 22 at 12. Indeed, Plaintiff argues, "Pond5 admit[s] that if it had the fraud protection mechanisms in place in 2014 that it has in place now, Pond5 would have flagged ckennedy342 for further review." *Id*. (citing Crary Dep. at 84-85).

Plaintiff's argument fails for at least two reasons. First, the DMCA does not require a service provider to affirmatively investigate whether infringing activity is occurring on its website. *UMG Records,* 718 F.3d at 1024 (quoting 17 U.S.C. § 512(m)) ("Nothing in this section shall be construed to condition the applicability of [DMCA's safe harbors] on ... a service provider monitoring its service or affirmatively seeking facts indicating infringing activity.");

14

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d at 1111 (stating that "a service provider need not affirmatively police its users for evidence of repeat infringement"); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 749 (S.D.N.Y. 2012) (noting the DMCA's explicit repudiation of any affirmative duty on the part of the service provider to monitor its service or to affirmatively seek facts indicting infringing activity). Second, Pond5 put forth evidence that from 2012 to 2016, it received twenty DMCA takedown notices and it removed the challenged content in every instance. *See* Crary Dec. ¶ 26. Plaintiff makes no attempt to refute this evidence. Indeed, Pond5's action in this case demonstrates that it effectively implements its infringement policy. It suspended ckennedy342's user account and removed all of his content from the website within one day of receiving Plaintiff's takedown letter. Accordingly, the Court concludes as a matter of law that Pond5 satisfies the threshold requirements of § 512(i) and may invoke DMCA's safe harbor. *Ellison*, 357 F.3d at 1080.

### 2.      Pond5 qualifies for safe harbor protection under § 512(c)

Having established that it satisfies the threshold requirements under § 512(i), Pond5 must now establish that is eligible for safe harbor protection under § 512(c). As set forth above, § 512(c) provides that a service provider shall not be liable for monetary, injunctive (with one exception that does not apply here), or other equitable relief for storing infringing material at the direction of a user if the service provider: (i) does not have actual knowledge that infringing material is on its system; (ii) is not aware of facts or circumstances from which the infringing activity is apparent; and (iii) acts expeditiously to remove the infringing material upon obtaining such knowledge or awareness. § 512(c)(1)(A)(i)-(iii). In addition, if the service provider "has the

15

right and ability to control [the infringing] activity," it must "not receive a financial benefit directly attributable to the infringing activity." § 512(c)(1)(B).[3]

**a.    § 512(c)(1)(A)(i)-(iii)**

Pond5 asserts that it satisfied § 512(c)(1)(A)(i)-(iii) because it removed the allegedly infringing material one day after it received Plaintiff's DMCA notice. Plaintiff counters that Pond5 is not eligible for safe harbor protection because it was subjectively aware of facts and circumstances that would have made the infringement "objectively" obvious to a reasonable person. Dkt. No. 22 at 14 (quoting *Columbia Pictures Indus. v. Gary Fung*, 710 F.3d 1020, 1043 (9th Cir. 2013)). In other words, Plaintiff argues that Pond5 ran afoul § 512(c)(1)(A)(ii).

In the Ninth Circuit, "actual knowledge [under § 512(c)(1)(A)(i)] turns on whether the provider actually 'subjectively' knew of specific infringement, while the red flag provision [under § 512(c)(1)(A)(ii)] turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person." *Fung*, 710 F.3d at 1043 (quoting *Viacom Int'l v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012))). Thus, a service provider may have "red flag" warning of specific infringement under § 512(c)(1)(A)(ii), but only to the extent the evidence establishes that a service provider "willfully bur[ied] its head in the sand to avoid obtaining … knowledge of specific infringing activity." *BWP Media*, 2015 1538366, *9 (D. Col. March 31, 2015) (quoting *UMG Recordings*, 718 F.3d at 1023).

The only evidence Plaintiff provides of Pond5's alleged willful blindness to ckennedy342's infringing activity is that Pond5 was aware that the individual behind the user name ckennedy342—Hassan Kahn—has previously used an alias to upload infringing nature

---

[3] Plaintiff does not dispute that Pond5 satisfies § 512(c)(1)(C).

16

audio videos to Pond5's website. Plaintiff points out that in 2014, Kahn created a user name "WildAudioProduction" and began uploading nature audio videos to the website. Pond5 became suspicious of WildAudioProductions in May 2014 and shortly thereafter Pond5 tagged both Kahn and WildAudioProduction as infringers and terminated both accounts. Thereafter, the ckennedy342 user account was created with Pond5 in August 2014. It is undisputed that the IP address associated with ckennedy342 is the same IP address in Pakistan that was used by Kahn and WildAudioProduction. In addition, the ckennedy342 account was linked to a Paypal account registered to the name Hassan Khan. These facts, Plaintiff argues, constitute "red flag" awareness of ckennedy342's infringement.

Plaintiff misstates the facts; specifically, it misrepresents the extent of Pond5's knowledge regarding ckennedy342 in 2014. Pond5 admits that it discovered that Hassan Kahn used an alias—WildAudioProduction—in May 2014 and that ckennedy342 created an account in August 2014, but that is the extent of Pond5's knowledge about ckennedy342 in 2014. It did not know that the IP address login for ckennedy342 was the same as the IP address login for Hassan Kahn and WildAudioProduction because Pond5 did not conduct IP address checks in 2014. *See* Crary Dep. 64:3-66:22. Likewise, Pond5 did not know that ckennedy342 was from Pakistan and could not have discovered that information without an investigation—something Pond5 is not required to do under DMCA. *UMG Recordings*, 718 F.3d at 1024. Moreover, Pond5 has presented evidence that even if it had been aware in 2014 that ckennedy342 was from Pakistan, that knowledge would not have indicated the potential for piracy because Pakistan is not a country that is widely considered to be a center for online piracy. *Id*. at 70:21-71:25. Lastly, Pond5 presented testimony that it does not perform a comparison of names used in PayPal or other payment accounts to other contributors to the website. Crary Dec. ¶ 6.

The Ninth Circuit's holding in *UMG Recordings* is illustrative. In that case, copyright holders instituted action against an internet service provider, Veoh Networks, because their protected music videos had been illegally uploaded to Veoh's website. *UMG Recordings*, 718 F.3d at 1024. The copyright holders had argued that Veoh was not entitled to safe harbor protection because it had actual and/or apparent knowledge of the infringement. *Id*. at 1023. As evidence of Veoh's knowledge, the copyright holders pointed to newspaper articles in which Veoh's CEO acknowledged that its website hosted a wide range of unauthorized media content, deposition testimony of the CEO in which he admitted that he was aware that copyrighted material occasionally ended up on the website, emails it received from copyright holders notifying it that their material had been illegally uploaded onto the website, and an email from a Veoh user who was upset that the website rejected his content because it contained infringing material because the user had seen "plenty of [other] copyright infringement material" on the site." *Id*. at 1024-25. The Ninth Circuit concluded that this evidence was insufficient to create a genuine issue of material fact as to whether Veoh had either actual or apparent knowledge that plaintiff's infringing material was on its website. *Id*. at 1026. Here, Plaintiff cites to significantly less evidence of red flag warnings; therefore, this Court is not persuaded that this matter warrants trial.

Next, Plaintiff argues that Pond5 did not expeditiously remove the infringing content upon learning of its existence as is required § 512(c)(1)(A)(iii). Plaintiff concedes that Pond5 removed the allegedly infringing material one day after it received Plaintiff's takedown letter. Nevertheless, Plaintiff argues that Pond5 is not eligible for safe harbor protection because "[c]kennedy342's infringement was apparent and obvious to a reasonable person within days of him creating a username from an IP address in Pakistan previously used by pirates, linking a

18

1    PayPal account with the same name as a previously removed pirate, and uploading 10,000 files."

2    Dkt. No. 22 at 16. Plaintiff argues that these "'facts and circumstances from which infringement

3    was apparent' were evident more than a year before Pond5 finally removed the infringing

4    content." *Id*. However, as discussed above, this Court rejects the notion that Pond5 was aware of

5    these facts in 2014. Simply put, Pond5 has provided sufficient evidence upon which to conclude

6    that it satisfied the requirements of § 512(c)(1)(A)(i)-(iii) and Plaintiff has failed to put forth

7    evidence creating a genuine issue of fact regarding the same.

8                              **b.       § 512(c)(1)(B)**

9          Next, Pond5 must establish that it "does not receive a financial benefit directly

10   attributable to the infringing activity, in a case in which the service provider has the right and

11   ability to control such activity." § 512(c)(1)(B). In the Ninth Circuit, the relevant financial

12   benefit inquiry is "whether the infringing activity constitutes a draw for subscribers, not just an

13   added benefit." *Ellison*, 357 F.3d at 1079; *Fung*, 710 F.3d at 1044 (noting that there must be "a

14   causal relationship between the infringing activity and any financial benefit a defendant reaps").

15   Thus, in *Fung*, the Ninth Circuit found a sufficient connection between the infringing activity

16   and a financial benefit where the plaintiff's income stream derived from advertising and the

17   plaintiff promoted its advertising by pointing to infringing content, attracted visitors to its

18   website who were primarily seeking infringing material (noting that up to 96% of the content on

19   plaintiff's website was infringing), and actively encouraged infringing activity. *Id*. at 1045.

20         Here, Pond5 received between $192.95 and $2,000 for sales from ckennedy342's

21   account. Plaintiff argues that this money constitutes a financial benefit directly attributable to

22   ckennedy's infringing activities. Pond5 counters that there is no evidence that it received a

23   financial benefit, as the term is used in § 512(c)(1)(B), from ckennedy342's infringing activity.

24

25

                                                  19

Pond5 argues that there is no evidence that customers visit its website looking for infringing material. To the contrary, Pond5 claims, unlike the plaintiff in *Fung*, it does not engage in advertising, directly or indirectly, that encourages infringement. Nor does it otherwise encourage infringing activity. In fact, Pond5 argues, its success depends on its reputation in the marketplace for not tolerating infringing activity.

This Court finds *BWP Media USA Inc. v. Clarity Digital Group, LLC* illustrative. In that case, the defendant operated a website where individuals could contribute original pieces of work. One of the contributors uploaded plaintiff's copyrighted photographs and plaintiff instituted legal action against the service provider. 2015 WL 1538366 (D. Col. March 31, 2015). The court granted summary judgment because, among other reasons, there was no evidence in the case that any financial benefit was attributable the infringing activity. The court noted that the "defendant promptly removes infringing content of which it has become aware and has policies directed at curtailing infringing activity. As a result, there are no facts supporting an inference that defendant's revenue stream is in any way predicated on or derived from the availability of infringing material on [defendant's website]." 2015 WL 1538366, *10. Similarly, in the instant case, there is no evidence that any customer has ever visited pond5.com because it hosts infringing content, nor is there any evidence that Pond5 has ever promoted infringing content. Likewise, there is no evidence that Pond5 markets by pointing to infringing conduct, nor is there evidence that pond5.com provides a significant source of infringing content in the marketplace. In short, there is a complete absence of any causal connection between any alleged financial benefit and any infringing activity.

Plaintiff's remaining arguments are unavailing. Plaintiff offers a reading of DMCA that simply collecting revenue from the sale of infringing content, without more, is sufficient to run

afoul of the financial benefit prong of § 512(c)(1)(B). Under this reading, the availability of the safe harbor would be a matter of fortuitous timing. That is, if the service provider was notified of the infringing content before the content was sold to a third-party customer, the service provider may qualify for the safe harbor. If, however, the infringing content was sold before the service provider was notified, the service provider would be barred from invoking the protection because it gained financially from the sale. The Court doubts that Congress intend to infuse such arbitrariness into the statute, especially given that Congress specifically disavowed that a service provider has a duty to monitor for infringing content. Likewise, the Court is not persuaded by Plaintiff's argument that Pond5 somehow receives an advertising benefit from the evaluation copies it allows customers to download for free because those clips are "watermarked with intermittent voice-overs stating 'Pond5.com.'"[4] Dkt. No. 22 at 18. Plaintiff argues that these evaluation copies "serve[] [as] free advertising for Pond5." *Id*. However, Plaintiff produces no evidence to support this allegation.

Because this Court concludes that Pond5 does not gain a financial benefit attributable to infringing activity, it is not necessary for the Court to determine whether Pond5 has the right and ability to control the infringing material. *Corbis*, 351 F. Supp. 2d at 1110.

---

[4] The evaluation copies are short clips of the uploaded media that a potential customer can download in order to determine if he wants to purchase the media.

21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## IV.    CONCLUSION

For the foregoing reasons, the Court HEREBY GRANTS Pond5's Motion for Summary Judgment [Dkt. No. 18].

Dated 25th day of October, 2016.

_Barbara J. Rothstein_
Barbara Jacobs Rothstein
U.S. District Court Judge

22