# EXHIBIT 1

# Deposition of 30(b)(6) Thomas Crary

# Hempton v. Pond5, Inc., et al.

# March 22, 2016



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**

www.buellrealtime.com

Olympia | 360.534.9066    Spokane | 509.624.3261    National | 800.846.6989

email: info@buellrealtime.com



## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

GORDON HEMPTON,           )
                          )
    Plaintiff,            )
                          )
    -v-                   ) CAUSE NO.
                          ) 3:15-CV-05696-DWC
POND5, INC., A Delaware   )
Corporation; and POND5 USER )
CKENNEDY342, A corporation of)
Individual of Type Unknown, )
                          )
    Defendants.           )
_____

DEPOSITION UPON ORAL EXAMINATION

OF

30(b)(6) THOMAS CRARY
_____

Taken at 1000 Second Avenue, Suite 3670

Seattle, Washington

DATE TAKEN: March 22, 2016
REPORTED BY: Nancy M. Kottenstette, RPR, CCR 3377

## Page 2

```
              APPEARANCES
FOR THE PLAINTIFF:
     Roger M. Townsend, Esq.
     Cindy Heidelberg, Esq.
     BRESKIN JOHNSON TOWNSEND
     1000 Second Avenue
     Suite 3670
     Seattle, WA 98104
     206.652.8660
     rtownsend@bjtlegal.com

     Nicholas Power, Esq.
     LAW OFFICES OF NICHOLAS POWER
     540 Guard Street
     Suite 150
     Friday Harbor, WA 98250
     360.298.0464
     nickedpower@gmail.com

FOR THE DEFENDANT:
POND5, INC., A DELAWARE CORPORATION
     Larry E. Altenbrun, Esq.
     NICOLL BLACK & FEIG
     1325 Fourth Avenue
     Suite 1650
     Seattle, WA 98101
     206.838.7555
     laltenbrun@nicollblack.com
ALSO PRESENT: Gordon Hempton
```

## Page 3

                INDEX OF EXAMINATION
                                              PAGE
EXAMINATION
    Questions By Mr. Townsend:                 5
CROSS-EXAMINATION
    Questions By Mr. Altenbrun:              142
REDIRECT EXAMINATION
    Questions By Mr. Townsend:               147


                INDEX OF EXHIBITS
NUM.         DESCRIPTION                      PAGE
Exhibit 1    Notice of Deposition              12
Exhibit 2    Pond5 Org Chart                   12
Exhibit 3    Pond5 Content License Agreement   14
Exhibit 4    Pond5 Contributor Agreement       19
Exhibit 5    Pond5 Terms of Use                20
Exhibit 6    Pond5 Content License Agreement   49
Exhibit 7    Correspondence between Wild       73
             Audio Productions and Pond5
             customer service most recently
             dated 5/5/14

Exhibit 8    Correspondence between Chris      74
             Kennedy and Pond5 most recently
             dated July 3

Exhibit 9    E-mail chain between Mr. Hempton  81
             and Mr. Crary most recently
             dated 10/16/15

## Page 4

Exhibit 10   File sent to Mr. Hempton on       83
             Information on Hassan Khan

Exhibit 11   E-mail chain between Hassan Khan  89
             and Pond5 most recently dated
             1/10/14

Exhibit 12   Frequently asked questions       110

Exhibit 13   Graph (Confidential)             111

Exhibit 14   Payment information to Mr. Khan 115

Exhibit 15   ID verification letters          122

Exhibit 16   Plaintiff's First                124
             Interrogatories and Requests for
             Production of Documents

Exhibit 17   Audible Magic SDK Implementation 128
             Task

Page 5

1      SEATTLE, WASHINGTON; March 22, 2016
2             8:57 a.m.
3
4   THOMAS CRARY,      witness herein, having been
5           first duly sworn on oath,
6           was examined and testified
7           as follows:
8
9             E X A M I N A T I O N
10  BY MR. TOWNSEND:
11      Q  Good morning.  Can you please state your name
12  and spell your last name for the record.
13      A  Thomas Crary, last name, C-R-A-R-Y.
14      Q  And you understand that you've been designated
15  to testify as a corporate representative in the matter
16  of Hempton v. Pond5 in the United States District
17  Court for the Western District of Seattle?
18      A  I do.
19      Q  ==And you understand that today you're==
20  ==designated to testify regarding the facts supporting==
21  ==Pond5's allegation that is entitled to the safe harbor==
22  ==protections under the Digital Millennium Copyright Act==
23  ==and/or 17 U.S.C. Section 512(c); is that right?==
24      A  ==Yes.==
25      Q  Have you had your deposition taken before?

Page 6

1       A  No.
2       Q  So I'll go through a couple of ground rules.
3   One is if you have any questions about my question or
4   if you're unclear in any way, just feel free to ask
5   and I'll clarify if I can.  Do you understand?
6       A  Sure, yes.
7       Q  Okay.  That's the other major rule is you need
8   to answer audibly.
9       A  Yes, yes.
10      Q  And then the other rule is to allow me to
11  finish my questions so that they come to an end, and
12  then, usually, you want to wait a beat in case your
13  attorney wants to insert an objection there.  But just
14  make sure I finish my questions and you listen to the
15  entirety of the question.  And do you understand?
16      A  Yes.
17      Q  And your attorney may object from time to
18  time.  Generally, objections are just done for the
19  record for preservation purposes.  Under rare
20  circumstances, particularly in the area of privileged
21  communications, he may instruct you not to answer the
22  question.  Do you understand?
23      A  Yes.
24      Q  And just to be clear, I'm not interested in --
25  I respect the attorney-client privilege, and to the

Page 7

1   extent you've had communications with Larry or Curt or
2   any other of the attorneys you've had in this case,
3   those are not the subject -- intended subject of my
4   inquiries.
5       A  Yes.
6       Q  Okay.  What's your title at Pond5?
7       A  Chief financial officer.
8       Q  And I'd like to go through a little bit of
9   your background.  Did you graduate from college?
10      A  I did.
11      Q  Where did you graduate from?
12      A  Babson College.
13      Q  What year did you graduate?
14      A  2002.
15      Q  And what was your degree in?
16      A  Bachelor of science in business management,
17  concentration in finance and accounting.
18      Q  And did you obtain any postgraduate education?
19      A  Yeah.
20      Q  Where was that?
21      A  Boston College.
22      Q  And did you get an MBA?
23      A  Masters of accountancy, 2003.  Sorry.  I'm not
24  supposed to answer until you ask a question.
25      Q  It's helpful in the beginning.  Eventually,

Page 8

1   the pacing works better if you stick to the questions,
2   but while we're doing the background, you can probably
3   foresee some of my brilliant questions.  So you got a
4   masters of accountancy.  That was a one-year program?
5       A  Year and a half.
6       Q  And did you sit for a CPA licensing?
7       A  I did.  But I was working during that time as
8   well for most of that year and a half, but, yes, I
9   actually passed the CPA exam before I graduated
10  college.
11      Q  And have you ever been employed as a CPA or
12  worked as a CPA?
13      A  Yes.  I worked at KPMG, LLP.  It's one of the
14  four big accounting firms.
15      Q  Let's go through your employment history
16  starting in -- after you graduated from college in
17  2002.  Where did you first work after college?
18      A  KPMG.
19      Q  And what is your title there?
20      A  I started as an associate.  I worked there ten
21  years in two different departments or two different
22  groups.  The first four and a half years I was an
23  auditor working with SEC registered public companies
24  doing assurance and financial statement auditing.  For
25  the last six years, I worked in the merger and

# EXHIBIT 2

| | |
|---|---|
| **From:** | Jeanette Hendricks |
| **Sent:** | Thursday, April 28, 2016 2:11 PM |
| **To:** | Jamie Telegin; Cindy Heidelberg; Melissa Vizzare; Nick Power; Roger Townsend |
| **Cc:** | Curt Feig; Kaye Smith; Larry Altenbrun |
| **Subject:** | RE: Hempton v. Pond5 - Pond5's Third Supplemental Responses to Plaintiff's First Interrogatories and Requests for Production |
| **Attachments:** | Pond5's Third Supplemental Responses to Plaintiff's First Set of Discovery (00134288).PDF; PON 000531 - 538 (00134276).PDF; Privilege Log for PON 000531-532 (00134287).PDF |

Good afternoon,

Attached please find Pond5's Third Supplemental Responses to Plaintiff's First Interrogatories and Requests for Production, corresponding documents, and privilege log. A thumb drive with audio files (PON 000530) is being delivered to Mr. Townsend this afternoon.

If you have any questions, please feel free to contact Larry Altenbrun, Curt Feig, or me.

Very truly yours,

Jeanette Hendricks
Paralegal
Nicoll Black & Feig PLLC
Puget Sound Plaza
1325 Fourth Avenue, Suite 1650
Seattle WA  98101
Telephone: (206) 838-7549
Facsimile:   (206) 838-7515
E-mail: jhendricks@nicollblack.com

*The information contained in this e-mail message may be privileged, confidential, and protected from disclosure. If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited. If you think that you have received this e-mail message in error, please contact the sender and delete the original message immediately.*

*Nicoll Black & Feig PLLC*

# EXHIBIT 3

| | |
|---|---|
| From: | Roger Townsend <rtownsend@bjtlegal.com> |
| Sent: | Thursday, July 14, 2016 9:21 AM |
| To: | Larry Altenbrun |
| Cc: | Curt Feig; nick power; Jeanette Hendricks; Roger Townsend; Cindy Heidelberg |
| Subject: | RE: Pond5 Litigation - Damages |

Larry:

I will look at your discovery requests. I'm out the last week of July and first week of August, so keep that in mind in your scheduling.

REDACTED - ER 904

There are two important discovery points which are outstanding and about which we need to meet and confer. Are you available on Friday morning at 10 am?

==Specifically, we have the tracks from Ckennedy that you previously provided. However, it appears that the metadata was stripped from the files. Can you advise whether that was done by Pond5? If so, we need versions with the metadata included.==

Additionally, please be advised that we need you to identify the individual end users who downloaded the tracks. We held off on discovery on this point in the hopes of settlement, which has passed.

Also, please include Cindy in your emails on this case.

Roger

From: Larry Altenbrun [mailto:laltenbrun@nicollblack.com]
Sent: Wednesday, July 13, 2016 2:30 PM
To: Roger Townsend <rtownsend@bjtlegal.com>
Cc: Curt Feig <cfeig@nicollblack.com>; nick power <nickedpower@gmail.com>; Jeanette Hendricks <jhendricks@nicollblack.com>
Subject: Pond5 Litigation - Damages

Dear Roger:

We will be sending over some written discovery requests today or tomorrow. They include several requests associated with damages. I am writing to see if you might be willing to share some of that information before these discovery requests are due. Providing this information to us now might help facilitate settlement discussions. In particular, during mediation, we were informed that the plaintiff's opening demand for $1.71 million included statutory damages for 114 tracks that were sold and an award of $15,000 per track. Can you provide us with any information or documents supporting these numbers? Do you have a list of the 114 tracks? Are there any documents that might help us

# EXHIBIT 4

# Deposition of 30(b)(6) Thomas Crary - Vol. II

# Hempton v. Pond5, Inc., et al.

# August 16, 2016



1325 Fourth Avenue • Suite 1840 • Seattle, Washington 98101

**206.287.9066**

[www.buellrealtime.com](www.buellrealtime.com)

Olympia | 360.534.9066    Spokane | 509.624.3261    National | 800.846.6989

email: info@buellrealtime.com



Page 164

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
------------------------------------------X
GORDON HEMPTON,
           Plaintiff,
    -against-
POND5, INC., A Delaware Corporation;
and POND5 USER CKENNEDY342, A
Corporation or Individual of Type
Unknown,

           Defendants.

CASE NO.: 3:15-CV-05696-DWC
------------------------------------------X

            126 East 56th Street
            New York, New York

            August 16, 2016
            9:10 a.m.

    DEPOSITION of 30(b)(6) THOMAS CRARY - VOL. II
before Melissa Gilmore, a Shorthand Reporter and
Notary Public of the State of New York.

Page 165

1   A P P E A R A N C E S:
2
3   BRESKIN JOHNSON TOWNSEND PLLC
4   Attorneys for Plaintiff
5       1000 Second Avenue, Suite 3670
6       Seattle, Washington 98104
7   BY:  ROGER M. TOWNSEND, ESQ.
8        PHONE 206-652-8660
9        E-MAIL rtownsend@bjtlegal.com
10
11
12  NICHOLAS POWER, ESQ.
13  Co-Attorneys for Plaintiff
14      540 Guard Street, Suite 150
15      Friday Harbor, Washington 98250
16      PHONE 360-298-0464
17      E-MAIL nickedpower@gmail.com
18
19
20
21
22
23
24
25

Page 166

1   A P P E A R A N C E S:  (Cont'd)
2
3   NICOLL BLACK & FEIG
4   Attorneys for Defendant POND5, A Delaware
5   Corporation
6       1325 Fourth Avenue, Suite 1650
7       Seattle, Washington 98101
8   BY:  LARRY E. ALTENBRUN, ESQ.
9        PHONE 206-838-7555
10       E-MAIL laltenbrun@nicollblack.com
11
12
13  ALSO PRESENT:
14      GORDON HEMPTON
15      DAVID S. ROSEN, General Counsel for POND5
16
17
18
19
20
21
22
23
24
25

Page 167

1   ------------------ I N D E X ------------------
2   WITNESS          EXAMINATION BY         PAGE
3   THOMAS CRARY     MR. TOWNSEND           168
4
5
6   ---------------- E X H I B I T S ----------------
7   PLAINTIFF'S   DESCRIPTION            FOR I.D.
8   Exhibit 18   Plaintiff's Fourth         169
9                Amended Notice of
10               30(b)(6) Deposition
11  Exhibit 19   E-Mail Exchange Between    224
12               Nicholas Power and Mike
13               Pace
14  Exhibit 20   Declaration of Gordon      240
15               Hempton, dated August 3,
16               2016
17
18
19
20
21
22
23
24
25

1 (Pages 164 to 167)

Page 168

```
 1   T H O M A S   C R A R Y,   called as a
 2       witness, having been duly sworn by a
 3       Notary Public, was examined and testified
 4       as follows:
 5
 6   EXAMINATION BY
 7   MR. TOWNSEND:
 8       Q.   Good morning, Mr. Crary.
 9       A.   Good morning.
10       Q.   Nice to see you again.
11       A.   Thanks.
12       Q.   You recall the deposition
13   admonishments that we went through before, last
14   time.  This is a continuation deposition.  So I
15   won't go through those again, other than if you
16   have any questions about my questions or
17   they're unclear in any way, please ask me and
18   I'll clarify them.
19            Do you understand?
20       A.   Yes.
21       Q.   And then the other key one to
22   remember is make sure you respond audibly.
23            You understand?
24       A.   Yes.
25       Q.   And the other one, which is often
```

Page 169

```
 1   hard for people to remember, is make sure I
 2   finish my question before you start your
 3   answer.
 4            You understand?
 5       A.   Yes.
 6       Q.   And that, you know, unless your
 7   attorney instructs you not to answer, you're to
 8   answer any questions that we provide -- that I
 9   ask.
10            You understand?
11       A.   Yes.
12       Q.   Okay.  You've been designated as the
13   CR 30(b)(6) deponent for Pond5; is that right?
14       A.   Yes.
15            (Plaintiff's Exhibit 18, Plaintiff's
16       Fourth Amended Notice of 30(b)(6)
17       Deposition, marked for identification.)
18       Q.   And I have handed you what's been
19   designated as the -- identified as the Fourth
20   Amended Notice of 30(b)(6) Deposition.
21            Do you recognize this document?
22       A.   Yes.
23       Q.   And you've been previously deposed
24   regarding subject matter 25, "The facts
25   supporting Pond5's allegation that it is
```

Page 170

```
 1   entitled to the safe harbor protections under
 2   the Digital Millennium Copyright Act," and you
 3   previously testified about that; is that right?
 4       A.   Yes.
 5       Q.   And that you're here today to
 6   testify about the remaining subject matters
 7   designated in this deposition; is that right?
 8       A.   Yes.
 9       Q.   I would like to start with
10   identifying and asking you about who are
11   Pond5's customers.  And when I say customers, I
12   am referring to end users that download files
13   from the Pond5 system.
14            Is customers an appropriate term of
15   art that you use?
16       A.   Sure.
17       Q.   And who would you say are your
18   largest customers by volume of files?
19            MR. ALTENBRUN:  Objection, beyond
20       the scope.
21       A.   In terms of the names of them or in
22   terms of their characteristics?
23       Q.   Well, I would like both, but let's
24   start with the types of entities that are --
25   that are your largest customers by volume.
```

Page 171

```
 1       A.   Sure.  It's what we consider it to
 2   be a long tail business, which means there's a
 3   wide, wide variety of customers that spend
 4   small amounts of money to medium amounts of
 5   money to large amounts of money.  Actually,
 6   year to year, it's not very predictable.  Our
 7   top customers vary year to year, depending on
 8   what projects they may have going on.
 9            So we have over 150,000 customers
10   every year.  The largest of those, which still
11   doesn't make up -- you know, so it depends how
12   want to make it down, but say our top thousand
13   or so, you know, still don't make up a large
14   percentage of our revenue.  It's still a very,
15   very small percentage, but -- sorry.
16       Q.   No.  Go ahead.  I don't want to
17   interrupt you.
18       A.   But in terms of characteristics,
19   typically the largest of those customers would
20   be production companies that produce -- use
21   media content that they're licensing for -- as
22   part of a larger project or, you know,
23   production that they're putting together.
24            So typically a movie, an
25   advertisement, TV show, a YouTube production.
```

2 (Pages 168 to 171)

Page 244

```
 1  which I'm aware of, we have been able to reach
 2  a settlement agreement with the infringed
 3  parties where they agreed to release the
 4  licenses.
 5          MR. TOWNSEND:  Let me confer with my
 6  co-counsel.  We will take a short break.
 7          (Recess taken.)
 8  BY MR. TOWNSEND:
 9      Q.  Just to go back with a couple of
10  clarification questions over what we talked
11  about before.
12          Is there anyone in particular -- you
13  mentioned the three people responsible for
14  curatorial review of sound and audio.
15          Is there anyone in particular who
16  focuses or specializes or emphasizes in sound
17  effects?
18      A.  No.
19      Q.  And you mentioned a two-third,
20  one-third distribution.  That would just be
21  randomly assigned amongst the three?
22      A.  Based on the queue volumes.
23      Q.  How are files assigned to individual
24  curators?
25      A.  There is a queue that sorts it by
```

Page 245

```
 1  artist and date of upload, and we basically
 2  just work down the list.  So whichever is at
 3  the top of the list, you pick it.
 4      Q.  So it's random --
 5      A.  Basically random, yes.
 6      Q.  -- as to which of the three?
 7      A.  Yes, yes.
 8      Q.  And I ask you this as a
 9  clarification question about you -- as you sit
10  here today, are you aware of any customer that
11  bought any file from the CKennedy342 user?
12          MR. ALTENBRUN:  Objection, beyond
13  the scope.
14      A.  By name?
15      Q.  Yeah.
16      A.  No.
17      Q.  And you've also talked before or you
18  testified before regarding the association of
19  CKennedy342 with Mr. Hassan Kahn in Pakistan,
20  right?
21      A.  Yes.
22      Q.  And you had identified, in your
23  review, other Pond5 accounts that were
24  associated with Mr. Kahn, right?
25      A.  Potentially.
```

Page 246

```
 1      Q.  And did you conduct any
 2  investigation of any end user for any of the
 3  associated accounts that were potentially
 4  associated with Mr. Kahn?
 5          MR. ALTENBRUN:  Object to form, and
 6  objection, beyond the scope of this
 7  deposition.
 8      A.  No.  Again --
 9      Q.  Wait.  No, you don't understand the
10  question or --
11      A.  No, I understand the question.  And
12  no, we did not conduct any analysis of the
13  customers or the license usages that any of the
14  customers would have bought or may have bought.
15          Again, in that case, there was
16  actually no complaint of potential
17  infringement.  We surfaced that ourselves and
18  took it down out of abundance of caution.
19      Q.  And you surfaced that before
20  CKennedy342 came on your system?
21      A.  Correct.
22          MR. ALTENBRUN:  Object to form and
23  beyond the scope.
24          MR. TOWNSEND:  Larry, let's pull up
25  the spreadsheet, PON000539.
```

Page 247

```
 1          MR. ALTENBRUN:  Sure.
 2          MR. TOWNSEND:  Let's go off the
 3  record for a second.
 4          (Discussion off the record.)
 5  BY MR. TOWNSEND:
 6      Q.  Mr. Crary, you have in front of you
 7  the spreadsheet, which has been Bates numbered
 8  PON00539.
 9          Do you know what this document is?
10      A.  Yes.
11      Q.  What is this?
12      A.  This is a scrape of the metadata
13  that is associated with the files directly from
14  Amazon Web Services where the files reside.
15      Q.  Okay.  You're going to have to go
16  through a few steps there.
17          So which files are included in the
18  spreadsheet?
19      A.  I believe it's all of Ckennedy's
20  files that are online or were online, I should
21  say.  Yeah, 10,243 files.
22      Q.  And when you say online or were
23  online, what do you mean by that?
24      A.  These are all the files he uploaded.
25      Q.  Okay.  And online, meaning all the
```

21 (Pages 244 to 247)

Page 248

1 files that were uploaded onto the Pond5 system?
2     A.   Yes.
3     Q.   Okay.  And where do you store them
4 or were are they located?
5     A.   Amazon Web Services, AWS for short,
6 is our outsourced hosting company.
7     Q.   Being from Seattle, we know them
8 well.
9          Describe the process of -- you said
10 scraping.  Describe that process, what you mean
11 by that.
12     A.   Files have associated file system
13 metadata that gets tagged onto them at
14 different steps of interactions which different
15 systems.  That metadata is generally, you know,
16 left in place, although it can be wiped off by
17 a user pretty easily.  It sometimes is
18 automatically wiped off by certain editing
19 systems, from what I understand, but whatever
20 metadata remains stays with the file, and it
21 can be, what we say, scraped off, which
22 basically means use an extraction tool to pull
23 the metadata into a, in this case, CSV file for
24 easy reading.
25     Q.   Does the scraping process modify the

Page 249

1 metadata in any way?
2     A.   Not that I'm aware of.
3     Q.   Did the scraping process capture, to
4 your knowledge, all of the available metadata
5 associated with the Ckennedy files?
6     A.   I've been doing a fair amount of
7 work on this, more than I would like, so I've
8 learned a lot about it.  One thing I've learned
9 since doing this particular exercise is,
10 depending on the extraction tool you use, you
11 sometimes will get different -- different
12 fields that can come up.
13          So I've tried four or five different
14 tools, and I've gotten different results in
15 different -- from the different tools, which is
16 interesting.
17     Q.   Can you identify, to the best of
18 your recollection, the tools that you've used?
19     A.   I really can't.  If you do a Google
20 search for EXIF data or metadata extraction
21 tools, you'll get a bunch of Google results.
22 My developers and myself have tried three or
23 four different versions, mostly just via that
24 Google search approach.
25          The one that we used here is the one

Page 250

1 that we have built into the site.  This is the
2 same information that you would normally
3 extract from the file upon upload.
4     Q.   Built into the site.  Are you
5 talking about the Amazon Web Services site
6 or --
7     A.   Built into the Pond5 site.  So
8 Amazon Web Services hosts our content.  Our
9 production site, so where the code sits, is
10 hosted actually by a different company, and
11 that's the extraction tools built into that
12 production site.
13     Q.   What company is that?
14     A.   Rimmu Hosting, R-I-M-M-U.
15     Q.   I'm just going to -- we have done
16 that Google search, and I'm just going to
17 identify a couple and see if they refresh your
18 recollection.
19     A.   Sure.
20     Q.   And if they don't, they don't.
21          There is an EXIF Data Viewer, did
22 you use that tool?
23     A.   I think this is going to be a
24 fruitless exercise.  I remember one we did
25 yesterday was Mediaarea.net.  That was one we

Page 251

1 did yesterday.  So I remember that one.
2     Q.   And this is information that would
3 be easy to recreate, right?  You just don't
4 have it off the top of your head.
5     A.   Yeah.  I mean, sure.  I probably
6 still have a few of them on my computer.
7     Q.   Okay.  And other than the files that
8 are included in the use of this extraction tool
9 that you used in this exhibit -- or not
10 exhibit, this document that you have produced,
11 what other fields were you able to view that
12 weren't included in this production?
13          MR. ALTENBRUN:  Object to form.
14     Q.   You understand what I'm asking?
15 What other information did you get from your
16 other searches?
17     A.   So it really depends on which files
18 you're looking at, right?  So we didn't do this
19 approach -- what we did here is we wrote a
20 script, which was using the site, right?  So we
21 did it 10,000 times.  If you download one of
22 those things, you got to do it one by one.  You
23 have to download the file and look at it,
24 download the file, look at it.
25          So we did a handful just to see what

Page 252

1  would come up.  See if there were differences
2  in the metadata that was being extracted, and
3  there was some differences.  You know, as far
4  as I'm concerned, there wasn't a whole lot of
5  useful information that came out of that.
6  There wasn't something that said Hempton, or
7  anything along those lines, that came up in the
8  files we looked at, but there were different
9  fields.
10         Interestingly, they didn't have some
11 of these like creation date and the dating
12 files that you see here, but they did have
13 fields that were sometimes filled in and
14 sometimes not, things like composer, producer,
15 date of recording.  Things like that.
16     Q.   Date of reporting?
17     A.   Date of recording.  And it was just
18 a year.  So it was year of recording maybe, but
19 it never had like a date.  It was more like a
20 year.
21     Q.   And I've reviewed this file, and
22 that's one thing that's stuck out to me, there
23 isn't a creation date on this production.
24 Did I miss that?
25         MR. ALTENBRUN:  When you say this

Page 253

1  production, are you referring to document
2  00539?
3          MR. TOWNSEND:  Yes, thank you for
4  clarifying, Counsel.
5      A.   That's true.  They have modified
6  date, change date and access date.  It looks
7  like the three dates that are coming up.
8          Like I said, there was no date on
9  the other version.  It was just a year.  So it
10 is different.
11     Q.   Say that again?
12     A.   It was just a year.  So that, you
13 know, like 2014, not month, time stamp kind of
14 stuff.
15     Q.   Okay.  Did you review or -- you
16 mention whether or not certain extraction tools
17 or certain tools for reviewing metadata will
18 include the composer, the producer; is that
19 right?
20     A.   They include fields that can and may
21 have names or dates or whatever, have data in
22 those fields.  I'm not saying they had complete
23 fields.
24     Q.   Right.  Do you view it as -- well,
25 is composer or producer or any -- strike that.

Page 254

1      Q.   Would you agree that metadata may
2  include information related to the creator of
3  content?
4      A.   It may.
5      Q.   And would you agree that it would be
6  helpful in your curatorial review process to
7  determine whether or not the creator of the
8  content was the person who uploaded the
9  content?
10         MR. ALTENBRUN:  Object to form, and
11 objection, beyond the scope.
12     A.   I'm sorry.  Are those two concepts
13 linked where you look at the metadata and that
14 determines whether they are the creator of the
15 content?  Is that what you're suggesting?
16     Q.   I'm suggesting that it would be
17 valuable information in your curatorial review
18 to determine whether or not the person who
19 uploaded the content is the person who's
20 identified in the metadata as the creator of
21 the content?
22         MR. ALTENBRUN:  Objection, calls for
23 speculation and beyond the scope.
24     A.   So when I've looked at this data, I
25 have yet to see information that is actually

Page 255

1  linked to the creators' names.  So I've looked
2  at a sample of items from Ckennedy and other
3  users that are on our site, downloaded their
4  raw unmodified files, and I have not seen a
5  whole lot of metadata that would associate the
6  file with a user name -- with a user.
7      Q.   Okay.
8      A.   I'm not saying it's never there, but
9  I'm saying the sample I looked at it's rarely,
10 if ever, there.
11     Q.   Okay.  But would you agree that it
12 would be helpful in your curatorial review to
13 determine whether or not the creator of the --
14 strike that.
15         You mentioned before that certain
16 metadata has fields for composers or producer,
17 correct?
18     A.   It has fields that can have
19 information potentially in them.
20     Q.   So in instances in which there is
21 information in those fields, composer or
22 producer, would it be helpful in your
23 curatorial review to compare the composer or
24 producer with the person who's uploaded the
25 content?

Page 256

```
 1        MR. ALTENBRUN:  Objection, lack of
 2   foundation, calls for speculation and
 3   beyond the scope.
 4        A.   Yeah, it strikes me as speculative
 5   as well because, again, I haven't seen
 6   instances where this data is available.
 7        Let's assume for a second it is
 8   available every single time, just for
 9   assumption purposes, why would I be led to
10   believe that that information is any more --
11   the veracity of that information is any more
12   reliable than the uploader itself.  Anyone can
13   add their name in metadata to one of these
14   things.
15        Q.   Right.  But if the person who
16   uploads the content is different than the
17   producer or creator, that would be valuable
18   information to know, wouldn't it?
19        MR. ALTENBRUN:  Objection, calls for
20   speculation, lack of foundation, beyond
21   the scope.
22        A.   What if -- can I ask you a question?
23   I'm not sure I'm allowed to, but I'm going to
24   try anyway.
25        What if that contributor that is
```

Page 257

```
 1   uploading it was not the original producer or
 2   composer of the information, but they did hold
 3   a valid license to be able to sublicense it out
 4   through our marketplace?  Would that be an
 5   acceptable answer to the dilemma you're
 6   proposing?
 7        MR. ALTENBRUN:  You're not allowed
 8   to ask questions.
 9        A.   I'm just trying to figure out what I
10   can do about it.  So like in the very seemingly
11   rare case where I have ever seen this
12   information that has --
13        Q.   You don't review the content -- you
14   don't review that information?
15        A.   We don't review that as part of our
16   curatorial step.
17        Q.   So you don't really know how often
18   it occurs, right?
19        A.   Only because I've sampled it at the
20   request of you guys.  So trying to figure out
21   exactly what is there, I've now done a sample
22   of both Ckennedy's work and other artists as
23   well to see what would be there in whatever
24   circumstances, and what I found is it's very
25   rarely anything there that's useful.
```

Page 258

```
 1        Q.   How broad is that sample?
 2        A.   Not very broad.  I mean, we're
 3   talking in the tens.
 4        Q.   So just to get back to the question
 5   because I don't think you've answered it.
 6        Would it be helpful information to
 7   you do you believe --
 8        A.   No.  Sorry.
 9        MR. ALTENBRUN:  Let him ask the
10   question.
11        Q.   -- in your curatorial review to
12   review who is identified in the metadata as the
13   producer or composer of audio content and
14   compare that information to the person who
15   uploaded the content on your website?
16        MR. ALTENBRUN:  Objection, lack of
17   foundation, beyond the scope and calls for
18   speculation.
19        A.   Yeah, I really don't think so.
20   Again, you get a series of misleading and false
21   positive answers that would not be helpful to a
22   curator that has two, three seconds to review a
23   sound effects file.
24        Q.   And taking aside how much time
25   you're willing to spend on it, that information
```

Page 259

```
 1   could be valuable, couldn't it?
 2        MR. ALTENBRUN:  Objection, asked and
 3   answered.  Same objections as last
 4   question.
 5        A.   I have not come across a situation
 6   in my review where the information was helpful
 7   at all in determining who the copyright holder
 8   of the information legitimately was.
 9        Q.   Right.  We know the scope of your
10   review to date, but it surprises me that that
11   wouldn't be relevant if there is data about the
12   owner of content and you're in the process of
13   doing a curatorial review that you wouldn't
14   want to investigate that data and determine
15   what that is and that that could be done
16   through an automated process.
17        MR. ALTENBRUN:  That's not a
18   question.
19        MR. ROSEN:  You didn't say that,
20   right?
21        MR. ALTENBRUN:  That's not a
22   question.  There's no response needed.
23   Counsel let's move on, please.
24        MR. TOWNSEND:  I'm not moving on.
25        MR. ALTENBRUN:  State a question
```

Page 260

1     instead of a comment.
2  BY MR. TOWNSEND:
3     Q.   So is it your position that it is
4  irrelevant whether or not the composer or
5  producer of content identified in metadata on
6  files is different or the same as the entity
7  that uploaded the content?
8          MR. ALTENBRUN:  Objection, beyond
9     the scope, lack of foundation, calls for
10    speculation and object to form.
11    A.   Would it help if I gave an example
12 from one of my samples?
13    Q.   Well, answer the question I think.
14    A.   Maybe I can answer the question in
15 the form of my example.
16         So Mr. Doug Price, who is -- who I
17 think Mr. Hempton knows and was the -- was the
18 subject of this letter here or started this
19 correspondence between Mr. Hempton and Pond5,
20 is one of our contributors, Pro Sound Effects.
21 They contribute lots of content to our site.
22         I looked at some of their stuff
23 through the same EXIF extraction tool
24 yesterday.  Now, nowhere on any of the items
25 that I sampled through Pro Sound Effects was

Page 261

1  the name Pro Sound Effects found in the
2  metadata.  I saw various other names, including
3  Bridge Broadcasting Company, BBC.
4          Am I, as a curator, to then assume
5  that he doesn't hold the copyright or the
6  ability to license that to one of our
7  customers?  I'm not allowed to ask you a
8  question, so I'll will keep going.
9          My position is there is very rarely
10 that data in there ever that would even be
11 useful.  And in the event that it is, it can
12 send you on a wild goose chase.
13         And taking a step back, where I do
14 have to get through 3,000 sound effects a day,
15 and I only have two, three seconds to review,
16 and this process is not automated, it's an
17 extraction tool where you have to, you know,
18 download the file, import into this tool and do
19 the metadata, and then make a conclusion on it.
20 I don't think that's reasonable or helpful.
21    Q.   And do you think it's an indicator
22 of the proprietariness of content whether or
23 not metadata has been stripped from that
24 content?
25         MR. ALTENBRUN:  Objection, lack of

Page 262

1     foundation.  Object to form and beyond the
2     scope.
3     A.   No, again, based on my sampling,
4  there were lots of -- lots of -- lots of
5  examples where there was very little or no
6  metadata still associated with the files that
7  you would normally expect to be there if it was
8  direct from a composer or whatever you're
9  suggesting.
10    Q.   And are there any -- I mean, you
11 haven't conducted much review of this, but is
12 it possible that metadata would contain, for
13 example, a copyright registration number?
14         MR. ALTENBRUN:  Objection, beyond
15    the scope and lack of foundation.
16    A.   I have not come across any instance
17 in my, albeit, limited review of a copyright
18 number of any kind.
19    Q.   And Pond5 doesn't review for that
20 information, does it?
21    A.   No.
22    Q.   Does Pond5 modify metadata on the
23 files that are uploaded onto its website as a
24 matter of practice?
25    A.   No.

Page 263

1     Q.   Does it add any metadata?
2          MR. ALTENBRUN:  Objection, lack of
3     foundation.
4     A.   Not to the file itself.  We don't
5  add any metadata to the file itself.
6     Q.   What distinction are you making?
7  What metadata do you add?
8     A.   We store data in our database.
9  That's metadata that's associated with the file
10 itself, but the actual file is stored in its
11 original unaltered form from what we have
12 gotten.
13         Amazon Web Services is like a hard
14 drive.  You make a copy when it comes from the
15 contributor, and it gets onto our site.  That
16 copy sits there forever in its unaltered form,
17 and that copy is what's available for download
18 by our customers.
19    Q.   Do you review that metadata as part
20 of your curatorial review process at all?
21    A.   No.
22    Q.   And did you review -- let me go
23 down.
24         If you look on 539 and just search
25 for QP, for Quiet Planet.  What file do you see

Page 264

```
 1  there?
 2      A.  The first file is on line 9,787, and
 3  it looks like it's QP050473, surf rock, jetty
 4  splash.
 5      Q.  And are you aware, as you sit here
 6  today, that that QP identifier is a product
 7  identifier for Quiet Planet content?
 8      A.  I'm seeing the QP, and I'm now
 9  suspicious.
10      Q.  I will represent to you if you do a
11  Google search on those QP numbers that you end
12  up at the Quiet Planet website.
13      A.  Okay.
14      Q.  Is that a process that Pond5 has
15  undertaken at any time, meaning Google
16  searching the metadata fields for who might be
17  the owner of the Ckennedy content?
18          MR. ALTENBRUN:  Objection, beyond
19      the scope and lack of foundation.
20      A.  I have been to Mr. Hempton's
21  Soundtracker website.  I haven't looked at the
22  file extensions that were included in his
23  files.
24      Q.  Okay.  At any time did Pond5 do a
25  Google search on the file names as uploaded and
```

Page 265

```
 1  identified by CKennedy342 at all?
 2          MR. ALTENBRUN:  Objection, beyond
 3      the scope and calls for speculation.
 4      A.  So I take this QP number and then --
 5      Q.  Or take surf rock, jetty splashy.
 6          MR. ALTENBRUN:  Same objections.
 7      A.  No.
 8      Q.  Okay.  Have you conducted any -- has
 9  Pond5 conducted any investigation into the fact
10  that the file names, as uploaded by
11  CKennedy342, are identical to the file names
12  used by Mr. Hempton to identify his content?
13      A.  No.  I didn't -- this is the first
14  I've seen this link.  So I guess I didn't
15  scroll all the way through the 9,787 lines to
16  get to this number.
17      Q.  And did you do any Google searching
18  on just the file names as identified by
19  Mr. Kahn operating as CKennedy342?
20      A.  Only after the fact.
21      Q.  And what did you determine when you
22  did that?
23      A.  I think I found at least one link to
24  a YouTube account for -- I can't remember the
25  name of the site.  I don't remember, but there
```

Page 266

```
 1  was one like sort of exact file name.  In fact,
 2  it was the longest clip.  There was like a
 3  30-minute clip on the site.  It was linked to
 4  some YouTube account.  It wasn't clear who the
 5  owner was of the site either.  It looked like
 6  it was some sort of free sound effects that
 7  they were providing under fair use.
 8      Q.  Okay.  And I think -- I'm not sure
 9  fair use is the term you want to use there.
10      A.  I think that's what they were
11  saying.
12      Q.  But -- so I'll represent to you that
13  in our review of the names of the Ckennedy
14  files, the thing that has become apparent is
15  the names of the Ckennedy files are identical
16  to the Ckennedy -- the files used by
17  Mr. Hempton.
18          And has Pond5, to your knowledge,
19  conducted any analysis comparing the file names
20  used by Ckennedy and the file names used by
21  Mr. Hempton?
22          MR. ALTENBRUN:  Objection, beyond
23      the scope and lack of foundation.
24      A.  So we have been talking for almost a
25  year now.  You know, I think the first
```

Page 267

```
 1  communication is here in front of us in May of
 2  2015, where it was alleged that there were
 3  thousands of Mr. Hempton's files online.  This
 4  is the first instance where there was ever a
 5  link, which was never explained to us how we
 6  could even determine where these files would
 7  reside after a year.
 8          So no, as I sit here today, this is
 9  the first time someone has represented to me
10  that this QP designation is a link that we can
11  and should make to our files.
12      Q.  Right.  And the question I'm asking
13  now is about the fact that, related to my
14  representation that the file names as used by
15  Ckennedy, are the same as the file names as
16  used by Mr. Hempton.
17          So that would just be a Google
18  search of, you know, for example, you know,
19  impact cardboard box hard, and I take that as a
20  random example.
21          So the question is, at any time did
22  Pond5 do a Google search on the names used by
23  CKennedy342?
24      A.  So I go through the 10,000 tracks,
25  pick out one, like impact cardboard box, and do
```

Page 268

```
 1   a Google search on that?
 2       Q.  Yes.
 3       A.  No.
 4       Q.  I have one more line of questioning,
 5   and I want to follow up on some comments from
 6   my client, but let me go through the evaluation
 7   license issue and then take a break, and we
 8   will wrap up.
 9           So I wanted to go back over the
10   issue of the -- or the treatment of evaluation
11   licenses by Pond5.
12           Just for the record, can you
13   describe how evaluation files are download and
14   made available to end users?
15           MR. ALTENBRUN:  Objection, beyond
16       the scope and object to form.
17       A.  So I think what you're referring to
18   is the previews that are available through the
19   site?
20       Q.  Right.
21       A.  So customers that are previewing
22   content of any media type, you know, in this
23   case we're talking about a sound effect, can go
24   onto the site, search for the search term
25   they're interested in finding, and then preview
```

Page 269

```
 1   a compressed version of the file with audio
 2   watermarking attached to it.
 3       Q.  So two questions.  One is what is
 4   the audio watermark that's put on there, and
 5   has that changed in the last year?
 6           MR. ALTENBRUN:  Objection, beyond
 7       the scope.
 8       A.  I think we did change it a few
 9   months ago.  It used to say, "Pond5.com."  Now,
10   it just says, "Pond5."
11       Q.  Let the record reflect that was done
12   in an English accent.
13       A.  Actually it was Dani DiCiaccio.
14       Q.  And you mentioned that they're
15   compressed files.
16           Has that always been the case?
17       A.  Yes.
18       Q.  And describe what you mean by
19   compressed files.
20           MR. ALTENBRUN:  Objection, beyond
21       the scope.
22       A.  So the bit rate of a full
23   uncompressed wave file is 1.4-megabytes per
24   second, megabits per second, and these files
25   are compressed to 120 kilobits to 192,
```

Page 270

```
 1   somewhere in that range, depending on the -- I
 2   don't even know what actually, but how they're
 3   compressed for both, you know, speed of loading
 4   as well as to prevent piracy.
 5       Q.  Do you track the user identity of
 6   anyone who's downloaded a -- well, strike that.
 7           When you download a sample, it's an
 8   evaluation license or sample version, right?
 9       A.  Yeah.
10       Q.  Is that downloaded onto a hard drive
11   so the user can use it and modify it?
12           MR. ALTENBRUN:  Objection, beyond
13       the scope and object to form.
14       A.  No.  No.  To my knowledge, I don't
15   think it -- at least it wouldn't be easily done
16   where you could actually download it to your
17   computer.  It's a preview that plays through
18   the browser.
19           It wouldn't surprise me if there's
20   some particularly engineering people out there
21   that have a way of getting such evaluation
22   licenses to their computer.  I, you know,
23   personally wouldn't know how to do it.
24       Q.  And do you track the user identity
25   that are subject to the evaluation license?
```

Page 271

```
 1           MR. ALTENBRUN:  Objection, beyond
 2       the scope.
 3       A.  We endeavor to track it for, you
 4   know, business intelligence purposes.  We have
 5   had some spotty data on it.  You know, the
 6   tracking mechanisms have to be very
 7   consistently applied to all the different
 8   items.
 9           So we endeavor to track it, and it's
10   one of the areas we're trying to, you know, be
11   able to track consistently.
12       Q.  Do you know whether anyone has -- or
13   anyone at any time has entered into an
14   evaluation license for any of the CKennedy342
15   content?
16           MR. ALTENBRUN:  Objection, beyond
17       the scope.
18       A.  I have not looked at the data
19   associated with these files.
20       Q.  Okay.  And so you don't know if
21   that's -- that data exists; is that right?
22           MR. ALTENBRUN:  Objection, beyond
23       the scope.
24       A.  I don't know if it exists.
25       Q.  And just looking at the Pond5
```